Scott McKay (ISB #4309)
Nathan Pittman (ISB #9430)
**NEVIN, BENJAMIN & MCKAY LLP**
303 W. Bannock Street
Boise, ID 83702
Tel.: (208) 343-1000
Fax: (208) 345-8274
Email: smckay@nbmlaw.com
Email: npittman@nbmlaw.com

*Local Counsel for Lead Plaintiffs Ofi Invest Asset Management, on behalf of Ofi Invest Actions Amérique, and Oklahoma Police Pension and Retirement System, and the Class*

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**DISTRICT OF IDAHO**

| | |
|---|---|
| OFI INVEST ASSET MANAGEMENT, ON BEHALF OF OFI INVEST ACTIONS AMÉRIQUE, and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LAMB WESTON HOLDINGS, INC., THOMAS P. WERNER, and BERNADETTE M. MADARIETA,<br><br>Defendants. | Case No. 1:24-cv-00282-DCN-CWD<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page(s)**


I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 9

III. PARTIES .......... 10

A. Plaintiffs .......... 10

B. Defendants .......... 11

IV. SUMMARY OF DEFENDANTS' FRAUD .......... 12

A. Lamb Weston's Business .......... 12

1. Lamb Weston's ERP Implementation and Win-As-One Initiative .......... 14

B. Lamb Weston Touts the Benefits of its New ERP System While Concealing Significant Problems with its Planning, Testing, and Implementation .......... 19

1. At the Beginning of the Class Period, Defendants Confirm Lamb Weston Will Launch the ERP .......... 20

2. Lamb Weston's ERP Launch is Broadly Described as Successful Despite Serious Undisclosed Order and Inventory Problems .......... 42

3. Lamb Weston's ERP Transition Causes Loss of Business as Key Customers' Orders Cannot be Fulfilled .......... 49

C. Defendants Misrepresented Lamb Weston's Growth and Pricing Environment .......... 51

1. Lamb Weston's Growth is Reversed by the Coronavirus Pandemic .......... 51

2. The Frozen Potato Market Was Not Competitive During the Class Period and Price Increases Were Not Correlated to "Inflation" .......... 52

V. THE TRUTH IS REVEALED .......... 62

A. April 4, 2024 Partial Corrective Disclosure .......... 62

B. July 24, 2024 Partial Corrective Disclosure .......... 65

C. December 19, 2024 Corrective Disclosure .......... 70

D. Post-Class Period Developments .......... 72

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 73

A. Lamb Weston's False Statements Regarding the ERP Implementation ........ 73

1. Defendants' False and Misleading Statements and Omissions Concerning Fourth Quarter and Fiscal Year 2023 ........ 74

2. Defendants' False and Misleading Statements and Omissions Concerning the First Quarter of 2024 ........ 75

3. Defendants' False and Misleading Statements and Omissions in Lamb Weston's October 11, 2023 Press Release and During the Company's Investor Day Call ........ 80

4. Defendants' False and Misleading Statements and Omissions Concerning the Second Quarter of 2024 ........ 81

5. Defendants' False and Misleading Statements and Omissions Concerning the Third Quarter of 2024 ........ 86

6. Defendants' False and Misleading Statements Concerning Fourth Quarter and Fiscal Year 2024 ........ 90

7. Defendants' False and Misleading Statements and Omissions Concerning the First Quarter of 2025 ........ 92

8. Defendants' False and Misleading Statements and Omissions Concerning Lamb Weston's Internal Controls Over Financial Reporting and Their Effectiveness ........ 93

B. Defendants' False and Misleading Statements and Omissions Regarding Competition and Pricing ........ 95

VII. ADDITIONAL SCIENTER ALLEGATIONS ........ 101

VIII. ADDITIONAL LOSS CAUSATION ALLEGATIONS ........ 112

IX. CLASS ACTION ALLEGATIONS ........ 113

X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ........ 114

XI. PRESUMPTION OF RELIANCE ........ 115

XII. CAUSES OF ACTION ........ 116

XIII. PRAYER FOR RELIEF ........ 120

XIV. JURY TRIAL DEMANDED ........ 121

Lead Plaintiffs Ofi Invest Asset Management ("Ofi Invest"), on behalf of Ofi Invest Actions Amérique, Oklahoma Police Pension and Retirement System ("Oklahoma Police," and together with Ofi Invest, "Lead Plaintiffs"), and Plaintiff Cleveland Bakers and Teamsters Pension Fund ("Cleveland Bakers," and together with Lead Plaintiffs, "Plaintiffs"), by and through their undersigned counsel, bring this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and all persons or entities who purchased or otherwise acquired Lamb Weston Holdings, Inc. ("Lamb Weston" or the "Company") common stock between July 25, 2023 and December 19, 2024, inclusive (the "Class Period"), and were damaged thereby. Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon the investigation conducted by and through counsel, which included, among other things, the review and analysis of: (i) transcripts, press releases, news articles, transcripts, lawsuits, reports and other public statements issued by or concerning Lamb Weston; (ii) research reports issued by financial analysts concerning the Company; (iii) reports and other documents filed publicly by Lamb Weston with the United States Securities and Exchange Commission ("SEC"); (iv) Lamb Weston's corporate website; (v) interviews of former Lamb Weston employees and other knowledgeable individuals; (vi) consultations with experts, and (vii) other material and data identified herein. Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by Defendants Lamb Weston, Thomas P. Werner, and Bernadette M. Madarieta (collectively, the "Defendants") or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

# I. INTRODUCTION[1]

1. This securities class action arises from Defendants' deception of investors regarding two key aspects of Lamb Weston's business: (a) the failed implementation of a new Enterprise Resource Planning ("ERP") software system that would administer critical aspects of Lamb Weston's operations, and (b) inflated product prices based on unsustainable, anti-competitive practices, including coordinated price increases with "competitors" that were not based on the Company's input costs. First-hand accounts from multiple senior Lamb Weston executives specify that Defendants Werner, the former CEO, and Madarieta, the CFO, had full knowledge of these issues, yet misrepresented the reality to investors. Those investors have been left holding the bag, as Defendants were forced to reveal hundreds of millions in lost sales, lost customers, and pricing "pressure" due to scrutiny of Lamb Weston's operation in an anticompetitive market. Disclosure of these previously concealed facts wiped out over five billion dollars in the Company's market capitalization and caused massive investor losses.

2. Leading up to the Class Period (July 25, 2023 through December 19, 2024, inclusive), Lamb Weston's revenues were stagnating and Defendants felt increasing pressure to improve the Company's margin performance—a difficult feat given Lamb Weston operated in a seemingly commodified market with products virtually indistinguishable from those of its competitors. Faced with these pressures, Lamb Weston announced new plans to drive growth, including the Company's "Win-As-One" initiative, which was designed to "increase Lamb Weston's profitability and margin performance, by creating efficiencies and reducing costs." Win-As-One's success centrally depended on implementation of the new ERP system, and efforts to

[1] Unless otherwise indicated, all emphasis in quotations contained in this Complaint is added.

increase prices to expand both sales and gross margins.[2]

3. Defendants told investors that the new ERP system was needed to replace Lamb Weston's antiquated software, which, despite playing a critical role in Defendants' management of inventories and filling customer orders, suffered from decades of underspending. The Company's switch to the new ERP system was led by Lamb Weston's CFO, Defendant Bernadette Madarieta.

4. Defendants announced at the start of the Class Period in July 2023 that they were "in the test stage"; they intended to "go live" with the new ERP system in November 2023. During the Class Period, Defendants repeatedly assured investors that the new ERP system would "strengthen [the Company's] operational infrastructure" and touted it as one of the Company's main "strategic levers that we can pull to drive margin improvement." After the ERP system was launched in November 2023, Defendants assured analysts and investors that "the company's ***ERP conversion is off to a good start***" and "***there were no major issues to report***." In January 2024, Defendants stated that the ERP implementation was "experiencing the usual bumps" but that they were "correcting those [issues]" and none would "have a material impact on [the Company's] full year business or operating results."

5. But Defendants knew the truth: the ERP project was an unmitigated disaster from the planning, training and testing stages through the end of the Class Period. As detailed below, by the start of the Class Period, the ERP implementation was plagued with inadequate training and testing deficiencies. Defendants Madarieta and Werner were warned by both their own executives and by Ernst & Young ("E&Y"), which Lamb Weston had hired to oversee the ERP

[2] Lamb Weston's ERP system was designed by SAP SE ("SAP"), a German software company that is the largest vendor of such ERP systems. As SAP states, an ERP system "helps organizations streamline their core business processes—including finance, HR, manufacturing, supply chain, sales, and procurement—with a unified view of activity and provides a single source of truth."

implementation, that launching the system in November 2023 would result in major problems. Defendants did not conform their public statements to these realities.

6. The undisclosed problems with the ERP implementation were known from at least March 2023, and included issues with training, testing, and the ability of Lamb Weston to communicate with its warehouse/logistics partners. For example, the Company assembled a training plan in March 2023 but the training was woefully deficient. Lamb Weston's former Vice President of Global Customer Service Planning & Logistics said that after being involved in 20 ERP implementations over her career, the one at Lamb Weston was by far the worst. She indicated that under the training plan, customer service specialists who needed ***three to four weeks*** of training and testing were allocated only ***three to five hours***. Similarly, Lamb Weston's former Vice President of Supply Chain Strategy reported that she had raised concerns over the Company's inadequate training and preparation for the ERP rollout for ***years*** prior to the November 2023 "Go-Live" date, decrying the lack of training as "terrible" and "woefully inadequate." The failures experienced when the ERP system went live were directly linked to the customer service tasks—picking, processing, and shipping orders—that these trainings should have been geared toward.

7. The pre-implementation testing undertaken by Lamb Weston and E&Y was also inadequate and still revealed significant issues that would later interrupt and constrain the Company's business. For example, during the testing phase Lamb Weston's third-party logistics providers warned Defendants that the ERP software was not properly interfacing with the inventory systems on which the Company depended to fulfill customer orders.[3] Specifically, beginning in September 2023, Defendants were warned that the "EDI" communications through

[3] As discussed further below, Lamb Weston uses third-party logistics providers to warehouse and then ship "finished" potato products to the Company's customers. As such, the Company needs to be able to have clear line of sight into the quantity and types of products being held at those companies and be able to direct the logistics providers to fulfill Lamb Weston's customers' orders.

the new ERP system—which are needed to track inventory and fulfill customer orders—were experiencing a 40% failure rate. One of the Company's primary logistics providers, Americold, indicated during testing that the new ERP system's interactive real time ordering process would not properly interface with Americold's systems. This issue was ignored.

8. Former executives also reported that the Company deliberately truncated its testing for budgetary reasons. For example, despite having up to 300 to 400 different scenarios the Company would typically encounter when exporting products, the Company tested only 80. Similarly, the Company limited the scenarios it tested to those involving only one shipping container per order, despite the fact that multi-container orders accounted for over 50% of Lamb Weston's business. Not surprisingly, the ERP system could not properly handle multi-container orders once it was launched. That failure plagued the Company's ability to fulfill customer orders for at least a year following the Go-Live date.

9. The planning, training and testing issues were discussed and presented to Defendant Madarieta at a series of meetings in the late summer and fall of 2023. Some of these meetings were referred to as "Go/No Go" meetings, as they were planned for the purpose of deciding whether to go live with the ERP system at the end of November. Critically, both Lamb Weston executives and the E&Y experts advised Defendant Madarieta ***not to proceed with its planned November 2023 "Go-Live" date***. A Lamb Weston supply chain executive indicated that in September 2023 E&Y made a very solid recommendation ***not to go live***, and made a detailed presentation outlining issues reflecting that the "master data" needed for the ERP system to process orders and track inventory was not "clean." Defendants disregarded these recommendations.

9. Once the ERP system went "Live," the expected problems identified in planning and testing immediately became manifest. The ERP transition caused massive informational

blackouts and left Lamb Weston "blind operationally," meaning that it had no visibility into how much inventory was in its warehouses. Customer orders were delayed and unfulfilled. Because the ERP system's users had no insight into the location or volume of product inventory, Lamb Weston was unable to troubleshoot the most basic of customer service issues.

10. As the problems with the ERP system mounted—as predicted—they affected the Company's sales and customer relationships, and could not be concealed any longer. The truth about Defendants' deception of investors was eventually revealed beginning on April 4, 2024. On that date, Lamb Weston disclosed that it had experienced significant challenges in its transition to the new ERP system. The April 4, 2024 disclosures revealed that the disastrous ERP system roll-out caused the Company to lose $135 million in sales during the third quarter of fiscal 2024, with negative impacts to net income of $72 million, and adjusted EBITDA of $95 million. The ERP implementation also necessitated a $330 million reduction to Lamb Weston's sales guidance for the 2024 fiscal year. As a result of these disclosures, the price of Lamb Weston common stock declined by $19.59 per share, or more than 19%.

11. However, as Lamb Weston's former Vice President of Global Customer Service Planning & Logistics reported, the ERP problems revealed in April 2024 were "***100%***" ***known*** by at least December 2023, including from twice-daily meetings that were personally attended by Defendant Madarieta. That former Vice President further indicated that reports from December 2023 reflected that the Company was only shipping an estimated 20%-30% of its normal sales volume. Lamb Weston's former Vice President of Supply Chain Strategy similarly reported that Defendants were "absolutely aware" of the ERP problems even before the Go-Live date. That former Vice President also reported that Defendant Madarieta sought to conceal known issues with the ERP internally, where she misrepresented the status of the ERP project and frequently

"rewrote" presentations in an effort to downplay problems.

12. Even when Defendants began to reveal these problems with the ERP implementation to the public in April 2024, they continued to downplay them. For example, Defendants misleadingly claimed that "the impact of the order fulfillment issues ***were contained to the fiscal third quarter*** as customer ***order fulfillment rates have been restored to pre-transition levels***." In truth, contrary to Defendants' statements, the negative financial impact of the disastrous ERP implementation was far from over. As multiple former employees reported, the order fulfillment issues the Company disclosed in April 2024 irreparably damaged the Company's customer relationships, causing severe losses of business that translated into lost market share. A former Sales Manager at Lamb Weston indicated that the Company was hamstrung for a year after the Go-Live date due to unreliable sales, customer order and inventory information. The ensuing losses severely damaged the Company's business with McDonald's after the ERP system problems caused Lamb Weston to ship unsatisfactory product to South Korean franchises—resulting in McDonald's locations in South Korean having no french fries to sell.

13. On July 24, 2024, Defendants were forced to disclose that the negative financial impact of the ERP transition was even worse. Specifically, the Company reported disappointing results for fiscal 2024 (which ended May 26, 2024), and substantially reduced its financial guidance for fiscal year 2025. Lamb Weston attributed its "disappoint[ing]" financial results and diminished outlook, including the loss of customers and market share, to "impacts associated with the Company's ERP transition." Following this news, the price of Lamb Weston common stock declined again, by $22.20 per share, or more than 28%.

14. The full truth concerning the negative impact of the disastrous ERP implementation would not be fully revealed until December 19, 2024. That day, the Company revealed continued

"customer share losses," due to the ERP fallout, which apparently included the loss of business from McDonald's—Lamb Weston's largest customer. The December 19, 2024 release disclosed missed earnings estimates and weak guidance. The Company also announced that it was replacing Defendant Werner as CEO. The price of Lamb Weston common stock declined by 20%.

15. During the same period, Defendants attempted to boost the Company's profit margins through a coordinated effort to increase prices, along with Lamb Weston's three purported competitors. Those four firms collectively dominate the frozen potato products market with 98% of the market share. Lamb Weston alone controls 40%. Recognizing that the Company's "competitive" pricing practices were critical to Lamb Weston's success and a topic of significance to investors, Defendants repeatedly stated that Lamb Weston operated in a "highly competitive" industry. Defendants also told investors they were raising prices charged to customers, but claimed that they were merely "implementing broad-based price increases" in order "to offset inflation" and, in setting prices with their customers, they had "negotiate[d] in good faith."

16. In truth, by at least the start of 2021, Lamb Weston was engaging in coordinated price increases with its competitors, resulting in pricing levels that allowed them to realize unprecedented margins. Through these supra-competitive practices, Lamb Weston and its competitors were able to increase the price of their products even after their input costs had leveled off and then significantly declined. This is evidenced in the graph attached as Appendix A, showing how the prices of potato products increased materially, and remained high even as the input costs for potato products fell.

17. The prices charged by Lamb Weston and its competitors climbed 47% from July 2022 through the end of the Class Period. In contrast to these sales prices, Defendants' input costs peaked in 2022 and leveled off after that, with a marked decline in the cost of raw potatoes in early

2024. In other words, while the cost of potatoes dropped off markedly during 2024, Lamb Weston continued to maintain elevated prices and attributed those supra-competitive prices to "inflation."

18. Former employees of the companies with which Lamb Weston conspired confirmed these facts. For example, a former Senior Director for McCain Foods ("McCain"), commented in 2024 that McCain was unwilling to compete with Lamb Weston on the price of battered fries. A former Vice President at Lamb Weston also acknowledged that the Company and its two largest "competitors"—J.R. Simplot and McCain—"have never ever seen margins this high in the history of the potato industry" and have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain high margins.

19. On December 19, 2024, in addition to the information concerning the ERP transition, Lamb Weston also disclosed that it was experiencing "pricing pressure" and indicated that it would begin "moderating some of the inflation driven pricing actions" due to "an increasingly competitive environment." These disclosures revealed that scrutiny from numerous civil antitrust lawsuits filed against Lamb Weston and its competitors beginning in November 2024 had resulted in a curtailment of the supra-competitive environment in which the Company had been operating.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud

or the effects of the fraud have occurred in this Judicial District. At all relevant times Lamb Weston had its principal executive offices located in this Judicial District and conducts substantial business here. In addition, many of the acts alleged herein occurred in this Judicial District.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III. PARTIES

### A. Plaintiffs

24. Lead Plaintiff Ofi Invest is an asset management company founded in 1971 and headquartered in Paris, France. Ofi Invest manages more than €180 billion in assets. Ofi Invest Actions Amérique ("Ofi IAAI"), a fund managed by Ofi Invest, purchased Lamb Weston common stock and suffered damages as a result of the violations of the federal securities laws alleged herein. Ofi IAAI's transactions in Lamb Weston common stock during the Class Period are reflected in the certification previously filed with the Court (ECF No. 21-3). Under French law, Ofi IAAI does not have a legal personality and cannot act on its own or sue in its own name. Instead, Ofi Invest, as manager for Ofi IAAI, has the exclusive right to engage in litigation on behalf of Ofi IAAI.

25. Lead Plaintiff Oklahoma Police is a benefit pension fund founded in 1980 and headquartered in Oklahoma City. Oklahoma Police manages more than $3.2 billion in assets. Oklahoma Police provides retirement and related benefits for qualified police officers and their beneficiaries in the state of Oklahoma. Oklahoma Police purchased Lamb Weston common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. Oklahoma Police's transactions in Lamb Weston common stock during the Class Period are reflected in the certification previously filed with the Court (ECF No. 21-3).

26. Plaintiff Cleveland Bakers and Teamsters Pension Fund ("Cleveland Bakers") is a multiemployer defined benefit Taft-Hartley pension fund whose members' participation is based upon a Collective Bargaining Agreement between their employer and either Bakers' Union Local No. 19 or Teamsters Local Union No. 507. Cleveland Bakers purchased Lamb Weston common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. Cleveland Bakers' transactions in Lamb Weston common stock during the Class Period are reflected in the certification filed contemporaneously with this Complaint.

**B. Defendants**

27. Defendant Lamb Weston is a food processing company and one of the world's largest producers of frozen potato products. The Company is incorporated under the laws of Delaware and headquartered in Eagle, Idaho. Lamb Weston began trading as a public company in November of 2016 and its common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LW." As of December 13, 2024, Lamb Weston had approximately 142 million shares of common stock outstanding, owned by hundreds or thousands of investors.

28. Defendant Thomas P. Werner ("Werner") was Lamb Weston's President and Chief Executive Officer ("CEO") and a member of the Company's board of directors from July of 2016 until January 3, 2025, including at all relevant times during the Class Period. Defendant Werner began working at Lamb Weston in 2007 and has held numerous positions at the Company during that time. One of those positions was as President of the Commercial Food unit at Conagra Brands, Inc., the corporation from which Lamb Weston was spun off in 2016.

29. Defendant Bernadette M. Madarieta ("Madarieta") is, and was at all relevant times during the Class Period, the Chief Financial Officer ("CFO") of Lamb Weston. Madarieta was named CFO in August of 2021. Prior to serving as CFO, Madarieta was Lamb Weston's Vice

President and Controller, from October of 2016 to August of 2021. Before that, Madarieta was a finance executive at Boise Inc., Boise Cascade, and Packaging Corporation of America. Madarieta is a Certified Public Accountant.

30. Defendants Werner and Madarieta (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## IV. SUMMARY OF DEFENDANTS' FRAUD

### A. Lamb Weston's Business

31. Lamb Weston was founded in 1950. Over the next few decades, Lamb Weston's business expanded, and by the 1990s it had purchased two plants in Holland and expanded into Canada.

32. In 1988, Lamb Weston was acquired by Conagra Foods, now known as Conagra Brands ("Conagra"). Conagra is an American consumer packaged goods holding company that manufactures and sells packaged foods to supermarkets and restaurants. In July of 2016, Conagra spun off Lamb Weston and named Defendant Werner its CEO.

33. In 2022, Lamb Weston announced the expansion of its existing facility in American Falls, Idaho. In 2023, Lamb Weston expanded into China, the Netherlands, the United Kingdom,

and Austria. Lamb Weston now has 27 manufacturing facilities and employs over 10,000 people.

34. Currently, Lamb Weston is regarded as a leading global producer, distributor, and marketer of frozen potato products, which the Company sells to restaurants and retailers around the world. The Company operates through four segments: Global, Foodservice, Retail, and Other.[4]

35. Lamb Weston offers its frozen potatoes, commercial ingredients, and appetizers under the Lamb Weston brand, as well as under various customer labels. Lamb Weston sells its product through a network of internal sales personnel and independent brokers, agents, and distributors to chain restaurants, wholesale, grocery, mass merchants, club and specialty retailers, businesses, educational institutions, independent restaurants, regional chain restaurants, and convenience stores. Fast-food chain McDonald's is one of the Company's largest customers.

36. Following the Conagra spin-off in July 2016, Lamb Weston's business experienced steady and increasing growth until the COVID-19 pandemic, which not only halted its expansion but also reversed the Company's growth trajectory. The shift from expansion to contraction of Lamb Weston's business squeezed the Company's profit margins leading up to, and through, the Class Period and highlighted the need for the Company to invest in an ERP system which, in theory, would drive operational efficiencies and reduce costs.

37. An ERP system is a centralized software system used for tracking vital business functions including sales, production and supply chain logistics, such as quality control and

---

[4] Lamb Weston's Global segment is responsible for frozen potato products sold to the top 100 North American-based restaurant chains and international customers comprised of global and regional quick service and full-service restaurants chains, foodservice distributors, and retailers. The Foodservice segment is responsible for frozen potato products sold throughout the United States and Canada to commercial distributors, restaurant chains outside the top 100 North American-based restaurant chains, and non-commercial channels. The Retail segment includes frozen potato products sold to grocery stores, mass merchants and specialty retailers. Lamb Weston's Other segment consists of its vegetable and dairy businesses, as well as mark-to-market gains and losses associated with its commodity hedging contracts before the commodities are used in its business segments.

warehousing. The system integrates many functions across a business, including financial management, human resources, sales, and manufacturing, and is utilized to increase productivity and efficiency.

38. In addition to the above, the successful implementation of the ERP system was critical for Lamb Weston's business, in part because the Company relies on third-party logistics and warehousing providers, which store and transport the Company's products to its customers. Thus, for Lamb Weston to successfully receive, process, and fulfill customer orders, its internal systems were required to interface with the inventory management systems of its third-party logistics ("3PL") providers. These communications, known as "3PL" communications, were critical to Lamb Weston's ability to fulfill orders and maintain relationships with its customers. Lamb Weston relied on several providers, including Lineage, Americold, and US Cold, to manage its storage and shipping operations in over 20 different locations.

39. An ERP system, when properly implemented, centralizes data and streamlines 3PL communications, providing real-time tracking, inventory management, and order fulfillment. But improper implementation of an ERP system can debilitate a company's operations and prevent effective communications with third-party warehousing providers' systems such that customer orders cannot be timely or properly fulfilled. This failure, in turn, can jeopardize a company's customer relationships and lead to customers taking their business to a competitor. Lamb Weston's ERP implementation suffered from all of the above.

### 1. Lamb Weston's ERP Implementation and Win-As-One Initiative

40. As early as 2017, Lamb Weston began "investigating upgrade options for our information technology infrastructure, including a long-term plan to implement a new" ERP system. Then, in its July 25, 2019 Form 10-K filed with the SEC, Lamb Weston announced its intention to replace its information technology infrastructure and implement a new ERP system in

phases, beginning in fiscal 2021.[5]

41. Lamb Weston planned to install an ERP system sold and designed by the German software firm SAP. SAP is one of the largest providers of ERP systems globally, but as Lamb Weston's former Vice President of Supply Chain Strategy explained, its offerings are "not intuitive" and require often complex and difficult implementation processes.

42. Lamb Weston's ERP system overhaul involved different phases, including both design and implementation phases. The design phase focuses on configuring the ERP system to meet the organization's specific requirements. This includes analyzing existing workflows to design new, more efficient workflows and other business processes that take advantage of the new system. The implementation phase involves actual deployment of the ERP system, including system configuration and customization, data migration, user training, testing, and "Go-Live" preparation.

43. The new ERP system aimed to replace Lamb Weston's antiquated and siloed operating and financial systems. The hope was that migrating its systems to SAP would enable the Company to maintain more accurate financial records, enhance operational functionality, provide timely information to the management team related to the operation of the business, and ultimately reduce costs. The ERP system was critical to Lamb Weston's operations, as it was designed to manage inventories, warehousing, customer orders, order fulfillment, customer invoicing, and supplier payments. Defendant Madarieta acknowledged that Lamb Weston's technological infrastructure suffered from "decades of under-spending in IT."

44. Despite the critical importance of implementing a new ERP system, Lamb Weston abandoned its first attempt to transition to the SAP ERP system shortly after it began in 2020 due

[5] Lamb Weston's fiscal year begins roughly around June 1 and ends roughly around May 31. For example, Lamb Weston's 2021 fiscal year began on June 1, 2020 and ended on May 31, 2021.

to the onset of the COVID-19 pandemic. On the April 1, 2020 earnings call for the third quarter fiscal 2020, Lamb Weston's former CFO, Robert M. McNutt ("McNutt"), announced that the Company had slowed down its ERP project "to manage both costs and risk in light of the challenging operating environment at hand."

45. A few months later, in its July 28, 2020 Form 10-K filed with the SEC, Lamb Weston reported that it encountered operational disruptions and, with a significant number of employees working remotely, continued to defer work on the ERP system transition, which it ultimately abandoned due to the uncertainty caused by the COVID-19 pandemic.

46. On an October 7, 2020 earnings call, Lamb Weston elaborated on its abandonment of the ERP implementation. McNutt explained that the Company has "really step[ped] back" from the ERP implementation, which "impacts more customer-facing and inventory elements," for two reasons: "[o]ne, to let the key people in the business run the business in this challenging time"; and "two, just managing through the risk."

47. Several months later, Lamb Weston announced a series of initiatives called Win-As-One, which included, among other things, a revived implementation of the ERP system. Specifically, on an April 7, 2021 earnings call, McNutt announced that, despite the pandemic-related effects on its supply chain and cost inflation, the Company was "starting to see the benefits of [its] supply chain team's work around a series of initiatives [called] Win-As-One." The Win-As-One initiative "build[s] upon the Lamb Weston operating culture productivity programs" and "seeks ways to reduce our variable and fixed cost, increase production throughout on existing assets, and improve working capital, especially inventories." Put simply, the Win-As-One initiative was launched to increase Lamb Weston's profitability and margin performance, by creating efficiencies and reducing costs. The initiative was largely undertaken in light of the

Company's limited capacity for gross margin expansion (absent collusion) and commoditized product base. Cutting costs and increasing efficiency were intended to boost the Company's financial results.

48. Defendant Madarieta replaced McNutt as CFO in August of 2021. Prior to entering the CFO role, Madarieta had been Vice President and Controller of Lamb Weston since November of 2016. As set forth herein, several former employees confirmed that Madarieta spearheaded Lamb Weston's renewed efforts to complete the ERP system implementation. Madarieta served as the "sponsor" of the ERP project and former employees (discussed below) confirmed that Madarieta updated Werner and the Board of Directors regarding the project's progress.

49. In its July 27, 2021 Form 10-K filed with the SEC, Lamb Weston announced its intention to resume ERP implementation at some point in fiscal year 2022. Analyst commentary recognized that the timing and implementation of the ERP system were critical to the Company's operations and performance, particularly given the multiple delays the Company had incurred to date. For example, just the day before this earnings call, an analyst from Barclays identified the subject of the Company's "[d]iscussion around potential longer term cost cutting initiatives and ERP implementation plans" as "What Matters Most" in commenting on the issues to be discussed during Lamb Weston's earnings call.

50. Indeed, on Lamb Weston's July 27, 2021 earnings call, Defendant Werner announced that Lamb Weston had begun to implement its Win-As-One initiatives, "further strengthen[ing]" its "operating culture of continuous improvement and driv[ing] financial benefits that should enhance margins and cash flow over the long term." In connection with those initiatives, Defendant Werner said the Company "expect[s] to begin [ERP] implementation later this fiscal year" which "will tie into our Win-As-One initiatives to provide better data and systems"

that purportedly would drive increased productivity and cost savings for Lamb Weston as well as more efficient operational execution. Defendant Werner stated that, through the Win-As-One initiatives, including the new ERP system, the Company would "improve [its] operations and cost structure so that [it] can return to or even exceed pre-pandemic margin levels[.]"

51. Lamb Weston continued touting its Win-As-One initiatives and new ERP system. On the October 7, 2021 earnings call, Defendant Madarieta informed investors that the Win-As-One productivity initiatives "will help us continue to gradually stabilize operations, improve production run rates and throughput, and manage costs as the year progresses" and that Win-As-One would help the Company "continue to gain momentum into fiscal 2023 as well."

52. The Company later stated, in its January 6, 2022 Form 10-Q filed with the SEC, that it would resume its efforts to implement the next phase of a new ERP system in the second half of fiscal 2022. Analysts at J.P. Morgan noted with anticipation that though Lamb Weston's "$300MM gross productivity program (Win as One) could take another year to contribute much to the P&L . . . many productivity initiatives are tied to the ERP rollout."

53. Subsequently, in its July 27, 2022 Form 10-K filed with the SEC, the Company announced that it recently had resumed designing the next phase of its ERP system implementation and was in the "build stage." On Lamb Weston's earning call that same day, Defendant Werner elaborated that "[w]e'll build and test the new system in fiscal 2023 and implement it in fiscal 2024 in a phased approach." In other words, after years of delays and mounting analyst pressure, Defendants committed to launching Lamb Weston's new ERP system in just over one year.

54. As such, during the second fiscal quarter of 2023, Lamb Weston began to ramp up its investments to design and implement the new ERP system. According to Lamb Weston's Form 10-Q filed with the SEC on January 5, 2023, the Company already "used $37.4 million to acquire

assets associated with the improvement of our information and technology services infrastructure" in the first half of that fiscal year.

55. In early 2023, market analysts continued to closely monitor Lamb Weston's ERP implementation and its efforts to enhance operational and executional efficiency. For example, on January 4, 2023, Barclays analyst Andrew Lazar reported that Lamb Weston's ERP project ties into the Win-As-One initiative "to provide better data and systems to drive more efficient execution." Lazar further reported that the Win-As-One initiative would increase productivity allowing the Company to continue to gain momentum in 2023 and "enhance margins, drive cash flow, and strengthen its culture of continuous improvement."

56. Prior to the ERP's implementation, analysts remarked that, while the design and implementation of the project would cause increased short-term expenses, in the long-term the new ERP system would make the Company more competitive. This reality put pressure on Lamb Weston executives to implement the ERP system in the near-term and to finish quickly—which would reduce the expenses associated with the implementation and allow the Company to begin realizing the cost and efficiency benefits of the new ERP system.

57. As discussed in greater detail in ¶¶58-141 *infra*, Lamb Weston and the Individual Defendants misrepresented the scope and severity of issues arising immediately with the ERP implementation, downplaying and failing to disclose significant challenges experienced by the Company during the Class Period.

### B. Lamb Weston Touts the Benefits of its New ERP System While Concealing Significant Problems with its Planning, Testing, and Implementation

58. As noted above, for many years prior to the Class Period, Lamb Weston operated its business through an antiquated IT system. As Lamb Weston itself noted in touting the benefits to be accrued from the new ERP system, the efficient operation of the Company's system was

critical to reducing costs and increasing margins. Critically, this included Lamb Weston's interactions and communications with the systems and personnel of the third-party logistics providers it relied on to manage inventory and fulfill customer orders. Smooth integration among Lamb Weston and the third-party logistics firms was essential to operating its business effectively. At the start of the Class Period, in July 2023, Lamb Weston's then-existing system was antiquated. Defendant Werner described it as a "decades-old legacy enterprise resource planning system." However, Defendants made stark misrepresentations and misleading statements about the status and impact of its disastrous effort to implement the new ERP system.

**1. At the Beginning of the Class Period, Defendants Confirm Lamb Weston Will Launch the ERP**

59. On the first day of the Class Period, Defendant Werner announced that Lamb Weston had completed the design phase of its new ERP software system. In its Form 10-K filed with the SEC on the same day, Lamb Weston disclosed that it had "resumed designing the next phase of [its] ERP implementation of central functions in North America and are in the test stage," with implementation of this in North America to commence in fiscal 2024.

60. When announcing the decision to resume the ERP implementation to investors, Defendants continued to tout the benefits that the project would bring to the Company. For example, on the July 25, 2023 earnings call, Defendant Werner told investors the ERP would "strengthen [the Company's] operational infrastructure." Defendant Madarieta echoed Defendant Werner's comments about the ERP, stating that these "increased investments to upgrade [the Company's] information systems" were sorely needed due to "decades of under-spending in IT." Analysts credited Defendants' statements about the ERP and touted their decision to resume its implementation. Market analysts continued to monitor Lamb Weston's progress on its ERP implementation, recognizing the strategic importance to the Company's core operations and the

high costs of the project. Specifically, on August 15, 2023, J.P. Morgan analyst Thomas Palmer reported that a key earnings driver for Lamb Weston is that "SG&A as a percentage of sales could soon head lower," noting that Lamb Weston's increased SG&A costs for fiscal 2024 include approximately $100 million in costs for the ERP implementation, IT systems, and related consulting, which "are expected to peak in FY24E and then portions should roll off starting in FY25E."

61. Analysts also noted the expected operational and cost benefits that would occur once the ERP system was successfully brought on line. For example, on September 12, 2023, TD Cowen issued a report touting the Company's "investment in [the] ERP" and stated that these "productivity improvements" would help the Company's "gross margin expansion to continue in FY24," making it "an excellent long-term investment." Barclays similarly reported that the "ERP project will tie into [the Company's] 'Win As One' initiative to provide better data and systems to drive more efficient execution," which Barclays reported placed the Company "on a path to get back to pre-pandemic profit levels."

62. On October 11, 2023, Defendants made similar statements championing their plan to continue with the ERP project during the Company's annual Investor Day presentation. Defendant Madarieta described the ERP as one of the Company's "multiple strategic levers that we can pull to drive margin improvement, including . . . optimizing our global manufacturing network over the long term."

63. Analysts similarly credited these statements. For example, on November 8, 2023, Zacks issued a report giving Lamb Weston a "Strong Buy" rating, citing the Company's "investments to upgrade information systems and ERP infrastructure" as initiatives that would drive revenue and margin growth.

64. Shortly after the ERP system's Go-Live date, i.e., when it was officially launched by the Company in November 2023, Defendants spoke favorably about how things were going, falsely claiming that "the company's ERP conversion is off to a good start" and "there were no major issues to report." Defendants made these statements in meetings with the analysts from TD Cowen, which were disseminated to investors through TD Cowen's analyst report on December 4, 2023. Based on these statements, TD Cowen rated "Lamb Weston as a 'must-own' for investors."

65. The next month, on the January 4, 2024 earnings call, Lamb Weston announced that it was transitioning some of its central systems in North America that managed supplier payments, inventories, warehousing, customer invoicing and customer shipments to the new ERP system. On the earnings call, Defendant Madarieta stated that the ERP implementation was progressing seamlessly and, although the Company is "experiencing the usual bumps," they would not have "a material impact on our full year business or operating results." Defendant Madarieta continued by stating that "[t]he estimated financial impact of the [ERP] system's go live is included in our fiscal 2024 targets[.]" In a press release on that same day, Defendant Werner advised that the Company "anticipate[s] that the consumer and operating environment will remain generally stable through the remainder of fiscal 2024."

66. Contrary to Defendants' repeated public statements that "the ERP conversion is off to a good start" and "there were no major issues to report," in reality, the opposite was true. Multiple former employees of Lamb Weston, including multiple highly-placed executives in the Company's senior leadership, confirmed that the ERP suffered from significant problems through all phases of planning, training, testing, and implementation. As these former employees recounted, Defendants Madarieta and Werner had direct knowledge of these problems from

multiple sources, including through repeated warnings and concerns raised by the Company's employees; consultants the Company had retained to design, test and launch the ERP; and the Company's third-party warehousing providers who reported problems with the ERP system that directly hindered the Company's ability to manage inventory and fulfill customers' orders. These facts were provided independently by multiple individuals who had direct experience working on the ERP at Lamb Weston in different roles and levels, yet are strikingly consistent and corroborate each other and the Company's subsequent admissions and disclosures.

67. FE-1 was the Vice President of Customer Service Planning & Logistics at Lamb Weston from October 2020 to June 2023, and the Vice President of Global Customer Service Planning & Logistics from June 2023 to April 2024.[6] As Vice President of Customer Service Planning & Logistics, FE-1 focused on operations for North America. As Vice President of Global Customer Service Planning & Logistics, FE-1 had global responsibilities and was the "Global Process Owner" for three business functions that would be impacted by the ERP: Customer Service, Planning and Logistics. Prior to joining Lamb Weston, FE-1 spent over eight years implementing a SAP system at her former company. After being involved in about 20 ERP transitions during her career, FE-1 said that Lamb Weston's ERP implementation was "by far the worst."

68. FE-1 stated that beginning in March 2023, she and the other Global Process Owners met on at least a monthly basis to discuss the status of the ERP implementation. The Global Process Owners also met with Defendant Madarieta on a weekly basis to discuss issues with the ERP.

69. FE-1 stated that she and the other Global Process Owners also met regularly with the ERP implementation team to discuss the status of the project and any gaps in the system. These

[6] Former Lamb Weston employees are referred to herein as "FEs" and are all referenced using feminine pronouns regardless of their actual gender in order to maintain their confidentiality.

meetings began on a monthly basis but became biweekly in September 2023, and increased to weekly in October 2023 as they approached the launch date in November. The implementation team also met at least monthly with leaders of all other functions in the Company, including procurement, manufacturing, and finance.

70. FE-1 explained that as early as March 2023, she and her fellow Global Process Owners began to notice and raise concerns over issues with the planned ERP implementation, such as inadequacies in training, gaps in change management, and a resistance to change from employees in the Company. The project had different phases: design, execution, training, testing—and throughout the project, FE-1 expressed concerns about the lack of testing and the lack of training. She explained that the lack of testing and training came as "the biggest shock" and the implementation plan did not include enough training and testing hours to be successful. For example, in March 2023, before testing began, Lamb Weston showed FE-1 its plans for training employees to use the new ERP, which detailed all of the roles and users who needed training on the system and the number of hours they were allocated for training. FE-1 stated the number of hours allocated for training was not sufficient. Specifically, the customer service specialists responsible for entering orders needed ***three to four weeks*** of training and testing, but were allocated only ***three to five*** hours of training.

71. FE-1 stated that she raised her concerns regarding insufficient training "every single month" from March 2023 through July 2023, including to project leader Tracy DeMuth, who was the Vice President, Business Transformation Delivery. These concerns were also discussed each month during the Global Process Owner meetings. Despite FE-1 raising these concerns, the Company never changed or amended the training schedule first reviewed in March 2023.

72. FE-1 stated that requests from her and the other Global Process Owners for

additional necessary resources were met with substantial resistance from Defendant Madarieta. For instance, as FE-1 explained, in September 2023, Defendant Madarieta refused to approve a training server or "practice box" for users of the new ERP to familiarize themselves with its functioning prior to the Go-Live date. According to FE-1, learning the new ERP system amounted to learning a new language. However, because of Defendant Madarieta's decision, users were never able to practice using the system in real life prior to going Live. Thus, both the quality and quantity of user training became a "huge gap" in the implementation, especially when compared to FE-1's prior experience implementing a SAP system.

73. According to FE-1, these issues with the ERP implementation were raised with increasing urgency, including at the "Go/No Go" meetings, which were held to decide whether Lamb Weston was ready to go live with the ERP. According to FE-1, the Go/No Go meetings were held biweekly and then weekly for between eight to ten weeks prior to the ERP's going live on November 27, 2023. FE-1 personally attended two Go/No Go meetings in November prior to the Go-Live date. FE-1 explained that Defendant Madarieta was particularly involved in those meetings because, as the "sponsor" of the ERP project, she was required to approve any additional investments, resources or changes in schedule.

74. FE-1 stated that, prior to the Go-Live date, the Company realized there were significant gaps in the ERP system and the users were not going to be able to successfully operate the new system, so they brought in consultants from New Era—who have expertise in operating a SAP system—to help process business transactions (e.g., sales orders) through Lamb Weston's SAP systems. She expressed concerns during the Go/No Go meetings prior to the November launch that the New Era consultants were just a "Band-Aid" because users were not ready for the ERP system.

75. FE-1 also took issue with the testing of the ERP's functionality prior to the Go-Live date, between August 2023 and November 2023. FE-1 stated that only a "very, very limited" subset of scenarios were tested prior to the Go-Live date. Based on FE-1's past SAP experience, at least 60 to 70% of the most critical scenarios should be tested. Instead, FE-1 saw Lamb Weston only testing for 80 possible export scenarios, even though there were 300 to 400 different scenarios that occurred in the Company's business. FE-1 explained that the testing was done in this limited way because of budgetary constraints. For example, FE-1 explained that Lamb Weston frequently encountered scenarios where they had to ship orders with multiple containers.[7] Despite these scenarios being "very common" and typically accounting for half of the orders the Company had to ship, Lamb Weston only tested scenarios with one container per order, failing to ensure that the system could properly handle orders with multiple containers. When the Company was required to execute these orders after the Go-Live, any order that contained more than one container did not work, and the team had to process them all manually. While the limited testing that was done for certain scenarios revealed issues, FE-1's biggest concerns were all the problems in scenarios that were ***not*** being tested.

76. FE-1 said that just four weeks before the Go-Live, E&Y[8] reported that 40% of the Electronic Data Interchange ("EDI") transactions were failing. FE-1 explained that transactions between the customer service team, the manufacturing sites, and the third-party logistics firms' warehouses concerning inventory and transactions operated through EDI interfaces. As FE-1 explained, EDI transactions are electronic communications of information between systems at Lamb Weston's plants, factories, warehouses, and central offices, and also those of the third-party

[7] Lamb Weston and its third-party warehousing and transportation providers use shipping containers to transport inventory from one place to another.

[8] E&Y was hired by Lamb Weston as the system implementer of the ERP project.

warehouses where Lamb Weston stored its finished products before they were shipped to customers. When a warehouse sends inventory out to a customer, that movement in inventory is communicated via EDI through the ERP so that an invoice can be generated, and the inventory figures can be updated throughout the system. She reported that 40% of those interfaces were not working, and that multiple people reported this to Defendant Madarieta or VP DeMuth before the ERP went live. FE-1 was first informed of this 40% failure rate by Lamb Weston's North America President, Sharon Miller. She also recalled that E&Y first reported these EDI communication failures to Defendant Madarieta and VP DeMuth in September 2023, two months before the Go-Live date.

77. According to FE-1, E&Y also discussed the severity of these failures with Lamb Weston's C-Suite, including Defendant Madarieta, and Chief Operating Officer ("COO") Mike Smith ("Smith") at the Go/No Go meetings.

78. Relatedly, FE-1 stated that reports reflecting important business data were not available when the ERP went Live, including order status reports, inventory reports, and shipment reports. FE-1 explained there had not been enough time to build the reports before Go-Live because of the many last-minute changes made to the ERP's functionality, and the Company decided not to fully implement these reporting functions before the Go-Live date. Neither FE-1 nor anyone else at Lamb Weston had reports on how much product was being shipped to customers, the value of their inventory, how much inventory they had, or the location of the Company's inventory. As a result, they had to do daily inventory reconciliation for a couple of months because the inventory actually on hand at various locations had discrepancies with what was shown in the ERP. They were receiving whatever information was in the 3PL's systems and entering it into Lamb Weston's system without any checks, resulting in missing inventory.

79. According to FE-1, the lack of reports presented huge risks because it caused loss of visibility into Lamb Weston's inventory. As FE-1 explained, these reports were "absolutely necessary" for the Company to be able to accurately track and fulfill customers' orders. Without these reports, the Company would receive frequent inquiries from customers about the status and timing of orders and could not answer their questions. According to FE-1, the lack of reports contributed to the "massive data issues" at Lamb Weston, which were brought to the attention of an unconcerned C-Suite at the Go/No Go meetings in the fall of 2023.

80. According to FE-1, Lamb Weston ultimately launched the ERP without resolving the EDI failures in November 2023. The duplicity of the Lamb Weston C-Suite's public comments after the Go-Live date frustrated FE-1. Based upon her prior experience, and contrary to the representations made by Defendants, the implementation of the ERP was anything but "normal." Instead, FE-1 explained, "December was terrible," and as of January, the system was a "huge failure." FE-1 stated that the ERP problems the Company publicly revealed in April 2024 were "100%" known earlier in December and January.

81. FE-1 stated that after the ERP system went live, she and Lamb Weston's C-Suite began attending daily "tracker" meetings in December 2023, wherein attendees learned how many orders and how many pounds of product were being shipped each day. These meetings were held twice a day in December 2023, with one held in the morning and another in the afternoon. During these meetings, Ryan Malecha, the President of Customer Service, Planning & Logistics for North America, presented a table each day showing how many pounds were ordered versus shipped, which showed that the Company was only shipping an estimated 20-30% of their normal volume and could ship barely half of outstanding customer orders by the end of December 2023. The Company continued to hold these meetings several times per week through January and February

2024. FE-1 explained that because the December 2023 and January 2024 meetings were attended by members of Lamb Weston's C-Suite, they were "100%" aware of the ERP implementation's disastrous results from the outset of Live. In particular, FE-1 recalled that Defendant Madarieta was in every meeting.

82. FE-1 explained that for those orders that were processed, the inventory figures required daily, manual reconciliation—a process that FE-1 remarked was "crazy" and did not "make any sense." According to FE-1, as noted above, the ERP problems caused "very limited visibility" into inventory and created "very low confidence on the accuracy" of the status of orders shown in the system. FE-1 attributed plummeting sales volume in December to these challenges. Furthermore, FE-1 explained the discrepancies between the inventory displayed by the SAP and the actual totals contained in and communicated by the warehouses required the Company to write-off "millions of dollars" of inventory beginning in December 2023.

83. FE-1 reported that these write-offs were executed by Justice Wolcott, VP of Finance, Supply Chain, who was responsible for inventory accounting and financial adjustments and provided daily updates to Defendant Madarieta about these inventory issues. FE-1 explained also that, while inventory management is normally a supply chain responsibility, at Lamb Weston, it was managed by the finance department. At a meeting attended by FE-1, E&Y recommended moving responsibility to the supply chain department under FE-1, which FE-1 also recommended because finance did not know the processes. Yet the Company decided to keep this responsibility within finance, for three to six months after the Go-Live date, which FE-1 stated was another reason the ERP had so many inventory discrepancies. "As a consequence, you could see what happened," FE-1 stated.

84. FE-1 stated that, even though Lamb Weston publicly blamed lower order volumes

on declining restaurant traffic, the Company could not, in fact, process and ship the orders it received because of the ERP's failure to support such orders after Go-Live in December 2023. She explained that despite the Company officially blaming declining restaurant traffic, within Lamb Weston "everyone knew that we were having system issues during the first couple of months after going live."

85. FE-2 served as Lamb Weston's Chief Supply Chain Officer ("CSCO") from 2019 to October 2023. As the CSCO, FE-2 initially led several aspects of the ERP implementation and served on Lamb Weston's "Steering Committee," which was responsible for overseeing the ERP project. FE-2 confirmed that Defendant Madarieta (Chief Financial Officer), Sharon Miller (President of Lamb Weston North America), Sukshma Rajagopalan (Chief Information and Digital Offer), Mike Smith (Chief Operating Officer), Steven Younes (Chief Human Resources Officer), Tracy DeMuth (Vice President, Business Transformation Delivery), and the Vice President of Supply Chain Strategy all served on the steering committee. FE-2 also served on the Executive Leadership Team with Defendants Werner and Madarieta, and Smith. FE-2 reported to Defendant Werner until May 2023, when she began reporting to Smith.

86. FE-2 stated that a "lack of competency" and "lack of transparency" plagued the ERP from the outset. She confirmed that the sponsor of the ERP implementation project was Defendant Madarieta. In May 2023, COO Smith became a co-sponsor of the project with Defendant Madarieta. COO Smith and Defendant Madarieta were the "overall owners" of the project and directed its implementation. FE-2 also stated that Rajagopalan, the Company's Chief Information and Digital Officer, was very involved with the ERP implementation and oversaw the project's technical aspects. FE-2 reported that Rajagopalan had a very quick tenure and left the Company after the ERP implementation. FE-2 explained that Smith and Defendant Madarieta

made all of the calls and decisions about the ERP implementation and reported directly to Defendant Werner. FE-2 explained that the ERP's implementation suffered because neither Defendant Madarieta nor Smith had any prior experience implementing an ERP on an international scale, nor supply chain management experience in general. According to FE-2, both Smith and Defendant Madarieta "managed it poorly" and their "execution was sub-par."

87. FE-2 stated that Lamb Weston's executive leadership repeatedly disregarded recommendations and warnings from E&Y, the consultant that Lamb Weston hired to help launch the ERP. She explained that the Company similarly disregarded warnings and concerns voiced by the Lamb Weston project leaders with the most ERP implementation experience (including her, and other members of the ERP Steering Committee). FE-2 recalled at least four to five occasions where these problems were discussed with Defendant Werner and Werner stopped the conversation, stating he did not want to discuss the issues and would deal with them himself. Despite hiring FE-2 and other senior employees for their combined decades experience and "know-how" with ERP implementation, "the project was not successful because the experienced people were shut up in big meetings" and Defendants disregarded their and E&Y's repeated warnings and concerns. FE-2 recounted that disregarding these warnings and concerns directly contributed to the problems with the ERP.

88. FE-2 stated that two months before the ERP was supposed to go live, it was "clearly not ready to go." For example, she explained, it was "very clear that the training was not sufficient" for the ERP to function properly. In September 2023, E&Y convened a "very big meeting" to discuss these problems with the ERP project. FE-2 personally attended this meeting, as did the rest of the Steering Committee, including COO Smith and Defendant Madarieta, who led the discussions on Lamb Weston's behalf. At the meeting, E&Y explicitly warned the Company not

to proceed with the November 2023 launch, including because the "master data" in the ERP system showed it was not ready. FE-2 described that E&Y made a "very solid recommendation" against proceeding with the ERP and warned that "basic elements were not in place" for it to function properly.

89. FE-2 explained that Lamb Weston had chosen E&Y as the "system integrator" responsible for conducting testing on the ERP, collecting the data, and using it to analyze the ERP's performance, including whether it met Key Performance Indicators ("KPI")—metrics used to gauge whether the system functioned properly. At the September 2023 meeting, E&Y presented on the data it collected, warning that it showed that the ERP suffered from widespread errors, including in terms of processing customers' orders and invoicing.

90. As FE-2 explained, there were KPIs that were not being met, and there were errors in invoicing, which showed that the level of sustainability after going live was not going to be manageable. E&Y warned that the ERP exhibited major discrepancies in the master data used to run the ERP system. FE-2 explained that for the ERP system to work properly, you need to have clean master data, meaning that it must match the reality of the orders and inventory in the Company's distribution centers and warehouses. But as FE-2 stated, E&Y's testing revealed that the master data was not clean. Specifically, E&Y warned Defendants that the Company had a significant inaccuracy rate in the master data used in the ERP system. E&Y warned the Company that these data errors needed to be corrected before the ERP could go live.

91. FE-2 reported that despite E&Y's presentation of all of these facts and the data, Defendant Madarieta and COO Smith disregarded E&Y's recommendation and told E&Y that the Company was going to go live with the original date in November.

92. FE-3 was the Vice President of Supply Chain Strategy at Lamb Weston from April

2023 through November 2023. Prior to that, she served as Vice President of Supply Chain Excellence from April 2020 through April 2023. As the VP of Supply Chain Strategy, FE-3 worked closely on Lamb Weston's ERP implementation and had significant oversight responsibility over the testing and implementation of the ERP system. FE-3 had thirty years' worth of experience running and implementing ERP systems. At Lamb Weston, FE-3 worked as a business lead on the ERP project. She was responsible for doing "everything possible" to make sure Lamb Weston was ready for the system when it went live. Employees who managed, built, designed, and tested the ERP reported to FE-3. FE-3 reported to the former Chief Supply Chain Officer. According to FE-3, Defendant Madarieta had "overall oversight" over the ERP project, and she frequently presented on the status of the ERP implementation to Defendant Werner. Defendant Madarieta told FE-3 that the information Madarieta received from FE-3 was for the purpose of reporting it up to Defendant Werner.

93. According to FE-3, the design of the ERP system was "locked" in June 2022 at a meeting she attended in Chicago where E&Y ran a "submission confirmation exercise" with all of Lamb Weston's vice presidents involved in the ERP implementation. The meeting was also attended by Tracy DeMuth, then Vice President of Business Transformation Delivery and one of her reports, Cody Gough, then Sr. Director, Business Transformation, as well as the Vice President of Customer Service Planning & Logistics. The purpose of the meeting was for E&Y to present the ERP design to each of these vice presidents in charge of the different business units that would be impacted by the ERP, to confirm that they accepted the features and capabilities that the new system would deliver, including how the ERP would process sales orders, process shipments, and account for the costing of products. FE-3 stated that during the meeting, each of the vice presidents had an opportunity to see the design and weigh in on if E&Y's plan got it right, got it wrong, or if

there were gaps. For example, FE-3 stated, E&Y presented to the VP of Customer Service Planning and Logistics all the capabilities that they were building and asked if she agreed that this is the right solution and correct design. After this meeting, the ERP's design was "locked and loaded" and the Company proceeded to the "build and test" phase. Lamb Weston focused on other elements such as design solutions, development, and page configuration. FE-3 worked closely with E&Y to, among other things, write new standard operating procedures for when the ERP was fully implemented.

94. FE-3 explained that there were multiple rounds of testing performed during the ERP implementation. The testing was conducted in three phases: Functional Unit Testing, System Integration Tests ("SIT"), and User Acceptance Testing. SIT tests were designed to assess what would happen if "something goes wrong." The Company tested the ERP system's functionality throughout the process to make sure everything came together. There were multiple rounds of SITs which began around August 2023. FE-3 reported that the testing was not as thorough as it should have been. In FE-3's view, a lot of the testing that was done was "happy path testing," which meant that the Company wasn't actually testing what happened if somebody does something wrong; instead you test if the person does what the system is expecting. FE-3's view was that Lamb Weston could have done more testing; she felt they just did the "standard round of testing." This testing took place between August and September 2023.

95. FE-3 was part of a group that would prepare presentations for the ERP's Steering Committee.[9] The Steering Committee typically met every two weeks, though as the ERP system

[9] Members of the Steering Committee included Defendant Madarieta (Chief Financial Officer), Sharon Miller (President of Lamb Weston North America), Sukshma Rajagopalan (Chief Information and Digital Offer), Mike Smith (Chief Operating Officer), Steven Younes (Chief Human Resources Officer), Tracy DeMuth (Vice President, Business Transformation Delivery), the Chief Supply Chain Officer, and the Vice President of Supply Chain Strategy.

ran into challenges, those meetings would happen more frequently, and eventually those meetings were happening twice a week. The Steering Committee was in charge of the ERP implementation project, and was responsible for overseeing everything from development, design, testing, and status reports.

96. FE-3 explained that there were times when Defendant Madarieta misrepresented the status of the ERP project. FE-3 reported that "Bernadette [Madarieta] rewrote our presentations all the time" in an effort to downplay internal problems with the ERP, especially when those problems were attributable to people Madarieta managed. She stated that "[w]e would present a point of view, and then Bernadette [Madarieta] would rewrite our point of view to present to the Board." For example, FE-3 explained that the ERP encountered particular problems with the Company's trade promotion management ("TPM") systems, which involved using fairly complex pricing algorithms to set prices under the Company's contracts. FE-3 reported that the Company was trying to build its TPM systems into the ERP at the same time, which meant that the ERP was not mature and not entirely ready to handle them. She explained when sales orders came in, problems with the master data would prevent the discounts/promotions algorithms from working properly, causing the order to "get stuck." This would require the Company to go back and fix the master data and reprocess the order, which caused big delays and slowed down the order processing. She said it was like 'building the plane while we were flying it.' She stated that this was still a problem at the time she left the company in November 2023. "It was absolutely still a problem," she said, but the Company decided to proceed with the ERP's Go-Live date, even though "it just didn't work." FE-3 stated that, when she drafted internal presentations explaining these issues, Defendant Madarieta downplayed the internal causes and "up-played" the reasons why they were attributable to external causes, like third parties the Company was working with. FE-3

explained that this was because the Lamb Weston employee who was in charge of pricing, Jennifer Perkins, then VP Finance Shared Services, was one of Defendant Madarieta's direct reports.

97. Every single risk related to the ERP implementation project was recorded on the Company's "Risk, Actions, Issues, and Decisions" ("RAID") log. FE-3 said the RAID log was run by Ken Nixon who served as the Company's IT Senior Program Manager. FE-3 reported that she had access to the RAID log, as did everyone on the project team. She stated that the biggest risks documented in the RAID log were raised to the Steering Committee. She explained that the RAID log was a classic project management activity that the Company began using to track issues with the ERP since before the design was locked in 2022. There were numerous risks identified on the log, and the biggest risk items would be raised in Sponsor and Steering 'decks' so they could be discussed. FE-3 reported that there were occasions where Defendant Madarieta reviewed the RAID log and directed FE-3 and others to modify the risks listed. For example, FE-3 explained, they might put five things on the RAID log, and Defendant Madarieta would take one off or re-present one. FE-3 confirmed that the biggest risks she recalled had to do with the 3PL communications, a lack of resources resulting in not getting the people they needed, and software delivery delays.

98. One of the biggest risks FE-3 recalled had to do with the 3PL communications, which referred to communications with Lamb Weston's third-party logistics providers who stored and transported the Company's products. FE-3 reported that one of the Company's providers, Americold, began raising what she thought were potentially valid risks about the ERP implementation during the testing phase in August 2023. Americold warned the Company that the testing demonstrated that the new ERP system's interactive real time ordering process would not properly interface with Americold's systems, which had previously operated on a batch basis. Specifically, because Americold was used to receiving orders on a batch basis, i.e., through one

large file three times a day, the new ERP system's operation on a transactional basis wherein orders were communicated in real time created serious concerns that were raised to FE-3 and Lamb Weston.

99. FE-3 reported that between July and August of 2023, months before the Go-Live date, Lamb Weston brought in an additional company, New Era, to address order and shipment issues with the ERP. According to FE-3, Lamb Weston did this because they knew productivity would be reduced as the Company's employees got used to the new system. She explained that New Era ultimately had to show Lamb Weston how to input orders and shipments manually when the ERP encountered problems. She stated the Company also brought in Accenture to help deal with the ERP problems.

100. FE-3 stated there just wasn't enough time to get the ERP ready for the launch in November 2023, and "time got compressed and compressed and compressed" as upper management pushed forward with the launch. She stated that despite upper management telling her that they would ensure the Company had sufficient resources to prepare for the launch, "there was always a veiled threat" behind the pressure to make the launch date.

101. FE-3 recalled that SAP was late delivering certain software that was necessary for the system. FE-3 explained that there were numerous meetings where Lamb Weston executives, including Defendant Madarieta, and COO Mike Smith, discussed whether or not to actually implement the ERP system in light of the deficiencies identified. These were called "Go/No Go" meetings and FE-3 was involved in some of those meetings. The Steering Committee (which again, included Defendant Madarieta), the Project Team members, and the Global Process Owners, who were the VPs in charge of the business units affected by the implementation, attended the Go/No Go meetings. These meetings took place frequently throughout September 2023, and the attendees

frequently talked about EDI communication failures, the TPM problems, and any other issues that "were bubbling up."

102. FE-3 recalled that in September 2023, she attended a meeting where E&Y recommended that the Company not proceed with the planned November 2023 launch. She stated that, during this meeting, E&Y presented on problems and challenges with the ERP in a PowerPoint presentation. According to FE-3, Defendant Madarieta still pushed forward with the launch despite E&Y's discussion at the meeting.

103. Lamb Weston executives were not the only ones concerned with the ERP implementation struggles. E&Y was concerned with the third-party logistics and storage firms who were warehousing Lamb Weston's product across twenty different locations: Lineage, Americold, and US Cold. FE-3 explained that the Steering Committee executives were informed that communications with those storage firms were failing. FE-3 explained that Lamb Weston would lose flexibility in the network if one warehouse was down because of the way product moves around. FE-3 explained that if you could not see the inventory in your ERP system, you cannot see it in the warehouses, and this meant that you would not be able to get it to customers effectively. She stated that if one of the logistics warehouses was not working, Lamb Weston could not go live because the warehouse system is an interconnected network. She stated that she was "very adamant" that proceeding with the ERP was the wrong thing to do.

104. FE-3 explained that employee training with the ERP system was "terrible" and "woefully inadequate." The people conducting the training were unprepared; FE-3 explained that they were "one page ahead in the manual if you're lucky"—meaning that the individuals conducting the training had limited knowledge and no real experience using the system they were training Lamb Weston's employees to use. There were many long-term employees at Lamb

Weston that had been working with inventory for 20 years and needed more time to adjust to the new system. FE-3 explained that people no longer knew how to get around the system when Lamb Weston began switching over to the SAP ERP system. "If you make an error, [the ERP system] doesn't forgive you," she explained. She stated that from the time the plan was laid out, two to three years before the Go-Live, she raised concerns about the timing allowed for training. Despite articulating her concerns to executive management in the early stages, Lamb Weston never amended the training schedule. She stated that raising these concerns was like banging her head against a brick wall.

105. FE-3 said Lamb Weston executives were "absolutely aware" of the implementation issues before the system went live. FE-3 explained that there had been a lot of conversations about not going live unless they were ready, but that there was also "a lot of pressure to go on time and on budget." According to FE-3, if the ERP system did not go live at the end of November, the next opportunity would not come for another six months. FE-3 explained that the other months in between were too close to quarter or year-end to implement the ERP system then. FE-3 explained that delaying the Go-Live date would have cost Lamb Weston millions of dollars.

106. FE-4 worked at Lamb Weston as a Financial Analyst from March 2019 through September 2024. During her tenure, FE-4 reported to a Finance Director in the Supply Chain Finance Department, Ron Howard, who in turn reported to Justice Wolcott, VP of Finance, Supply Chain. FE-4 was involved in the implementation and testing of the ERP system for warehousing and transportation beginning in August 2023. She was tasked with performing testing and validations on the ERP to check the accuracy of the data going in and out of the system. This testing focused on the ERP's function of calculating and administering payments to the Company's third-party warehouses that stored and transported products to customers to fulfill their orders. FE-

4 explained that Lamb Weston's warehouses and providers all had different costs and payment schedules, which the ERP was supposed to track and calculate automatically to replace the Company's manual processes.

107. According to FE-4, Lamb Weston would instruct E&Y what functionalities they wanted the ERP to have, and E&Y would send FE-4 excel spreadsheets to populate with data. E&Y would then enter that information into the ERP system. FE-4 was also responsible for "validating" the data that came back out of the ERP to ensure that the system was correctly calculating and administering costs. She was heavily involved in this testing and validation work from September 2023 through November 2023. FE-4 reported that the testing revealed constant problems due to incorrect calculations within the system. For example, FE-4 stated that E&Y's testing involved running "test scripts," which consisted of step-by-step instructions given to her in order to test the accuracy of the data in the ERP system. FE-4 stated that there were a "ridiculous amount of test scripts" and that test scripts kept being added as new problems emerged. These scripts revealed that the ERP system was not calculating costs correctly. FE-4 stated that many of these problems were so severe that they did not have a fix at all, and if they could not get something to work right, it would get put on the backburner. FE-4 explained that Lamb Weston would do the bare minimum to meet threshold levels for testing purposes, but not what was actually needed for the ERP system to function properly.

108. FE-4 reported that every aspect of the ERP testing was documented and reported to senior management. For example, when a script revealed a problem with the ERP, FE-4 was required to document and report what went wrong. She stated that these problems were rated from low to high priority, and the "high priority ones were definitely looked at by higher up management," including through daily or weekly reports that E&Y provided to upper

management. In addition to these reports, FE-4 stated that problems with the ERP revealed by testing were discussed in meetings with upper management, including daily meetings to go over test scripts, testing status, workarounds, and what people needed to do to get their testing done. In daily "stand-up" calls that FE-4 personally attended, management discussed a list of issues with the ERP, noting that for some issues there was not a fix. She reported that these meetings were attended by the finance team and Global Process Owners who were running the ERP project.

109. FE-4 stated that, as a result of these issues, the ERP was not ready when it was launched, and that this was the consensus in her group. She explained that despite the problems revealed during the testing phase of the project and the lack of solutions to fix them, the Company refused to change its planned timeline to fix these issues prior to launch. She stated that the "implementation was rushed" and she and others felt it was not ready, but upper management continued pushing forward to meet the deadline. She reported hearing from higher-ups that meeting the deadlines was what management wanted; they had to meet the deadline.

110. FE-4 reported that the ERP did not change significantly by the time it went live in November 2023. She explained that, by the time of the launch, the ERP was ***at most, 60-70% there*** in terms of functionality, as a result of problems revealed during testing getting put on hold and put on the backburner. Due to these problems, Lamb Weston hired another consultant, Accenture, to deal with the problems during the transition period after the ERP's Go-Live date. FE-4 stated that the Company hired Accenture because E&Y had too much overload to deal with all the problems with the implementation that needed to be addressed after the Go-Live date. FE-4 remained at the Company for 10 months after the Go-Live date. She reported that, by the time she left, there were still multiple, unresolved issues with the ERP.

### 2. Lamb Weston's ERP Launch is Broadly Described as Successful Despite Serious Undisclosed Order and Inventory Problems

111. On April 4, 2024, Lamb Weston revealed that, contrary to its earlier statements, the Company had experienced severe problems implementing the new ERP system. Defendants revealed that "[t]he ERP transition temporarily reduced the visibility of finished goods inventories located at distribution centers, which affected our ability to fill customer orders. In turn, this pressured sales volume and margin performance." Specifically, the Company disclosed that its disastrous roll-out of the ERP system caused the Company to lose $135 million in net sales during the quarter and required a $330 million reduction to its sales guidance for the full fiscal year of 2024. That day, Defendants also disclosed that the "ERP transition negatively impacted adjusted gross profit by approximately $88 million."

112. Despite revealing this information, Defendants reassured investors that the problems it experienced with the new ERP system were temporary and confined to that fiscal quarter. For example, Defendants stated that "after implementing systems adjustments and modifying processes, we believe ***the impact is behind us as our order fulfillment rates have normalized***." The Company also assured investors that "***the impact of the order fulfillment issues has been contained in the third quarter***" and "[w]e do not expect the ERP system transition to have a material impact on our financial performance for the remainder of fiscal 2024."

113. Defendants also reassured investors that these ERP issues would not impair its customer relationships or market share. For example, the Company told investors that it "partnered closely with its customers to minimize the impact" of the ERP issues, including by "collocating Lamb Weston team members at our distribution centers to resolve data errors and process[ed] issues in real-time and adjusting systems and processes for balancing inventory between distribution centers and SAP." Defendant Werner also assured investors that, although "some

customers affected by either delayed or canceled shipments may have temporarily secured supply from alternative sources until they gain confidence in our service levels," the Company had restored "healthy warehouse inventory levels that flow[] throughout the system," and was "actively engaging customers with our direct sales force to earn their trust and their business."

114. Analysts were surprised by Defendants' disclosures, but credited Defendants' reassuring statements that the ERP problems were "temporar[y]" and their impact was "contained" to the third quarter of that fiscal year. For example, on April 4, 2024, Bank of America reported that Lamb Weston "remains a compelling opportunity within packaged food, with ERP-related headwinds contained to 3Q." Similarly, Wells Fargo reported that the "silver lining" of the ERP rollout was that the "ERP impact appears contained." Bank of America also credited Defendants' reassurances that the ERP transition would not impact the Company's customer relationships or market share, citing Defendants' "plans to win back lost customers" through the Company's "direct salesforce in the foodservice channel (180 individuals and unique to the industry)."

115. Contrary to Defendants' public statements that the ERP issues were "contained" to the third fiscal quarter ending February 25, 2024, multiple former employees confirmed that the Company's ERP problems were not resolved by that time and their impact persisted far beyond the Company's third quarter.

116. FE-1, the former Vice President of Customer Service Planning & Logistics discussed above, explained that the problems caused by the ERP transition continued into 2024, including the widespread discrepancies between the inventory displayed by the SAP ERP system and the actual totals contained in and communicated by the warehouses. She stated that these discrepancies required the Company to continue writing-off "millions of dollars" of inventory in January and February 2024.

117. FE-1 confirmed that not only was she personally receiving calls from suppliers saying they had not been paid, but that Lamb Weston was not requesting payment from or sending invoices to customers who had received shipments. For example, Greater Pacific, one of the warehouse suppliers, contacted her saying they hadn't gotten paid. Other suppliers in Seattle also contacted her to report that they had not been paid or that Lamb Weston was very late with its payments. These problems, she explained, reflected how badly the ERP system was operating during that time.

118. FE-1 stated the issues with the ERP system were so severe that they remained unresolved even by the time she left the Company in April 2024. For instance, FE-1 stated that the EDI transaction failures were not resolved by April 2024, and remained a "huge mess," requiring the Company to rely on "workarounds." FE-1 also reported that the ERP's problems with processing orders with multiple containers remained unresolved at the time she left. The problems resulting from the ERP's inability to generate reports also remained unresolved by the time FE-1 left the Company. As of April 2024, the Company still lacked "critical reports" that it needed for accurate and reliable insight into inventory. For example, the Company lacked "Orders Cut" reports,[10] which meant the Company could not accurately keep track of items that needed to be reprocessed or ordered again to fulfill customers' orders. Because the information previously used for the function in the legacy system disappeared when the ERP launched, orders would be cut and shipped without the customer service team being able to react. This left the Company without visibility into its finished goods inventories and prevented the Company from recovering volume from cut orders.

119. FE-1 stated that Sam Dirksen ("Dirksen"), Senior Director EPMO & Data

[10] These reports are generally used to track when items cannot be included in a shipment and are "cut" from a larger order, such that they need to be re-processed or included in a later shipment.

Analytics, was primarily responsible for developing the new reports. According to FE-1, when Defendant Madarieta and COO Smith asked Dirksen to generate the reports, Dirksen confirmed there was no way technically to create them with the new system. This remained the case until the day FE-1 left, when Dirksen told FE-1 it was "impossible" to create the reports with the ERP.

120. FE-5 worked at Lamb Weston as a Project Manager in the Innovation department from January 2024 through July 2024. She began at Lamb Weston while the Company was switching over from its previous logistics systems to the new ERP system. FE-5 worked directly in the new ERP system as part of her daily job. FE-5 stated that during the transition to the ERP system, there were numerous "blackout periods" when neither the previous logistics system nor ERP were running.

121. FE-5 reported that the ERP system suffered from problems while she was at the Company. For example, she stated that the ERP had a "really big problem," where the system could not properly communicate with the inventory systems at the warehouses the Company used. This was a problem that her whole department "frequently talked about."

122. FE-5 stated that order implementation was a repeated problem for Lamb Weston as a result of the failed ERP system launch. FE-5 explained how Lamb Weston's transition to the new ERP system impaired the Company's ability to service its major customers.

123. FE-5 stated that she attended multiple meetings in which the head of her department raised concerns that problems with the ERP rollout were causing Lamb Weston customers to move their business to competitors. For example, she recounted a meeting in which the VP of Innovation and Marketing, Kim Cupelli, discussed that problems with the ERP transition caused a medium-to-large-sized customer to move its business to Lamb Weston's competitor, J.R. Simplot. FE-5 stated that they specifically discussed concerns that the ERP transition was impacting her team's

ability to get projects done, causing business to go to competitors. As she explained, the reality was that if the Company could not get the projects out, customers were going to get product from the competitors.

124. FE-6 worked at Lamb Weston as a Sales Manager for Specialty Markets from 2016 until 2024, and had previously worked in a variety of sales roles at the Company, dating back to 1991. FE-6's tenure at Lamb Weston dated back to when the Company was owned by Conagra. As a sales manager, her job was to sell Lamb Weston products to large distributors, who would in turn send Lamb Weston's products to restaurant chains and individual operations. FE-6 experienced the effect of Lamb Weston's new ERP system on the Company's business and sales.

125. According to FE-6, Lamb Weston's new ERP impacted every department of the business, because it affected everyone from the supply chain, to sales, to administration.

126. FE-6's distribution customers, such as Sysco and U.S. Food Service, bought and received thousands of products, and sold them to various end-users, including restaurants, country clubs, stadiums, and schools. FE-6 stated that 100% of her customers were impacted by the ERP system's failures.

127. FE-6 explained that the poor implementation of the new ERP system "obliterated" her line of sight into inventory through the fall of 2024. As FE-6 stated, approximately 90% of Lamb Weston's inventory was held in warehouses and distribution centers, which were operated by third parties. According to FE-6, the new ERP system would process an order, but Lamb Weston could not see inventory at a given warehouse or distribution center. FE-6 explained that salespeople at Lamb Weston processing orders would not be able to confirm or validate inventory levels because of the massive ERP blackouts. FE-6 said that Lamb Weston had product but was "blind operationally." FE-6 stated that when she stopped working at Lamb Weston in October

2024, a year after the Go-Live date, she was still unable to look up sales numbers in the system, as the ERP could not reliably show what items and quantities a customer had purchased. The Company was "hamstrung" for the year after Go-Live and remained that way at least through October when she left the Company.

128. According to FE-6, Lamb Weston quickly became aware that trucks were not leaving with customers' entire orders. As FE-6 explained, this was the primary symptom of the ERP implementation.

129. As a result, FE-6 explained, Lamb Weston was operating "blind," and customers were repeatedly delivered less product than they ordered. FE-6 noted if a customer ordered a full truckload of potatoes, for example, that customer might get only half a truckload. FE-6 stated that in addition to simply not getting what they ordered, there were major delays in getting product to customers as a result of the ERP system failures. She explained that customers would call to tell her that half their truck of inventory arrived empty, and there were some orders that just did not happen at all. She explained "that was very frustrating because it went on for months."

130. FE-6 explained that customers were irate for months following Lamb Weston's launch of the new ERP system. She explained that for six full months following Go-Live in November 2023, "our customers were stressed not being able to count on us fulfilling their orders to their satisfaction." This was not because Lamb Weston had not produced enough product or that there wasn't product available. She explained, "if the system can't see it, it was useless anyway." FE-6 stated that because the ERP could not provide any reliable service level or fulfillment rate, order fulfillment rates dropped below the expected 96-99% fulfillment rate to approximately 70% for a period of months.

131. FE-6 also explained production had to operate at less than full capacity because the

warehouses were full due to the ERP issues. She was aware that, beginning at the time of the November 2023 launch of the ERP, some of the storage facilities were "bursting at the seams with inventory." She explained, "if there's nowhere to send product, you'd be silly to keep manufacturing it."

132. FE-6 explained how these failures could impact customer relationships. FE-6 noted that if an individual restaurant or chain did not get their product, they would complain to their distributor. In turn, the distributor would tell the customer that the supplier (Lamb Weston) shorted them or did not give the correct products. This, FE-6 explained, could cause an end-customer to take their business to a different potato manufacturer that competed with Lamb Weston.

133. FE-6 explained that customers complained frequently, and that she had to keep asking customers to bear with Lamb Weston while they tried to fix the problems with the ERP system and order fulfillment. FE-6 described this as the most difficult time of her career, which had spanned several decades. She explained that these problems affected dozens of her counterparts at Lamb Weston who were responsible for managing customer relationships, and that the order fulfillment problems were a "common dialogue."

134. According to FE-6, the President of Lamb Weston North America, Sharon Miller, sent a message to all customers describing the problems that Lamb Weston was dealing with, and telling customers what Lamb Weston was doing to get order fulfillment back on track. She explained that there was a letter that went out to Lamb Weston customers in December, within a month after launch date, and then another one in January, one and a half or two months into the new system. FE-6 recalled that customers were still complaining about fulfillment issues in March and April 2024. While order fulfillment improved at the beginning of summer 2024, there were still issues that remained when FE-6 left the Company in October 2024. FE-6 noted that she and

others who had worked in this business for years had heard of numerous companies, including Sysco, GM, and Heinz, who struggled to implement new ERP systems from SAP (the same company that designed Lamb Weston's new ERP system). FE-6 stated that those companies took at least a year to fix problems with the SAP ERP system.

### 3. Lamb Weston's ERP Transition Causes Loss of Business as Key Customers' Orders Cannot be Fulfilled

135. The issues Lamb Weston experienced when implementing the ERP were felt particularly acutely by its customers operating in Asia, including McDonald's—which was Lamb Weston's largest customer at the time. Contrary to Defendants' representations that the impact from the ERP transition was contained to the third fiscal quarter 2024, multiple former employees reported that as a direct result of ERP system failures, McDonald's locations throughout Japan and South Korea were left entirely without french fries in the first quarter of Lamb Weston's fiscal year 2025, which began at the end of May 2024.

136. Specifically, FE-1 reported that the ERP's problems with processing orders with multiple containers remained unresolved by the time she left. She explained that these issues prevented Lamb Weston from processing export orders to Japan and South Korea, leading to a complete absence of french fries at the McDonald's locations in those countries. FE-5's coworker also informed her that as a result of ERP system failures, McDonald's South Korean branches, and the rest of the Company's South Korean customers, did not have french fries.

137. This is corroborated by news reports from South Korea.[11] For example, as reported by The Chosun Daily, the English version of the Chosun Ilbo, Korea's oldest newspaper, McDonald's Korea announced on June 20, 2024 that "[d]ue to unexpected issues within the supply

---

[11] *See* You Jin-woo & Yeom Hyun-a, *Why is McDonald's Korea Out of French Fries Again?* THE CHOSUN DAILY (June 25, 2024), *available at* https://www.chosun.com/english/industry-en/2024/06/25/36ZPZRT535G5RDWGSFWVMINUII/.

chain, we are temporarily unable to provide french fries." A spokesperson for McDonald's Korea explained that "[s]ome frozen potatoes did not meet our standards, so we proactively decided to halt product distribution." The Chosun Daily further reported that "[i]ndustry insiders suggest that McDonald's reliance on a single supplier may have contributed to the shortage. McDonald's Korea partners with U.S.-based Lamb Weston, a major potato processing company that supplies Russet Burbank frozen potatoes from Idaho, the largest potato-producing state in the U.S., to McDonald's worldwide." McDonald's Korea was Lamb Weston's biggest customer in South Korea and was without french fries.

138. FE-1 believed that Lamb Weston lost business from McDonald's because of these order fulfillment issues caused by the ERP issues.

139. While failing to do so in a transparent or explicit way, Defendants' July 24, 2024 disclosures, releasing results for the fourth quarter of fiscal 2024 (which ended on May 26, 2024), effectively admitted that Lamb Weston lost business, including from a major customer (McDonald's in South Korea). Lamb Weston's press release vaguely indicated that during the fourth quarter it conducted a "voluntary product withdrawal" related to a single customer in the Company's International segment, without identifying this customer by name (indeed, Defendant Werner explicitly refused "to get into customer specific" during that day's earnings call). However, these facts closely mirror the above information from several FEs and from McDonald's own representatives in terms of the identity of the customer, the timing, and the discussion of a product quality issue. Defendant Madarieta stated that Lamb Weston "identified it soon after the end of the fourth quarter[,]" i.e., soon after May 26, 2024.

140. In December 2024, Defendant Werner further admitted that "when we had our ERP challenges, ***we protected a lot of the North America customers and we had some impact on our***

***International, specifically in Asia customers***." This indicates a clear connection between the ERP implementation and the loss of business with McDonald's, which Werner also admitted was generating "incremental customer share losses" during the Company's second quarter of 2025 (which ended on November 24, 2024).

141. The "voluntary product withdrawal" due to a quality issue was, in fact, directly the result of the Company's ERP transition, which left the Company "blind" to the product in its warehouses, and resulted in shipments of product to McDonald's in South Korea that "didn't meet [Lamb Weston's] standards," or, apparently, McDonald's standards.

## C. Defendants Misrepresented Lamb Weston's Growth and Pricing Environment

### 1. Lamb Weston's Growth is Reversed by the Coronavirus Pandemic

142. As discussed above, Lamb Weston separated from Conagra Brands in November 2016, and has since become "the number one supplier of value-added frozen potato products in North America." Following its spin-off, Lamb Weston experienced steady and increasing growth, as its net sales climbed in the years preceding the COVID-19 pandemic.

143. However, at the beginning of the pandemic, Lamb Weston's sales growth abruptly halted, and eventually even reversed, as reflected in the table below:

| Fiscal Year (Ended May) | Net Sales (Billions) | % Change Y-o-Y |
|---|---|---|
| 2016 | $2.993 | SPINOFF YEAR |
| 2017 | $3.168 | +6% |
| 2018 | $3.423 | +8% |
| 2019 | $3.756 | +10% |
| 2020 | $3.792 | +1% |
| 2021 | $3.670 | -3% |

144. The Company's sales were primarily to "quick service and full-service restaurants

and chains, foodservice distributors, non-commercial channels, and retailers," many of which were negatively impacted because of the pandemic. In turn, Lamb Weston's net sales came under pressure, and the Company's stock price cratered. Lamb Weston's stock price did not recover to its pre-pandemic levels until just before the start of the Class Period.

### 2. The Frozen Potato Market Was Not Competitive During the Class Period and Price Increases Were Not Correlated to "Inflation"

145. Following the onset of the COVID-19 pandemic, Lamb Weston needed to recover lost revenue. To achieve this, Lamb Weston took pricing actions before and during the Class Period, which artificially inflated prices for its potato products in excess of functioning market conditions. Lamb Weston did not disclose this to investors, however, and instead assured the investing public that the Company continued to operate in a competitive market and offered false explanations for price increases.

146. For instance, on July 25, 2023, the first day of the Class Period, Defendants filed Lamb Weston's Annual Report on Form 10-K with the SEC. In that report, Defendants stated that the "frozen potato products industry . . . is highly competitive," and that Lamb Weston and other potato producers competed "on the basis of, among other things . . . price." Moreover, Defendants asserted that a "strong competitive response from one or more of our competitors to our marketplace efforts could result in us reducing pricing, increasing spend on promotional activity, or losing market share," and that "[c]ompetitive pressures may restrict our ability to increase prices."

147. Analysts credited Defendants' representations, and accepted that Lamb Weston operated in a competitive market. For instance, analysts from Zacks Investment Research noted "Intense Market Competition" as a key risk to the Company shortly after the start of the Class Period. These analysts, based on Lamb Weston's representations, stated that the Company

remained "exposed to stiff competition in the frozen potato product space in North America, Europe and other global markets," and competed with other firms "on the basis of customer service, innovation, product quality, price and loyalty among other attributes." Months later, in December 2023, Wells Fargo initiated coverage of Lamb Weston. In its first report, Wells Fargo similarly noted that the "frozen potato category is highly competitive based on product innovation, price, quality, brand loyalty, consumer preferences, and customer service."

148. Defendants' representations continued throughout the Class Period, as Defendants repeatedly attributed their sales and earnings growth, as well as their margin increases, to "pricing actions" that Defendants had purportedly taken to counter various forms of inflation. For example, in October 2023, Defendants claimed that their "Price/mix was up 23% as we benefited from the pricing actions taken in fiscal 2023 in both our North America and International segments to counter input and manufacturing cost inflation." Then, in April 2024, Defendant Madarieta once again noted that Lamb Weston's price/mix had increased, as the Company "continued to benefit from the inflation-driven pricing actions taken in fiscal 2023."

149. Investors were focused on whether the Company could resume its previous impressive growth trajectory and generate increased margins that would drive growth. Indeed, Lamb Weston specifically focused the market's attention on the Company's margins, which they described in SEC filings as a "[k]ey measure of financial health recovery following the COVID-19 pandemic." Analysts such as Wells Fargo frequently reported on Lamb Weston's "unique pricing power," relative to other food staples, which they mistakenly attributed, based on Defendants' representations, to Lamb Weston's "market leadership, innovation, tight industry supply, and category contribution margin to third-parties allowing cost pass-though."

150. Throughout the Class Period, analysts frequently questioned Defendants regarding

pricing actions and margins, and Defendants provided various innocent explanations for the pricing actions that they took. For example, during Lamb Weston's Investor Day conference on October 11, 2023, a Jeffries analyst noted that, "[E]ven if we're . . . to assume that in fiscal '25 costs were inflationary, it seems like you said, . . . over the next couple of years, there could still be some pricing opportunity," to which Defendant Werner replied, "[A]s we go through maybe a normalized inflationary period as we have in the past, we're going to continue to price through that. . . . [W]e're going to continue to evaluate the market, the inflation, our input costs. And we've absorbed a tremendous amount of cost in this business over the last 2 years. We've honored our commitments to our customers in terms of absorbing the inflation. We did a great job, as you can see in the results, getting our pricing architecture back kind of where it was and improved, and we're going to continue to focus on it."

151. Similarly, during Lamb Weston's January 4, 2024 earnings call, a Goldman Sachs analyst asked: "[S]o as we think about the absence of this charge or assuming it wouldn't repeat in 2025, all else equal, your gross profit margins are tracking kind of pretty comfortably ahead of how you framed your business outlook at the Investor Day in October? Or am I mischaracterizing it now?" Defendant Madarieta replied, "You're correct . . . . [A]s we've been talking about, that increase is related to the pricing actions and then catching up to the multiyear impact of inflation and also allowing the benefit of the productivity and mix that fall through."

152. Unknown to investors at the time, Lamb Weston's pricing actions, which generated significant additional revenue for the Company, were actually the result of supra-competitive pricing activity between Lamb Weston and its so-called "competitors" in the frozen potato industry. For years leading up to and during the Class Period, Lamb Weston relied on anticompetitive price increases in tandem with other frozen potato manufacturers, or in some cases

took advantage of pre-existing coordinated actions, to engage in price hikes that could never be accomplished in a competitive market. In fact, in the years leading up to the Class Period, Lamb Weston had made at least one anticompetitive price increase in tandem with each of the three other major frozen potato producers. These four producers controlled approximately 97% of the frozen potato market. According to a Morningstar analyst report, Lamb Weston held over 40% of the market in North America; McCain Foods approximately 30%; J.R. Simplot Co. controlled approximately 20%; and Cavendish Farms approximately 8%.

153. Lamb Weston's pricing of its potato products shows clear signs of noncompetitive behavior alongside other potato manufacturers. Using their collective access to pricing data, Lamb Weston and other frozen potato producers implemented numerous coordinated price increases, which resulted in potato prices being maintained at artificially high prices, well beyond the effects of inflation. For example:

a. February 11, 2022: Lamb Weston announces price increase. Simplot and McCain match that price increase on February 15, 2022; Cavendish matches that price increase on February 16, 2022.[12]

b. April 2022: Lamb Weston, Simplot, McCain, and Cavendish implement the previously announced identical price increases.[13]

c. May 2022: Simplot implements price increases, prompting Lamb Weston to implement corresponding price increases that July.[14]

d. May 2023: Simplot and Lamb Weston both implement price increases.[15]

---

[12] *Price Increases on French Fries Sold to Restaurants, Bars Generate Accusations of Coordination*, 10 Capitol F. 299, 4 (May 19, 2022).

[13] *Id.*; Katya Schwenk, *The Rise of the French Fry Cartel,* Jacobin, (Jan. 3, 2025), *available at* https://jacobin.com/2025/01/french-fry-price-fixing-antitrust.

[14] Tegus Transcript, Lamb Weston Holdings Inc. – Director, Sales Solutions at J.R. Simplot Company (Nov. 9, 2023).

[15] *Id.*

154. These are just a few instances of the major frozen potato producers' overarching pattern of lockstep price increases. In an interview conducted by Tegus, an expert services platform, on November 9, 2023, a director of Sales Solutions at Simplot stated, "I think in the 12 years I've been here, there's only been about three or four different price increases where the whole industry didn't take it within a month or two. Like if one goes up, the three go up within the month and with a very similar amount."

155. Publicly-accessible data confirms that these price increases simply were not reflective of a normal, functioning market, where competitors will try to compete on price and take market share opportunistically from each other if they can take advantage of input cost decreases, operating efficiencies or scale. The Federal Reserve Bank of St. Louis collects and aggregates the producer price index of numerous commodities, including for frozen potato products, dating back to 1967, using data from the U.S. Bureau of Labor Statistics. This Federal Reserve Economic Data ("FRED") indicates that from 1967 until 2012, the price index for frozen potato products generally increased slowly and steadily. Then, from 2012 until 2022, prices remained almost completely even. Beginning in 2022, however—around the time when Lamb Weston began taking anticompetitive pricing measures—the price index jumped dramatically. From 2022 through December 2024, frozen potato product prices increased by nearly 50%, as reflected by the FRED data.[16]

---

[16] U.S. BUREAU OF LABOR STATISTICS, Producer Price Index by Commodity: Processed Foods and Feeds: Frozen Potato Products (French-Fried, Patties, Puffs, etc.), retrieved from FRED, Federal Reserve Bank of St. Louis; https://fred.stlouisfed.org/series/WPU02450202 (Feb. 20, 2025).




156. As noted above, this price increase from 2022 until 2024 was not reflective of external or macro market conditions. In fact, the ***cost*** of producing potatoes either remained flat or ***decreased*** over the same period of time, as reflected in the below graph (also attached as Appendix A). That graph (with the shaded area primarily representing the Class Period) represents the pricing of various PPIs tracked by the federal government, which represent either input costs for Lamb Weston and its "competitors" or prices of goods that are closely correlated with the prices of frozen potatoes.[17] As noted below, the prices of other related products or costs inputs—raw potatoes, frozen foods broadly, and food manufacturing, reflect far greater stability and much more modest price increases. Even as the pricing for these correlated goods decreased or remained flat the prices of frozen potato products remained at artificially inflated levels.

[17] The Producer Price Indexes ("PPI") for various products and services are generated by the Bureau of Labor Statistics and "measures the average change over time in the selling prices received by domestic producers for their output." *See* U.S. BUREAU OF LABOR STATISTICS, *Producer Price Indexes*, *available at* https://www.bls.gov/ppi/.




157. Former employees of Lamb Weston and other frozen potato producers have come forward and provided critical context for these price increases. For instance, the President of Pommes Frites LLC, a consulting company specializing in the french fry industry, and formerly the Vice President of International at Conagra (before Lamb Weston was spun-off), explained in detail the anticompetitive activity Lamb Weston participated in. In an interview conducted by Tegus in April 2021, he explained that the potato industry had "never ever seen margins this high." When asked directly during the interview whether those margins were "driven by just demand getting better," he explained that instead, the increased margins were "driven by the consolidation of this industry." Indeed, while in the 1990s, the frozen potato industry was described as "an intensely competitive business," since then, Lamb Weston and the other three major potato producers have "eliminated or acquired most of their smaller rivals."[18] As a result, th executive

[18] Eric Schlosser, *Fast-Food Nation Part Two: Meat and Potatoes*, ROLLING STONE (Nov. 26, 1998), *available at* https://www.rollingstone.com/culture/culture-news/fast-food-nation-part-two-meat-and-potatoes-72936/.

agreed with the interviewer that there was "no incentive to fight that hard for each other's share" of the market, and that all of the major frozen potato producers were "behaving themselves. They're not killing each other's business at low margins."

158. This anticompetitive pricing did not stop after 2021. In November 2023, a director of Sales Solutions at Simplot, one of the other four largest frozen potato producers, explained to Tegus during an interview that "the whole industry" had raised prices.[19]

159. As late as April 2024, the anticompetitive practices were still in place. That month, a former Senior Director of Global Portfolio optimization at McCain (who left McCain in October 2023) explained during an interview with Tegus how he was specifically directed to not compete with Lamb Weston on price. He explained that at McCain, "[t]he one thing we haven't been willing to do is compete with Lamb on price," and that he "was in the minority force" during that discussion.[20] This executive explained that, for instance, battered potato products generated 40% margins, but that it would "still be really attractive at 30% margin." As a result, he was "under the impression we should be more aggressive on pricing" to "compete against" Lamb Weston but noted that "there hasn't been the desire to do that." This executive noted that the "higher ups in the room" at McCain decided that if McCain started competing with Lamb Weston on price, "they're going to race us to the bottom. And we're just going to screw it up for everyone. So we shouldn't risk it."

160. These price increases were passed on to consumers. For instance, as one recent report noted, the "cost of fries at McDonald's has increased by 138 percent since 2014, and hash brown prices have more than doubled in recent years at fast food joints including Jack in the Box

---

[19] Tegus Transcript, Director, Sales Solutions at J.R. Simplot Company (Nov. 9, 2023).

[20] Tegus Transcript, Former Senior Director, Global Portfolio Optimization at McCain Foods (Apr. 12, 2024).

and Hardee's."

161. Contrary to Lamb Weston's representations, the price increases implemented following the COVID-19 pandemic—particularly beginning in 2022—were not instituted to combat inflation; they were reflective of an anticompetitive market that Lamb Weston held the single-largest share of. These price increases were wildly effective. As demonstrated by Lamb Weston's annual reports for fiscal years 2022 through 2024, Lamb Weston achieved unprecedented net sales growth and captured previously unheard-of margins, delivering the rebound that the Company desperately needed.

| Fiscal Year (Ended May) | Net Sales (Billions) | % Change Y-o-Y |
|---|---|---|
| 2016 | $2.993 | SPINOFF YEAR |
| 2017 | $3.168 | +6% |
| 2018 | $3.423 | +8% |
| 2019 | $3.756 | +10% |
| 2020 | $3.792 | +1% |
| 2021 | $3.670 | -3% |
| 2022 | $4.098 | +12% |
| 2023 | $5.350 | +31% |
| 2024 | $6.467 | +21% |

162. The structure of the frozen potato market lent itself to the anticompetitive pricing. In a typical functioning market, potato suppliers would compete for market share, and if one supplier raises prices, the others will lower their own prices to capture additional market share. Over the past several years, prices for frozen potatoes have consistently risen. A number of factors demonstrate that the frozen potato industry is susceptible to anti-competitive activity.

- ***First***, the frozen potato market is highly concentrated, and four companies control approximately 98% of the industry. Lamb Weston, the largest of the four, accounts for more than 40% of the market in North America; McCain Foods accounts for approximately 30%; J.R. Simplot Co. holds approximately 20%; and Cavendish farms approximately

8%.[21] In its SEC filings, Lamb Weston explicitly identifies each of these companies as "significant competitors."

- ***Second***, there are significant barriers to entry in the frozen potato industry, which prevent new competitors from opening a business and competing with any of the four major suppliers. To start, it can cost hundreds of millions of dollars to acquire, open, or expand a frozen potato processing plant; indeed, in July 2021, Lamb Weston announced its plan to expand capacity at a french fry facility in American Falls, Idaho. The Company disclosed that this process would cost approximately $415 million and would take almost two years to complete.[22] Moreover, Lamb Weston has already developed long-standing relationships with potato farmers and major customers, such as McDonald's.

- ***Third***, frozen potatoes are generally not subject to demand elasticity. Products with low demand elasticity experience much smaller fluctuations in demand as a result of price changes. In other words, even if the price of potato products goes up, consumers will purchase them. A report published by Potatoes USA in 2022 noted that "the demand for potato products is becoming ***more inelastic***. This is a good thing for the US potato industry as ***inelasticity suggests greater price power***[.]"[23]

- ***Fourth***, there are not close substitutes for frozen potato products. Consumers are more likely to be willing to purchase that product at higher prices.

- ***Fifth***, frozen potato products are, ultimately, commodities—standardized products that are effectively the same regardless of provider.

- ***Finally***, the four major producers work closely together and are involved in many of the same business organizations, which allows for increased opportunity to engage in anticompetitive activity. For instance, Lamb Weston and the other major potato producers are all members of the Potato Association of America. Lamb Weston, Simplot, and McCain each have a representative on the board of directors of the Potato Sustainability Alliance, as well as the American Frozen Food Institute. Lamb Weston and other major potato suppliers each also use the same industry services that allow those suppliers to exchange data relevant to pricing. For instance, according to the Company's own investor presentations, Lamb Weston uses data from a service called Circana, which provides data on supply and demand for potatoes. Circana provides a variety of services, including through its Circana Unify platform, to collect potato sales data.

---

[21] *Lamb Weston: Slower QSR Traffic and ERP Woes Have Created a Discount, but Demand Outlook Is Strong*, Morningstar Equity Analyst Report (Oct. 7, 2024).

[22] Press Release, Lamb Weston Holdings, Inc., *Lamb Weston Holdings Announces $415 Million Capital Investment in New French Fry Processing Line in American Falls, Idaho; Declares Quarterly Dividend* (July 22, 2021).

[23] Timothy J. Richards, *Returns to Potatoes USA Marketing Programs*, Potatoes USA Evaluation Report (July 2022), *available at* https://potatoesusa.com/wp-content/uploads/2022/07/2022-Potatoes-USA-Evaluation-Study.pdf.

## V. THE TRUTH IS REVEALED

### A. April 4, 2024 Partial Corrective Disclosure

163. Before the market opened on April 4, 2024, Lamb Weston reported financial results for its third fiscal quarter 2024. In its press release filed on Form 8-K with the SEC, the Company disclosed significant problems with its transition to the new ERP system. As Defendants revealed in their press release, "[t]he transition to a new enterprise resource planning (ERP) system in North America negatively impacted our financial results in the quarter by more than we expected." The unsuccessful ERP transition resulted in "reduced visibility into finished goods inventories at its distribution centers," which negatively impacted the Company's ability to fulfill customer orders, resulting in shipment delays and cancelled orders.

164. Lamb Weston announced that the ERP transition negatively impacted Lamb Weston's net sales by $135 million, net income by $72 million, and adjusted EBITDA by $95 million, with more than half of that due to lower sales and unfulfilled customer orders and the remainder due to incremental costs and expenses directly related to the ERP transition. For the third quarter fiscal 2024, the Company also reported a 17% decline in sales volume in North America year-over-year, more than half of which Lamb Weston attributed to the ERP transition.

165. Later that morning, Lamb Weston held its quarterly earnings call, during which Defendants provided additional information concerning the botched ERP transition. On that call, Defendants explained that the "the ERP transition negatively impacted adjusted gross profit by approximately $88 million." As a result of the failed ERP transition, the Company had lost $135 million in sales during its third quarter of fiscal 2024 and had to "reduce[] [its] annual net sales target to $6.54 billion to $6.6 billion from [a] previous target range of $6.8 billion to $7 billion," or by as much as $460 million. As Defendant Werner revealed during the earnings call, the ERP was particularly ill-equipped to handle "filling shipments of mixed product loads," i.e., shipments

that combine different types of products into a single order. As Werner revealed on the earnings call, the ERP's disproportionate impact on fulfilling these mixed-load orders was particularly detrimental to the Company's financial performance and "pressured margins in the quarter" because, as he explained on the call, these orders "are generally higher margin than shipments of single product loads."

166. Defendants also revealed that the Company's earlier statements on January 4, 2024 positively describing the ERP implementation were materially false and misleading. Contrary to the Defendants' statements that the ERP experienced only "the usual bumps" and would have no "material impact on [the Company's] full year business or operating results," Defendant Werner revealed that the ERP transition in fact "proved more difficult than we expected despite the countless hours we spent planning, testing, and preparing for the transition."

167. On that day, Lamb Weston also disclosed for the first time that the Company had needed to revise and update its internal controls over financial reporting in light of the botched ERP transition. In the Company's Quarterly Report filed on Form 10-Q that day, Lamb Weston disclosed that "During the quarter ended February 25, 2024, we transitioned certain central systems and functions, including order to cash, produce to deliver, source to pay, and inventory management, among others, in North America to a new enterprise resource planning ("ERP") system, as part of our multi-year effort to upgrade our information systems and ERP infrastructure across the Company. ***This implementation included changes to certain financial processes impacting key controls related to our internal controls over financial reporting. We have updated our internal controls as appropriate in light of the system implementation and will continue to monitor the impact of the implementation on our processes, procedures, and internal control over financial reporting***." In other words, when the new ERP system went live, the

Company's internal controls over financial reporting were ineffective, and had to be updated.

168. As a result of these disclosures, the price of Lamb Weston stock declined by $19.59 per share, or 19.4%, from a closing price of $101.12 per share on April 3, 2024, to a closing price of $81.53 per share on April 4, 2024.

169. Lamb Weston's disclosures, however, did not reveal the full truth concealed by Defendants' misleading statements and omissions—or anything close to it. To the contrary, Defendants continued to make false statements and conceal facts concerning the extent of the failed ERP transition, its impact on Lamb Weston's business, and the Company's participation in a market that benefited from supra-competitive prices owing to a lack of competition.

170. For example, in the Company's April 4, 2024 press release, Defendant Werner stated that "[w]hile we are disappointed with the magnitude of the ERP transition's effect on the quarter . . . ***we believe the impact is behind us*** . . . ." Further, in that same press release, the Company disclosed that "***the impact of the order fulfillment issues were contained to the fiscal third quarter as customer order fulfillment rates have been restored to pre-transition levels***."

171. Later that day, during Lamb Weston's earnings call, Defendant Werner explained to analysts that "we have ***contained the effect of the inventory visibility issues to our fiscal third quarter and have restored customer order fulfillment rates to pre-transition levels***."

172. Concerned analysts specifically asked Defendants questions in an effort to understand the scope of the problem with the ERP transition and whether there would be broad impacts on the Company's business. For instance, during the earnings call, an analyst from Bank of America asked Defendants whether there were "any orders that continue to be delayed" and whether customers were "leaning on" Lamb Weston during contract negotiations as a result of missed orders and other problems caused by the ERP transition. In response, Defendant Werner

assured the market that there was "no fallout from a lot of our bigger customers as we went through this."

173. Following these disclosures, analysts expressed significant confusion and questioned management's credibility. For instance, analysts at BNP Paribas described the magnitude of the Company's earnings miss and resulting guidance cut as a "clear negative surprise," and analysts from Barclays described the announcements as "clearly disappointing." Likewise, a Bank of America analyst report noted that Lamb Weston and its executives would "have work to do to regain investor/street confidence," and Morningstar commented that "although management stated that fulfillment rates have been restored, lost market share might not be quickly won back." Even weeks later, Goldman Sachs expressed skepticism concerning Lamb Weston's excuses concerning slowing restaurant demand, stating: "LW's volume weakness and capacity utilization declines are substantially more a function of company-specific strategic actions (including the ERP-related setbacks in FY3Q24) than broader industry traffic softness." Despite their concerns, these and other analysts credited management's assurances that the impact of the ERP disruption had passed and been fully accounted for by Defendants' disclosure. For instance, Bank of America analysts noted on April 4, 2024 that "LW remains a compelling opportunity within packaged food, with ERP-related headwinds contained to 3Q." Similarly, analysts from Wells Fargo concluded that the one "silver lining" was that the "ERP impact appears contained."

**B. July 24, 2024 Partial Corrective Disclosure**

174. On July 24, 2024, Lamb Weston reported financial results for the fourth quarter and full year fiscal 2024 (which ended on May 26, 2024), and disclosed that it continued to experience substantial and sustained problems with its transition to the new ERP system, highlighting the ongoing challenges and their material influence on the Company's operations and financial performance. Similar to the previous quarter, and despite Defendants' full-throated reassurances

that the ERP issues were "contained" to the previous quarter, the unsuccessful ERP transition again negatively impacted the Company's ability to fulfill customer orders, resulting in shipment delays and cancelled orders, and caused a reduction in the Company's net sales, net income, and adjusted EBITDA.

175. In a July 24, 2024 press release, filed in a Form 8-K with the SEC before the market opened, Defendant Werner called the Company's fiscal fourth quarter performance "disappoint[ing,]" as "price/mix results were below our expectations, ***while market share losses . . . were greater than expected***." Lamb Weston's sales volume declined 10% year-over-year, with one-third "of the volume decline ***reflect[ing] share losses and the impact of unfilled customer orders related to the ERP transition[.]***"

176. The press release also included the Company's financial guidance for full fiscal year 2025, "***reflecting the carryover impact of market share losses incurred in the prior year***[.]" Specifically, for fiscal year 2025, Lamb Weston was expecting net sales between $6.6 billion and $6.8 billion, net income between $630 million and $705 million, and adjusted EBITDA between $1.38 billion and $1.48 billion. Critically, this was a decline from the Company's fiscal year 2024 net income of $726 million, which already represented a 28% decline in net income from fiscal year 2023.

177. On the July 24, 2024 earnings call, Defendant Werner stated that the Company's "level of execution is unacceptable" and the "leadership team take[s] full responsibility for operating and financial results." Defendant Werner also commented on Lamb Weston's market share losses, stating that the ERP transition caused market share losses that "over-indexed" the Company's sales to "independent restaurants" and that the Company is "working really hard to regain those customers."

178. On that same earnings call, Defendant Madarieta also suggested that the Company anticipated additional volume declines during the first half of the year due to "the impact of recent share losses" during the ERP transition.

179. Finally, during that call, Defendants also attributed their negative financial results to an "unexpected voluntary product withdrawal," which Defendants had purportedly implemented "soon after the end of the fourth quarter" because some of Lamb Weston's products "didn't meet our specs." Defendants represented that they "chose to" withdraw the product as a result of their commitment to "keeping to our values of integrity and responding to our customers and keeping the specifications of the product at high levels." Defendants ultimately "wrote off the remaining inventory that was on hand" in connection with this product withdrawal. Defendants did not identify the specific customer, but said that the product withdrawal affected the Company's International segment. In other words, the product withdrawal involved a foreign customer rather than a domestic one.

180. During the call, one analyst asked whether Lamb Weston "incur[red] some market share losses associated with that product withdrawal? Or is that business back up and running?" In response, Defendant Madarieta evasively answered: "Yes. We are back shipping to the customer." Defendants disclosed that they that their adjusted gross profits had "declined $72.2 million versus the prior year quarter to $363.0 million, due to an approximately $40 million impact associated with the voluntary product withdrawal, as well as lower sales volumes." Defendant Werner acknowledged the significant and material effects of this product recall, stating: "It's not lost on me and my team on the financial impact . . . And I know it has a tremendous financial impact on the company."

181. Analysts were once again stunned. J.P. Morgan analysts wrote on July 25: "***What***

***broke bad so fast***? . . . [I]t was harder than anticipated for LW to regain customer orders lost during the ERP transition. The messaging after 3Q's ERP difficulty was that because of LW's relationships and direct sales force, ERP-driven volume losses would quickly be recovered; this turned out to be optimistic. . . . Many questions remain." J.P. Morgan further described Lamb Weston's earnings announcement as "one of the worst days for a larger-cap food producer in modern history." Analysts from TD Cowen were similarly skeptical, questioning Defendants' assurances that Lamb Weston had a "a clear line of sight to recovering customer business they lost in FY24" and asking: "***[W]hy should we feel so comfortable that the market share gains will materialize as expected***."

182. As a result of the July 24, 2024 disclosures, the price of Lamb Weston stock declined by $22.20 per share, or 28.2%, from a closing price of $78.62 per share on July 23, 2024, to a closing price of $56.42 per share on July 24, 2024.

183. In connection with its results for the first quarter of 2025, released on October 1, 2024, Lamb Weston notably announced that it was reducing its net income target for fiscal 2025 to $395 million to $445 million, down from the $630 million to $705 million range previously provided on July 24, 2024. Still, the Company appeased investors by affirming its net sales guidance of $6.6 billion to $6.8 billion, while announcing a restructuring plan to cut costs further that was focused on the closure of Lamb Weston's manufacturing facility in Connell, Washington, "curtailment" of certain production lines, a 4% reduction in the Company's workforce, and a $100 million reduction in capital expenditures.

184. After these announcements, and beginning in Fall 2024, purchasers of frozen potato products began filing a series of complaints alleging the existence of a price-fixing conspiracy between Lamb Weston and other frozen potato producers: McCain Foods Limited and McCain

Foods USA, Inc., J.R. Simplot Co., and Cavendish Farms Ltd. and Cavendish Farms, Inc, in violation of state and federal antitrust laws.

185. These complaints allege that from at least the start of 2021, Lamb Weston and the three other major frozen potato producers—who control 97% or more of the frozen potato products market—conspired to fix prices of their frozen potato products. Lamb Weston and its co-conspirators are alleged to have implemented a series of lockstep price increases, even after their input costs significantly declined, thus boosting their profit margins to unprecedented levels. As of the time of this Complaint, dozens of lawsuits against Lamb Weston and the other major potato producers have been filed.

186. Just days before the final corrective disclosure on December 19, 2024, one of Lamb Weston's largest shareholders, JANA Partners, issued a harsh critique of the Company's year. JANA lambasted Defendants and Lamb Weston's Board of Directors for having "attempted to place primary blame for the Company's challenges on end market softness – rather than offering a long overdue *mea culpa* and acknowledging the magnitude of damage inflicted on the business and investors from its litany of self-inflicted missteps." Among those missteps included: (i) "Executing a multi-hundred million dollar ERP project riddled with delays (underway for almost a decade and now paused) where ***implementation failed so spectacularly that it left important Lamb Weston customers without products for a period in F3Q24, costing the Company both customers and reputational damage***"; and (ii) "Failing to identify ***and address product quality problems for a key customer until so late in the process that the Company incurred ~$80m in losses*** from product withdrawal." Notably, when JANA's position in Lamb Weston was first revealed in October 2024, it was broadly perceived as positive by the Company's shareholders, based on JANA's history of activism and the perception that a shake-up at Lamb Weston would

be accretive.

### C. December 19, 2024 Corrective Disclosure

187. The full truth regarding the negative impact of Lamb Weston's failed ERP implementation emerged on December 19, 2024, when Lamb Weston reported (before the opening of financial markets) disappointing results for the second fiscal quarter of 2025. Specifically, Lamb Weston announced that sales volume had declined 6%, net sales had declined 8% to $1,601 million, ***income from operations declined 94% to $19 million***, ***net income declined $251 million to a loss of $36 million***, and diluted EPS declined $1.73 to a loss of $0.25. The Company also announced that Defendant Werner would leave the Company and resign as CEO.

188. Lamb Weston's poor financial performance forced it to reduce its guidance for fiscal year 2025, which it had issued (and partially reduced) just one quarter earlier. Specifically, Defendant Madarieta disclosed that Lamb Weston would reduce "net sales target range to $6.35 billion to $6.45 billion, from our previous range of $6.6 billion to $6.8 billion. Using the midpoint of the new sales range implies a sales decline of 1% versus fiscal 2024. We're also reducing our adjusted EBITDA target range to $1.17 billion to $1.21 billion from our previous estimate of around $1.38 billion."

189. On the same day, Lamb Weston held its earnings call for the second quarter of fiscal year 2025. During the call, Defendants disclosed that Lamb Weston was continuing to experience issues with its ERP system, highlighting the ongoing challenges and their material influence on the Company's operations and financial performance, and confirming that, contrary to their prior representations, the impact of the ERP transition had not been "contained" to the third quarter of fiscal 2024. As it had done in the third fiscal quarter of 2024, the unsuccessful ERP transition continued to negatively affect Lamb Weston's ability to retain its customers. Specifically, the Company announced "incremental sales volume pressure" resulting from the "loss of a chain

restaurant customer" in North America. Moreover, Defendant Werner admitted that "when we had our ERP challenges, we protected a lot of the North America customers and we had some impact on our International, specifically in Asia customers." In other words, Lamb Weston had chosen to prioritize certain domestic customers instead of its international customers when the ERP transition took place, which was ***now*** generating "incremental customer share losses."

190. Defendant Werner's disclosure that the "ERP challenges . . . had some impact on our International, specifically in Asia customers" also revealed to the investing public for the first time that the complete absence of french fries in McDonald's locations throughout Japan and South Korea during the fourth fiscal quarter 2024 had been caused by the ERP implementation's challenges, despite Defendants' previous representations to the contrary.

191. Defendants also attributed their guidance reduction to recent "pricing pressure" that the Company was experiencing. Lamb Weston indicated that it would begin "moderating some of the inflation driven pricing actions" that it had previously instituted and was suddenly "experiencing an ***increasingly competitive environment***." In other words, Defendants were now, after the filing of multiple antitrust complaints, being forced to lower prices across the board after years of sales at supra-competitive prices.

192. Analysts once again harshly criticized Lamb Weston following this news, focusing on customer losses, lower-than-expected margins (due to pricing pressure), and the ERP transition. For instance, analysts from Barclays described Lamb Weston's financial results as "***remarkably weak***" and noted that the Company's "gross margin [was] well below our estimate." Analysts from Deutsche Bank commented that they expected a negative market reaction after "full-year guidance was materially reduced, and LW announced a CEO change," and acknowledged Lamb Weston's recent "disappointing" new commentary around "an ***intensifying competitive landscape***." JP

Morgan was even harsher: "***Lamb reported another in a series of truly bad prints (typically we might say 'soft' or underwhelming," but euphemisms don't suffice today)***."

193. TD Cowen commented that the volume pressure that Lamb Weston was experiencing in North America related to "***slower than expected recovery after the ERP disruption***." TD Cowen further noted: "Having missed and lowered guidance 4 times in the past 5 quarters, we too have lost confidence in mgmt's oversight." A Barclays report further noted that "Organic net sales declined -8% YOY, or twice as bad as our already below-Consensus expectation, as North America was a bit weaker than our estimate and International was significantly worse due to softening restaurant traffic results in key markets and ***further customer losses.***" A Paragon report noted that management evaded discussion of "***concerns about reputation risk and customer trust after losing a chain customer***" and further stated that the call conveyed "uncertainty about how Lamb Weston plans to regain customer confidence and market position."

194. As a result of the December 19, 2024 disclosures, the price of Lamb Weston stock declined by $15.72 per share, or 25.1%, from a closing price of $78.22 per share on December 18, 2024, to a closing price of $62.50 per share on December 19, 2024.

### D. Post-Class Period Developments

195. On January 27, 2025, JANA Partners, one of Lamb Weston's largest shareholders, issued the latest in a series of scathing publications. JANA criticized Lamb Weston's "Board's recent decision to double down on a broken status quo, after already subjecting shareholders to years of systemic failures across nearly all key dimensions of operating the business." JANA commented harshly concerning Lamb Weston's December 19, 2024 earnings report, which had sent Lamb Weston's "stock plummeting 20% in one day and now trading near its 52-week low." JANA further criticized Lamb Weston's ongoing management failures, noting that while

Defendant Werner's termination was "long overdue," Lamb Weston's Board of Directors had simply replaced him with his "right hand," demonstrating "its continued failure to recognize the magnitude of changes required at the Company."

196. Perhaps most notably, JANA criticized Lamb Weston for "shirk[ing] accountability for the self-inflicted missteps that have led to substantial share losses" and for its "disingenuous presentation of the facts" concerning the Company's market share losses. Stunningly, JANA revealed the results of feedback JANA had received "from roughly 70% of the top 70 Lamb Weston shareholders who participated in an independent shareholder perception study." On a scale of 1-10, where "1 = very weak and 10 = very strong," Lamb Weston scored a 1.1 out of 10 on "Board & Management Credibility."

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. Lamb Weston's False Statements Regarding the ERP Implementation

197. On July 25, 2023, Lamb Weston announced that it had completed the design work for its new ERP system and the Company would begin to transition to that new system. The Company further stated that, "we continued to strengthen our operational infrastructure by completing the design work for the next phase of our new enterprise resource planning system" and "we'll begin implementing this new system across a portion of our supply chain in North America later this year." Lamb Weston also emphasized its "capital investments to upgrade its information systems and ERP infrastructure." From that day forward, Defendants made false and misleading statements about the implementation of its new ERP system, while concealing from investors that: (1) between March 2023 and July 2023, the beginning of the testing phase of the ERP, Defendants were consistently warned that the training and testing for the ERP system implementation were woefully deficient; (2) during the testing phase announced in July 2023, the Company encountered widespread errors rendering the new ERP system so deficient that the

Company's own consultant E&Y urged Lamb Weston not to proceed with the November 2023 Go-Live launch; and (3) as soon as Lamb Weston implemented the new system it suffered from crippling inventory visibility issues preventing the Company from fulfilling customer orders and contributing directly to the Company losing business and sales.[24]

**1. Defendants' False and Misleading Statements and Omissions Concerning Fourth Quarter and Fiscal Year 2023**

198. On July 25, 2023, Lamb Weston held an earnings call to discuss its financial results for the fourth quarter and fiscal year 2023. During that call, Defendant Werner told investors that, "***[w]e continue to strengthen our operational infrastructure*** by completing the design work for the next phase of our new enterprise resource planning system. We'll begin implementing this new system across a portion of our supply chain in North America later this year." Defendant Madarieta echoed Defendant Werner's comments, stating that the Company was making "increased investments ***to upgrade our*** information systems and ***ERP infrastructure*** . . . ***as well as ERP investments we expect to place in service during the year***."

199. Defendants' statements above in paragraph 198 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading for Defendants to claim, among other things, that the ERP "strengthened" and "upgraded" the Company's operational systems without disclosing that the ERP implementation suffered from significant problems and deficiencies known to Defendants by the time these statements were made, including (as detailed above) that the Company's training and testing plans and practices were woefully inadequate for the system to properly operate, as

[24] In this section of the Complaint, the language that is emphasized in ***bold italic*** type is quoted from Defendants' public statements and disclosures and is the language that Plaintiffs specifically allege to be materially false and misleading as set forth in this paragraph and the paragraphs that follow. Plaintiffs include additional surrounding language from Defendants' statements for context.

reported by former employees. As set forth herein, the Company's training plan issued in March 2023 failed to allocate sufficient time and resources to training employees to properly use the new ERP system, as Defendants were consistently warned by the time the above statements were made.

200. That day, Lamb Weston also filed its Annual Report on Form 10-K with the SEC, signed by Defendants Werner and Madarieta. The Form 10-K included a risk disclosure about Lamb Weston's supply chain. Specifically, the 10-K stated:

> ***Disruption to our supply chain could adversely affect our business*** . . . Further, the inability of any supplier, logistics service provider, or independent distributor to deliver or perform for us in a timely or cost-effective manner could cause our operating costs to increase and our profit margins to decrease. We have experienced, and may continue to experience, disruptions in our supply chain, including as a result of temporary workforce disruptions, labor shortages, increased transportation and warehousing costs, and other factors related to the effects of the COVID-19 pandemic and the ongoing war in Ukraine. ***In addition, the occurrence of a significant supply chain disruption or the inability to access or deliver products that meet requisite quality and safety standards in a timely and efficient manner, could lead to increased warehouse and other storage costs or otherwise adversely affect our profitability and weaken our competitive position or harm our business.***

201. Defendants' statements above in paragraph 200 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading to continue to identify as a mere contingent and future risk that a "disruption to [the] supply chain could adversely affect" Lamb Weston. As set forth herein, multiple former Lamb Weston employees reported that the ERP implementation suffered from significant problems and deficiencies by the time these statements were made, including (as detailed above) that the Company's training and testing plans and practices, such as the March 2023 training plan for the ERP, were woefully inadequate for the system to properly operate.

### 2. Defendants' False and Misleading Statements and Omissions Concerning the First Quarter of 2024

202. On October 5, 2023, Lamb Weston held an earnings call to discuss its financial

results for the first quarter of fiscal year 2024. During this call, Defendants Werner and Madarieta updated investors on the status of its major projects, including Lamb Weston's new ERP system implementation. Defendant Werner opened the call by stating, "[o]ur integration of our EMEA operations is progressing well, our capacity expansion in China is now up and running, ***and our other*** expansion and ***modernization efforts around the globe remain on track***." In addition, Defendant Werner represented that "over the long-term, we continue to expect . . . ***supply chain productivity improvements will be the primary levers to offset inflation***."

203. Defendants' statements above in paragraph 202 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading for Defendants to state, among other things, that Lamb Weston's modernization efforts—which included the ERP system's implementation—were "on track" and that "supply chain productivity improvements" (such as the new ERP system) would benefit the Company without disclosing that the ERP implementation suffered from significant problems and deficiencies known to Defendants by the time these statements were made, including (as detailed above) that the Company's training and testing plans and practices were woefully inadequate for the system to properly operate. As set forth herein, the Company's training plan issued in March 2023 failed to allocate sufficient time and resources to training employees to properly use the new ERP system, as Defendants were consistently warned by the time the above statement was made. Further, as set forth herein, multiple former employees reported significant problems and deficiencies revealed during the testing phase of the ERP announced in July 2023, including that the ERP experienced widespread data errors and discrepancies that directly hindered the Company's ability to properly manage inventory and fulfill customer orders. These problems were so severe that the Company's own consultant (E&Y) and others urged Defendants not to

proceed with the November 2023 launch of the ERP because "basic elements were not in place" for the ERP to function properly and the system was plagued by deficiencies for which the Company had no solution.

204. During the same earnings call, Defendant Werner stated that "[w]e should see our year-over-year volume trends improve as the year progresses as we begin to lap and backfill exited volumes with higher-margin business. Overall, we feel good about the health of the category, our first quarter financial results, and our operating momentum and have raised our sales and earnings targets for the year." In response to an analyst question for more detail concerning "when some of these backfill higher-margin customers potentially start to come online for [the Company]," Defendant Werner stated, "[s]o it was a measured, disciplined action we did . . . we have a line of sight to backfilling that volume . . . Been through this before, but we have a great commercial team that has identified a number of opportunities in the market in both North America and international, and we're actively working that . . . ***volume is going to be sequentially getting better over the next quarter and the back half of the year*** . . . ***we're going to execute and continue to grow the volume in the back half of the year and over the course of the next several quarters***." He added, "we have line of sight to additional business that we're going to start backfill with . . . I fully expect based on how we've got the business forecast and the opportunities we have that ***we're going to start seeing positive volume trends in the back half.***"

205. Defendant Werner's statements above in paragraph 204 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading for Defendant Werner to claim, among other things, that the Company would "continue to grow [sales] volume" and would see "positive volume trends" without disclosing that the ERP system suffered from myriad, significant problems that hindered

its ability to reliably manage inventory and fulfill customer orders necessary to maintain and grow sales volumes. As set forth herein, multiple former employees reported that by the above statements were made, the Company's training plans and practices were woefully inadequate and the ERP experienced widespread data errors and discrepancies that directly hindered the Company's ability to properly manage inventory and fulfill customer orders, which were so severe that the Company's own consultant and others urged Defendants not to proceed with the November 2023 launch of the ERP. Compounding these deficiencies, Defendants had decided to forego full activation of the ERP's reporting functions, which deprived the Company of critical inventory and order reports necessary to accurately track and fulfill customer orders. Contrary to Defendants' assurances that the Company would grow sales volumes, and as Defendants knew, Lamb Weston could not even fulfill its current levels of customer orders with the ERP system.

206. On October 5, 2023, Lamb Weston filed a Form 10-Q with the SEC for the period ended August 27, 2023, which was signed by Defendants Werner and Madarieta. In the Form 10-Q, the Company incorporated by reference purported risk warnings issued by Lamb Weston and stated that there had "***been no material changes to the risk factors discussed in the Form 10-K***." Lamb Weston's Form 10-K had been previously filed on July 25, 2023. In addition to the risk disclosure referenced above in paragraph 200, which was false for the same reasons stated in paragraph 201, Lamb Weston's Form 10-K included a risk disclosure about Lamb Weston's ERP system. Specifically, the 10-K stated:

> ***Problems with the transition, design, or implementation of our new ERP system could interfere with our business and operations and adversely affect our financial condition***:
>
> We are in the process of building a new ERP system to replace our existing operating and financial systems. The ERP system is designed to accurately maintain our financial records, enhance operational functionality, and provide timely information to our management team related to the operation of the business. The

> ERP system implementation process has required, and will continue to require, the investment of significant personnel and financial resources. Due to the uncertainty caused by COVID-19, we paused ERP work in fiscal 2021, after completing the first phase of implementation. We have resumed designing the next phase of our ERP implementation of central functions in North America and are in the test stage. We expect to begin implementing this next phase in fiscal 2024. ***We have experienced, and may continue to experience, difficulties as we transition to new upgraded systems and business processes***. These difficulties have or may include loss of data; difficulty in making payments to third-parties; difficulty in completing financial reporting and filing reports with the SEC in a timely manner; or challenges in otherwise running our business. We may also experience decreases in productivity as our personnel implement and become familiar with new systems and processes. Any disruptions, delays, or deficiencies in the transition, design, and implementation of a new ERP system, particularly any disruptions, delays, or deficiencies that impact our operations, could have a material adverse effect on our business, financial condition, and results of operations. Even if we do not encounter adverse effects, the transition, design, and implementation of a new ERP system, may be much more costly than we anticipated.

207. Defendants' statements above in paragraph 206 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. The Form 10-Q incorporated by reference Lamb Weston's purported risk warning from its July 2023 Form 10-K, and represented that there had been "no material changes" to those risk factors. It was materially false and misleading for Defendants, among other things, to continue to identify as a mere contingent and future risk that Lamb Weston "may" experience difficulties during the ERP transition, when then-known facts made clear that the ERP transition was beset with multiple problems that would impact and disrupt the Company's business. As set forth herein, multiple former Lamb Weston employees reported that the ERP implementation suffered from myriad, significant problems by the time the above statements were made, including (as detailed above) that the Company's training and testing plans and practices were woefully inadequate and the ERP experienced widespread data errors and discrepancies that directly hindered the Company's ability to properly manage inventory and fulfill customer orders, which were so severe that the Company's own consultant and others urged Defendants not to proceed with the November 2023

launch of the ERP. Compounding these deficiencies, Defendants had decided to forego full activation of the ERP's reporting functions, which deprived the Company of critical inventory and order reports necessary to accurately track and fulfill customer orders.

### 3. Defendants' False and Misleading Statements and Omissions in Lamb Weston's October 11, 2023 Press Release and During the Company's Investor Day Call

208. On October 11, 2023, Lamb Weston issued a press release in connection with the Company's Investor Day. In the press release, filed on Form 8-K with the SEC, Lamb Weston highlighted its "Continued Strong Execution of Strategic Growth Initiatives," which included the ERP transition, and reaffirmed its financial guidance for fiscal 2024. In this press release, Defendants represented that they were ***"[w]ell-positioned to drive sustainable, profitable growth*** through expanded global footprint, advanced production capabilities and innovation leadership." Defendant Werner touted Lamb Weston's "***global supply chain optimization***" as having "***created a more profitable, high-growth business***."

209. During the Company's Investor Day conference on October 11, 2023, Defendant Madarieta stated that Lamb Weston had "multiple strategic levers to pull ***to drive margin improvement***," including its "***supply chain productivity initiatives***" as part of the Company's Win-As-One program, and the optimization of its global manufacturing network, "which ***will be aided by a global ERP system once it's fully implemented.***" Defendant Madarieta continued, "we do expect that ***volume trends will continue to improve as the year progresses and into 2025***, as we can lap that lower margin business that we chose to exit in the second half of fiscal 2023, as well as, as we gradually backfill that low-profit business. We're confident in the decisions we made to exit that business as the right strategic business for Lamb Weston over the long term."

210. Defendants' statements above in paragraphs 208-209 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It

was materially false and misleading for Defendants, among other things, to tout the "strong execution" of the ERP and claim that the ERP implementation would "drive margin improvement" and improve sales "volume trends" without disclosing that the ERP system suffered from myriad, significant problems that hindered its ability to reliably manage inventory and fulfill customer orders necessary to maintain and grow sales volumes. As set forth herein, multiple former employees reported that by the above statements were made, the Company's training plans and practices were woefully inadequate and the ERP experienced widespread data errors and discrepancies that directly hindered the Company's ability to properly manage inventory and fulfill customer orders, which were so severe that the Company's own consultant and others urged Defendants not to proceed with the November 2023 launch of the ERP. Compounding these deficiencies, Defendants had decided to forego full activation of the ERP's reporting functions, which deprived the Company of critical inventory and order reports necessary to accurately track and fulfill customer orders. Contrary to Defendants' assurances that the Company would grow sales volumes, as Defendants knew, Lamb Weston could not even fulfill its current levels of customer orders with the ERP system.

### 4. Defendants' False and Misleading Statements and Omissions Concerning the Second Quarter of 2024

211. Lamb Weston's new SAP-based ERP system went "live" at the end of November 2024. On December 4, 2023, TD Cowen released an analyst report disclosing information that its analysts were provided by representatives of Lamb Weston, including concerning the ERP transition. The report stated, in pertinent part:

> In our recent meeting with investor relations, ***we were encouraged to hear that*** demand remains in-line with expectations and that ***the company's ERP conversion is off to a good start***. That said, management acknowledged that the robust potato crop this fall is likely to outstrip its demand plan. We view this dynamic as transitory and unlikely to impact the processing industry's strong pricing power.

> . . .
>
> ***Warehouse ERP Cut-Over On Schedule***. The ERP conversion for the North American warehouses went live on December 4. ***There were no major issues to report.*** The N.A. production facilities will convert to the new system later in the fiscal year. Europe will convert in 2025. Management said that they pulled forward a small amount of volume into 2Q from 3Q to provide safety stock ahead of the conversion.

212. Defendants' statements above in paragraph 211 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading for Defendants to claim that Lamb Weston's "ERP conversion is off to a good start" and "on schedule," and that there were "no major issues to report," without disclosing that the ERP's myriad, significant problems pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders for which the Company had no solutions. As set forth in detail above, immediately upon the ERP system "going live" it suffered from numerous failures and problems that prevented the Company from fulfilling customer orders, having visibility into its inventory (some of which was stored at facilities operated by its third-party logistics firms), and a failure to generate critical reports on sales and stock. This resulted, as the Company would later admit and as corroborated by multiple former employees, in sales volume declines, profit impacts, cost increases and customer losses. Moreover, even prior to the Go-Live date, multiple former employees reported the Company's training plans and practices were woefully inadequate and the ERP experienced widespread data errors and discrepancies which were so severe that the Company's own consultant and executives had urged Defendants not to proceed with the November 2023 launch of the ERP. Compounding these deficiencies, Defendants had decided to forego full activation of the ERP's reporting functions, which deprived the Company of critical inventory and order reports necessary to accurately track and fulfill customer orders.

213. On January 4, 2024, Lamb Weston issued a press release announcing the Company's second fiscal quarter 2024 results. In the press release, filed on Form 8-K with the SEC, Lamb Weston stated that "[a]s expected, our ***volume performance in the quarter improved sequentially versus our fiscal first quarter*** . . . We anticipate that the consumer and operating environment will remain generally stable through the remainder of fiscal 2024."

214. On January 4, 2024, Lamb Weston held an earnings call with analysts and investors to discuss the Company's second quarter 2024 results. During the call, Defendant Madarieta purported to give an update on the ERP implementation, stating, "we transitioned some of our central systems in North America that manage supplier payments, inventories, warehousing, customer invoicing and customer shipments to SAP [the ERP system]. ***We're experiencing the usual bumps associated with these highly challenging large-scale projects*** but don't expect that the cutover will have a material impact on our full year business or operating results." Defendant Madarieta continued by stating that, "[t]he estimated ***financial impact of the system's go live is included in our fiscal 2024 targets,*** including the impact of pausing production and increasing planned downtime at our processing facilities, followed by a gradual ramp up of production, and reduced shipments ***due to short-term inventory visibility challenges at our third-party finished goods warehouses in the period immediately following the cutover***." Later in the call, Defendant Madarieta stated that, "[w]ith respect to sales, ***we expect the inventory visibility challenges that we experienced at the third-party warehouses to affect shipment and temper the sequential improvement in our third quarter volume trends***. But as I mentioned, earlier, we continue to expect ***year over year volume growth in our fiscal fourth quarter***."

215. On the same call, in response to an analyst question about Lamb Weston's sales volumes, Defendant Madarieta responded, "[w]e're really pleased with what ***we're seeing from a***

***volume perspective*** and the sequential improvement that we've continued to post. ***We will be positive in the fourth quarter***." Defendant Madarieta continued, referencing her earlier comments about "having reduced shipments as a result of converting over to our new ERP" and "the inventory visibility challenges that we had with our third-party warehouses," that ***I'm confident that we're correcting those***." She reiterated that, in terms of the Company's sales volumes, Lamb Weston would be "***definitely positive in the fourth quarter as we had originally projected.***" Echoing these comments, Defendant Werner told analysts, "[w]e remain confident that ***our volume trends will continue to improve*** in the back half of fiscal 2024 ***as we begin to lap and backfill exited volumes with higher margin business***."

216. Defendants' statements above in paragraphs 213-215 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. It was materially false and misleading for Defendants to claim, among other things, that ERP implementation experienced only "the usual bumps" and "short-term inventory visibility challenges" that the Company was "correcting" without disclosing that the ERP's myriad, significant problems pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders for which the Company had no solutions. Defendants statements concerning "volume growth" and sales volume improvements were similarly misleading. These statements were false misleading because the ERP system's myriad, significant problems pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders. As set forth in detail above, immediately upon the ERP system "going live" it suffered from numerous failures and problems that prevented the Company from fulfilling customer orders, having visibility into its inventory (some of which was stored at facilities operated by its third-party logistics firms), and a failure to generate critical reports on sales and stock. This resulted, as the

Company would later admit and as corroborated by multiple former employees, in sales volume declines, profit impacts, cost increases and customer losses. In addition, at the time of these statements the problems were neither contained nor corrected: they were in fact causing major disruptions that caused Defendant Madarieta and other Lamb Weston executives to attend daily (or more frequent) meetings to address the fallout from the ERP system implementation. Moreover, even prior to the Go-Live date multiple former employees reported the Company's training plans and practices were woefully inadequate and the ERP experienced widespread data errors and discrepancies which were so severe that the Company's own consultant and executives had urged Defendants not to proceed with the November 2023 launch of the ERP. Compounding these deficiencies, Defendants had decided to forego full activation of the ERP's reporting functions, which deprived the Company of critical inventory and order reports necessary to accurately track and fulfill customer orders.

217. The Company also later admitted its January 4, 2024 disclosures were materially false and misleading. During the Company's third quarter earnings call on April 4, 2024, Defendant Werner stated that "[w]hile the [ERP] transition went well in many areas, it proved more difficult than we expected despite the countless hours we spent planning, testing and preparing for the transition." Thus, as Defendant Werner admitted, Defendants knew of problems emerging between the Go-Live date in November 2023 and their January 4, 2024 statements, yet failed to disclose them until April 4, 2024 (and, even then, did not disclose the full scope or severity of these issues).

218. On January 4, 2024, Lamb Weston also filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended November 26, 2023, which was signed by Defendants Werner and Madarieta. In the Form 10-Q, the Company stated that there had "been no material

changes to the risk factors discussed in the Form 10-K." Those risk disclosures, set forth above in paragraphs 200 and 206, were materially false and misleading for the reasons set forth above in paragraphs 201 and 207 above. In addition to those reasons, Defendants' representation that there had been "no material changes" was materially false and misleading as the Company's implementation of the ERP system in November 2024 reflected massive, current problems that contradicted the Company's contingent description of ERP-related risks and adversely impacted Lamb Weston's supply chain, as more fully discussed in paragraphs 212 and 216 above. Thus, it was materially false and misleading for Defendants, among other things, to identify as a mere contingent and future risk that the Company "may" experience difficulties during the ERP transition.

### 5. Defendants' False and Misleading Statements and Omissions Concerning the Third Quarter of 2024

219. On April 4, 2024, Lamb Weston issued a press release announcing the Company's second quarter 2024 results. The press release, filed on Form 8-K with the SEC, quoting Defendant Werner, stated: "The ERP transition temporarily reduced the visibility of finished goods inventories located at distribution centers, which affected our ability to fill customer orders. In turn, this pressured sales volume and margin performance. While we are disappointed with the magnitude of the ERP transition's effect on the quarter, after implementing systems adjustments and modifying processes, ***we believe the impact is behind us as our order fulfillment rates have normalized***." Lamb Weston's press release also represented that: "The transition had a greater impact on shipments of higher-margin mixed-product loads than shipments of single-product orders, resulting in unfavorable mix. ***The Company partnered closely with its customers to minimize the impact*** and estimates the lower order fulfillment rates reduced sales volume growth by approximately 8 percentage points and net sales by approximately $135 million during the fiscal

third quarter, with $123 million and $12 million in the Company's North America and International segments, respectively." Finally, the earnings release stated: "The Company believes ***the impact of the order fulfillment issues were contained to the fiscal third quarter*** as ***customer order fulfillment rates have been restored to pre-transition levels***."

220. Also, on April 4, 2024, Lamb Weston held an earnings call to discuss the financial results of its third quarter fiscal 2024. During that call, Defendant Werner told investors that, "[w]hile the transition ***went well in many areas***, it ***proved more difficult than we expected*** despite the countless hours we spent planning, testing and preparing for the transition. In particular, we had more difficulty filling shipments of mixed product loads, which are generally higher margin than shipments of single product loads. This pressured margins in the quarter. We partnered closely with our third-party and company-owned distribution centers to minimize the impact of these challenges. This included co-locating Lamb Weston team members at our distribution centers to resolve data errors and processing issues in real time and adjusting systems and processes for balancing inventory between distribution centers and SAP." Later during the call, Defendant Werner told investors: "***With the impact of the order fulfillment issues behind us***, we remain focused on serving our customers as we close out fiscal 2024."

221. During the call, Thomas Hinsdale, an analyst from Palmer Citi Group, asked Defendant Madarieta the following question: "Okay. And then just the mid-single-digit volume decline in 4Q. If we were to kind of break that down between industry and then versus Lamb Weston specific, I mean just any help here, I mean is it industry a smaller piece to consider and the Lamb Weston piece is more meaningful?" Defendant Madarieta answered: "Yes. No, I would say that ***it's more industry is where you're going to be seeing that with the softer traffic trends***. And then the other piece will be any hangover that we have from the ERP transition, but ***definitely***

***more traffic trends softening that's impacting that***."

222. Defendant Werner reiterated this later during the call, stating: "So in summary, we believe ***the impact of the order fulfillment issues has been contained in the third quarter*** as service levels have been restored to pre-transition levels. Overall, global fry demand remains resilient although restaurant traffic trends continue to be challenged as consumers adjust to higher menu prices."

223. Defendant Madarieta echoed this sentiment, stating: "[a]s Tom noted, we're not happy with the magnitude of the impact of the ERP transition on our customers, our business, and our P&L. However, I do want to take a moment and say how proud I am of our Lamb Weston team members who did work tirelessly to ***remedy the issues we experienced and bring our customer order fulfillment rates back to pretransition levels within the quarter.*** I also want to thank our sales team members who stayed close to our customers to limit the impact as much as possible on their businesses." Later during this earnings call, Defendant Werner told investors that "[a]s with any transition, our teams are still adapting to the new system. I'm pleased that we have ***contained the effect of the inventory visibility issues to our fiscal third quarter and have restored customer order fulfillment rates to pre-transition levels.***"

224. During this earnings call, Defendant Werner also discussed Lamb Weston's relationships and communication with its customers. Specifically, Defendant Werner told investors that, "we were ***communicating well with them with the challenges we had. A lot of our bigger customers, we made sure they understood all the things we were going through***. So, generally, they didn't like it, but they understood. ***But there's no fallout from a lot of our bigger customers as we went through this.*** And we did our best to protect everybody as we could."

225. On April 4, 2024, Lamb Weston also filed with the SEC its quarterly report on

Form 10-Q for the quarterly period ended February 25, 2024, which was signed by Defendants Werner and Madarieta. In the Form 10-Q, the Company stated that, "[b]y the end of the quarter, ***we restored the visibility into our finished goods inventories and customer order fulfillment rates to pre-transition levels***." Also, in Lamb Weston's Form 10-Q, the Company stated that, "[w]e do not expect the ***ERP system transition to have a material impact on our financial performance for the remainder of fiscal 2024 as customer order fulfillment rates have been restored to pre-transition levels***."

226. Defendants' statements above in paragraphs 219-225 were materially false and misleading, and omitted to state material facts necessary to make them not misleading. It was materially false and misleading for Defendants to claim, among other things, that order fulfillment rates had "normalized," that the negative impacts of the ERP implementation were "contained" to the third quarter and the issues caused by the ERP were "behind us," without disclosing that the ERP's myriad, significant problems pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders for which the Company had no solutions. As multiple former employees also reported, these problems (as more fully described in paragraphs 212 and 216 above) were ongoing through the end of the Class Period and resulted directly in severe reductions of the Company's order fulfillment rates and inventory visibility issues that persisted through the time these statements were made. Contrary to Defendants' assurances that the disruption from the ERP transition was "contained" to the third quarter and had "no fallout" from customer losses, as Defendants knew, the order fulfillment issues caused lost sales volumes from Lamb Weston's customers and resulted in their going to competitors, negatively impacting the Company's financial performance beyond the current quarter for the rest of the fiscal year. Moreover, Defendants' statements concerning their ability to maintain sales and relationships with

the Company's "bigger customers" were materially false and misleading because Lamb Weston lost business with large customers, including (as detailed above) McDonald's due to what Lamb Weston later would describe as a "product recall."

227. Lamb Weston's Form 10-Q filed that day also included representations as to the Company's prior risk disclosures. Specifically, the Company stated that there had "been no material changes to the risk factors discussed in the Form 10-K." That statement and the underlying risks disclosures were materially false and misleading for the same reasons as set forth in paragraphs 218 and 226 above.

### 6. Defendants' False and Misleading Statements Concerning Fourth Quarter and Fiscal Year 2024

228. On July 24, 2024, Lamb Weston held an earnings call to discuss the financial results of its fourth quarter of fiscal year 2024 and year-end. During that call, Defendant Madarieta stated that "With respect to the ERP transition, the issues we experienced that affected our third quarter order fill rates ***were temporary and contained in that quarter***." Later during the same call, Defendant Madarieta also represented that "During the second half of the year, we expect our volume to increase, ***as we lap the prior year impacts of the ERP transition and voluntary product withdrawal***, increasingly benefit from recent customer contract wins in the US and key international markets, and recapture some of the market share we lost in fiscal 2024."

229. Defendants' statements above were materially false and misleading, and omitted to state material facts necessary to make them not misleading. It was materially false and misleading for Defendants to claim, among other things, that the negative impact of the ERP transition was "temporary and contained" to the prior quarter without disclosing that the ERP's myriad, significant problems pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders for which the Company had no solutions. As multiple former employees

also reported, these problems (as more fully described in paragraphs 212 and 216 above) resulted directly in severe reductions of the Company's order fulfillment rates and inventory visibility issues and were ongoing through the end of the Class Period. Contrary to Defendants' assurances that the impact of the ERP transition on the Company's performance was "temporary and contained" and the Company was now positioned for "volume to increase," as Defendants knew, the order fulfillment issues caused lost sales volumes from Lamb Weston's customers and resulted in their going to competitors, negatively impacting the Company's financial performance for the rest of the fiscal year and beyond.

230. That day, Lamb Weston filed its Annual Report on Form 10-K with the SEC. That Annual Report included two purported risk warnings. Specifically, the Annual Report stated:

> ***Disruption to our supply chain could adversely affect our business*** . . . Further, the inability of any supplier, including, but not limited to, those that supply our packaging, ingredients, equipment and other necessary operating materials, co-manufacturer, independent contractor, logistics service provider, or independent distributor to deliver or perform for us in a timely or cost-effective manner could cause our operating costs to increase and our profit margins to decrease. We have experienced, and may continue to experience, disruptions in our supply chain, including as a result of temporary systems disruptions, labor shortages, increased transportation and warehousing costs, longer shipping times, and other factors related to the effects of pandemics or other public health crisis, such as the COVID-19 pandemic, the ongoing war in Ukraine and the conflicts in the Middle East. For example, in fiscal 2024 after our transition to a new ERP system in North America, ***we experienced temporary reduced visibility into finished goods inventories at our distribution centers, which affected our ability to fill customer orders and reduced our sales and increased costs***. In addition, the occurrence of a significant supply chain disruption or the inability to access or deliver products that meet requisite quality and safety standards in a timely and efficient manner, could lead to increased warehouse and other storage costs or otherwise adversely affect our profitability and weaken our competitive position or harm our business.

231. In addition, the Annual Report stated that:

> ***Problems with the transition, design, or implementation of our new ERP system*** have and ***could further interfere with our business and operations and adversely affect our financial condition***. The ERP system implementation process has required, and will continue to require, the investment of significant personnel and financial resources. We have experienced, ***and may continue to experience***,

> ***difficulties*** as we transition to new upgraded systems and business processes. For example, after the ERP transition in our fiscal third quarter 2024, ***we experienced temporary reduced visibility into finished goods inventories at our distribution centers***, which affected our ability to fill customer orders. . . . Any disruptions, delays, or deficiencies in the transition, design, and implementation of a new ERP system, particularly any disruptions, delays, or deficiencies that impact our operations, could have a material adverse effect on our business, financial condition, and results of operations. Even if we do not encounter further adverse effects, the transition, design, and implementation of a new ERP system, may be much more costly than we anticipated.

232. Defendants' statements above in paragraphs 230-231 were materially false and misleading, and omitted to state material facts necessary to make them not misleading. It was materially misleading for Defendants to (i) present as a mere contingent and hypothetical risk that supply chain disruptions "could" or "may" impact Lamb Weston's business in the future; and (ii) represent Lamb Weston had experienced "temporary" reduced visibility, which suggested that this issue had been resolved. As set forth herein, multiple former employees reported that the ERP's myriad, significant problems (including as more fully described in paragraphs 212 and 216 above) pervasively hindered the Company's ability to reliably manage inventory and fulfill customer orders for which the Company had no solutions, resulting in severe reductions of the Company's order fulfillment rates and inventory visibility issues that were ongoing through the end of the Class Period. Contrary to Defendants' assurances that the impact of the ERP transition on the Company's performance was "temporary and contained" and the Company was now positioned for "volume to increase," as Defendants knew, the order fulfillment issues caused lost sales volumes from Lamb Weston's customers and resulted in their going to competitors, negatively impacting the Company's financial performance for the rest of the fiscal year and beyond.

### 7. Defendants' False and Misleading Statements and Omissions Concerning the First Quarter of 2025

233. On October 2, 2024, Lamb Weston filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended August 25, 2024, which was signed by Defendants Werner

and Madarieta. In the Form 10-Q, the Company stated that there had "been no material changes to the risk factors discussed in the Form 10-K," referring to the risk disclosures quoted above in paragraphs 230-31. Those statements were materially false and misleading for the same reasons as set forth in paragraph 232 above.

### 8. Defendants' False and Misleading Statements and Omissions Concerning Lamb Weston's Internal Controls Over Financial Reporting and Their Effectiveness

234. In Lamb Weston's Annual Reports filed on July 25, 2023 and July 24, 2024, Defendants Werner and Madarieta made a series of representations concerning the Company's purported internal controls over financial reporting. Specifically, they stated:

> Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer and oversight of the Board of Directors, assessed the effectiveness of our internal control over financial reporting as of [year-end]. Management based this assessment on criteria for effective internal control over financial reporting described in *Internal Control – Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Management's assessment included evaluation of elements such as the design and operating effectiveness of key financial reporting controls, process documentation, accounting policies, and our overall control environment . . . Based on this assessment, management concluded that, as of [year-end], ***our internal control over financial reporting was effective*** to provide reasonable assurance regarding the reliability of financial reporting and the preparation of consolidated financial statements for external reporting purposes in accordance with GAAP. We reviewed the results of management's assessment with the Audit and Finance Committee of our Board of Directors.

235. In Exhibits 31.1, 31.2, 32.1, and 32.2 of each Annual Report on Form 10-K and each Quarterly Report on Form 10-Q, Defendants Werner and Madarieta further certified under Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") that the Annual and Quarterly Reports were accurate and complete, and that they had established appropriate internal controls, stating that they: (i) were responsible for establishing and maintaining internal control over financial reporting, and (ii) had designed such internal controls over financial reporting to provide reasonable assurance regarding the reliability of Lamb Weston's financial reporting and

the preparation of Lamb Weston's financial statements during the Class Period. Furthermore, Defendants Werner and Madarieta represented that they had reviewed Lamb Weston's filings and that the filings did not contain any "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading."

236. Lamb Weston's January 4, 2024 Quarterly Report made additional representations as to the ongoing effectiveness of Lamb Weston's internal controls over financial reporting. This report, which was issued after the launch of Lamb Weston's new ERP system, represented: "Except as it may relate to the integration of the LW EMEA business, ***there have been no changes in our internal control over financial reporting during the quarter ended November 26, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting***."

237. Defendants' statements above in paragraphs 234-236 made in Lamb Weston's January 2024 Quarterly Report, which were predicated upon Defendants' earlier representations in their July 2023 Annual Report, were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. Contrary to Defendants' assertions, Lamb Weston did not maintain effective "internal controls over financial reporting." Lamb Weston was unable to effectively monitor and assess its inventory or fulfill customer orders, rendering Lamb Weston's internal controls ineffective. Indeed, as Defendants were forced to admit in April 2024, their internal controls were so ineffective that they had to implement "changes" to "certain financial processes impacting key controls related to our internal controls over financial reporting" in order to "update[] our internal controls as appropriate in light of the system implementation." Even after making these changes, however, Lamb Weston's internal controls remained ineffective,

as Lamb Weston was still "blind operationally" until at least October 2024, leading to continued customer share losses.

### B. Defendants' False and Misleading Statements and Omissions Regarding Competition and Pricing

238. As alleged above, during the Class Period Lamb Weston priced its frozen potato products at prices that were supra-competitive. In particular, by early 2023, if not before, the price of Lamb Weston's products was not correlated with the underlying "input" costs of those products. Despite these facts, throughout the Class Period Defendants made repeated false and misleading statements that falsely described the market for Lamb Weston's products as "highly competitive" and stressed that price increases were additive and based on "input and manufacturing cost inflation."

239. On July 25, 2023, Lamb Weston filed an Annual Report with the SEC on Form 10-K, which was signed by Defendants Werner and Madarieta. In this report, Defendants described the competitive environment Lamb Weston operated in, stating: "The value-added frozen potato products industry in North America, Europe and other international markets ***is highly competitive***." Defendants then stated: "***We compete with producers of similar products*** on the basis of, among other things, customer service, value, product innovation, product quality, brand recognition and loyalty, ***price***, and the ability to identify and satisfy customer preferences. ***The markets in which we operate are expected to remain highly competitive for the foreseeable future.***"

240. Lamb Weston's Annual Report also described the drivers of Lamb Weston's financial results for fiscal year 2023 in comparison with the previous fiscal year. In discussing those financial results, Defendants told investors that: "Price/mix increased 26%, ***reflecting the benefit of pricing actions*** across each of our core business segments ***to counter input and***

***manufacturing cost inflation.***"

241. Later that day, Lamb Weston held its quarterly earnings call, during which Defendant Madarieta described pricing actions that Lamb Weston had previously taken, stating: "Price/mix was up 24% as we ***continued to benefit from pricing actions taken in fiscal 2023 across each of our business segments to counter input and manufacturing cost inflation***." On the same call, when discussing Lamb Weston's retail segment specifically, Defendant Madarieta stated: "Sales in our Retail segment increased 25%. Price/mix increased 35%, driven by pricing actions across our branded and private label portfolios that we began to implement in February ***to counter input cost inflation.***"

242. On October 5, 2023, Lamb Weston filed a quarterly report with the SEC on Form 10-Q, which was signed by Defendants Werner and Madarieta. In that report, Defendants stated, "In the first quarter of fiscal 2024, ***we drove solid sales growth and earnings growth, reflecting***: the carryover benefit of ***pricing actions taken in the prior year to counter input cost inflation***[.]"

243. On that same day, Lamb Weston held its quarterly earnings call, during which Defendant Madarieta reiterated that "Price/mix was up 23% as we ***benefited from the pricing actions taken in fiscal 2023*** in both our North America and International segments ***to counter input and manufacturing cost inflation.***"

244. On October 11, 2023, Lamb Weston held its Investor Day conference, which Defendant Werner and Madarieta participated in. During the conference, Defendants once again attributed their favorable financial results to pricing actions purportedly taken to counter inflation. Specifically, Defendant Madarieta stated: "In fiscal 2023, we grew our organic sales an impressive 20%. ***Our price/mix increased 26% as we continued to benefit from pricing actions across each of our business segments to counter input and manufacturing cost inflation.***"

245. During the conference, an analyst from Jeffries asked: "[L]et's just say we're to assume that in fiscal 2025, costs weren't inflationary, it seems like you said kind of over the next couple years, there could still be some pricing opportunity. Is that fair?" In response, Defendant Werner stated:

> Again, we've kind of reset our margin structure to pre-pandemic. And as we go through maybe a normalized inflationary period, as we have in the past, we're going to continue to price through that. So, I'm confident, and we haven't historically rolled back pricing. And I know everybody is concerned about that.
>
> But we're going to continue to evaluate the market, the inflation, our input costs. And ***we've absorbed a tremendous amount of cost in this business over the last two years. We've honored our commitments to our customers in terms of absorbing the inflation.*** We did a great job, as you can see in the results, getting our pricing architecture back kind of where it was and improved. And we're going to continue to focus on it. But pricing in this business is always going to be a lever that we're going to evaluate when to pull and what the market spread, as Bernadette alluded to, in terms of restaurant pricing.

246. On January 4, 2024, Lamb Weston filed another quarterly report with the SEC on Form 10-Q, which was signed by Defendants Werner and Madarieta. In that report, Defendants discussed Lamb Weston's financial results for the second quarter of fiscal year 2024 in comparison with the prior year quarter, stating that: "Price/mix increased 12%, ***reflecting the benefit of inflation-driven pricing actions*** across each of our business segments[.]"

247. On that same day, Lamb Weston held its quarterly earnings call, during which Defendant Madarieta reiterated that "Price/mix was up 12% ***as we continued to benefit from the inflation-driven pricing actions taken in fiscal 2023 along with the pricing actions taken this year*** in both our North America and international segments."

248. Then, during the same earnings call, an analyst from Goldman Sachs asked Defendants to confirm that without the potato write-off Defendants announced, Lamb Weston's "gross profit margin in this quarter would have been 350-or-so basis points higher and your full

year gross margins would have been . . . 90 to 100 basis points [higher].” The analyst continued, “[A]s we think about the absence of this charge or assuming it wouldn’t repeat in 2025, all else equal, your gross profit margins are tracking kind of pretty comfortably ahead of how you framed your business outlook at the Investor Day in October? Or am I mischaracterizing that?” Defendant Madarieta responded, “You’re correct. Our Q2 gross margin implies a 31.3% margin, excluding the write-off of the potatoes. And as we’ve been talking about, ***that increase is related to the pricing actions and then catching up to the multiyear impact of inflation*** and also allowing the benefit of the productivity and mix that fall through.”

249. On April 4, 2024, Lamb Weston filed a quarterly report with the SEC on Form 10-Q, which was signed by Defendants Werner and Madarieta. In that report, when describing Lamb Weston’s financial results for the third quarter of fiscal year 2024, Defendants stated, “Price/mix increased 4%, reflecting ***the benefit of inflation-driven pricing actions*** across both of our business segments, partially offset by lower customer transportation charges.”

250. That day, Lamb Weston held its quarterly earnings call, during which Defendant Madarieta reiterated that “Price/mix was up 4% as we continued to ***benefit from the inflation-driven pricing actions taken in fiscal 2023*** and ***pricing actions taken this year*** in both our North America and international segments.” Later during that call Defendant Madarieta represented that: “Adjusted gross profit increased $24 million to $427 million, ***which was driven by the benefit of inflation-driven pricing actions*** and incremental earnings from the consolidation of the EMEA business.”

251. On July 24, 2024, Lamb Weston filed its Annual Report with the SEC on Form 10-K, which was signed by Defendants Werner and Madarieta. In that report, Defendants stated, “***The value-added frozen potato products industry*** in North America, Europe and other international

markets ***is highly competitive.***" Defendants then stated, "***We compete with producers of similar products on the basis of***, among other things, customer service, value, product innovation, product quality, brand recognition and loyalty, ***price***, and the ability to identify and satisfy customer and consumer preferences. ***The markets in which we operate are expected to remain highly competitive for the foreseeable future.***"

252. Lamb Weston's Annual Report also discussed Lamb Weston's financial results for fiscal year 2023 in comparison with the previous fiscal year. Specifically, Defendants stated: "Price/mix increased 10%, reflecting ***the carryover benefit of inflation-driven pricing actions taken in fiscal 2023***, ***as well as pricing actions taken in fiscal 2024***, across each of our business segments, partially offset by lower customer transportation charges that were driven by lower volume and the pass-through of lower freight rates."

253. Defendants continued to attribute their financial success to purportedly legitimate factors, telling investors that: "Adjusted Gross Profit increased $262.1 million, or 17.5%, to $1,758.7 million, ***driven primarily by*** incremental earnings from the consolidation of the financial results of LW EMEA, and ***benefits from inflation-driven pricing actions.***"

254. That day, Lamb Weston held its quarterly earnings call. While describing Lamb Weston's financial results for the fourth quarter of fiscal year 2024, Defendant Madarieta stated: "Price mix increased 3%, ***reflecting the carryover benefit of inflation driven pricing actions taken in late fiscal 2023, as well as pricing actions taken in fiscal 2024 across both of our business segments***."

255. On October 2, 2024, Lamb Weston filed its quarterly report with the SEC on Form 10-Q, which was signed by Defendants Werner and Madarieta. In that report, when describing Lamb Weston's financial results for the first quarter of fiscal year 2025, Defendants stated:

"Price/mix increased 2%, reflecting the benefit of ***inflation-driven pricing actions*** in Europe and North America."

256. That day, Lamb Weston held its quarterly earnings call, during which Defendant Madarieta reiterated that "Price mix increased 2% compared with the prior year due to the benefit of ***inflation driven pricing actions*** in Europe, ***as well as the carryover benefit of pricing actions we took last year in North America***. Unfavorable channel and product mix as well as targeted investments in price and trade tempered the increase in price/mix."

257. Later during the October 2, 2024 call, an analyst from TD Cowen asked Defendants whether it was "fair to say that pricing goes negative for the rest of the year in North America? Because I think you still have to give incentives to food service customers to get them to come back after the ERP disruption. So can you give us an update on how that's going, . . . have you started that yet or is there a lot more acceleration to do in a follow up after?" Following a general response by Defendant Werner, Defendant Madarieta stated that "***I just want to emphasize that the overall pricing environment is competitive***, but it's been disciplined. And as Tom said, our pricing investment for the year is – continues to be on track. You will see greater pricing investment, though, during the balance of the year relative to the first quarter. And so, we will see some negative price/mix."

258. The statements identified above in paragraphs 239-257 were materially false and misleading, and omitted to state material facts necessary in order to make them not misleading. First, it was materially false and misleading for Defendants to assert that the frozen potato market was "highly competitive," and that Lamb Weston "compete[d] with producers of similar products on the basis of . . . price." *See* ¶¶239, 251, 257. In truth, the frozen potato market was not competitive. Lamb Weston and the other major frozen potato producers ***did not*** compete as to

price, and instead, had engaged in price increases in tandem with other frozen potato producers for the past several years immediately preceding the Class Period, which established supra-competitive pricing and reflected a lack of competition. As former employees of both Lamb Weston and its purported competitors explained, frozen potato producers had for years refused to compete with one another as to price. This allowed Lamb Weston and the other frozen potato producers to capture significant margins that the industry had "never ever seen." *See* Section IV.C, *supra*.

259. Second, it was materially false and misleading for Defendants to attribute Lamb Weston's financial success to pricing actions that were purportedly taken in response to ***inflation.*** *See* ¶¶240-250, 252-256. In truth, Defendants' pricing actions were a reflection of Defendants' supra-competitive activity. Defendants and Lamb Weston's purported competitors had engaged in coordinated price increases for the past several years immediately preceding the Class Period that were not connected to any increased costs from inflation. In fact, even as frozen potato input costs eventually began to decrease, frozen potato prices (including Lamb Weston's) either increased or remained at supra-competitive levels, and Defendants also continued to attribute their pricing actions to "ongoing inflation" through the end of the Class Period. *See* Section IV.C, *supra*.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

260. Numerous allegations set forth above and summarized below collectively support a strong inference that Defendants knew, or at a minimum were deliberately reckless in not knowing, the true and omitted facts when they made material misrepresentations to investors throughout the Class Period.

261. ***First,*** before and during the Class Period, Defendants were in direct possession of information from multiple sources contradicting their public statements. Defendants Madarieta and Werner were informed by multiple Lamb Weston employees, including senior leaders of the

Company tasked with implementing the ERP, about the severe problems with the ERP system, both before and after its implementation. For example, as FE-1 reported, the three Global Process Owners, who were Vice Presidents with direct involvement in the ERP implementation, reported issues with the ERP to Defendant Madarieta on a weekly basis in standing meetings about the status of the ERP implementation. Defendant Madarieta was also a member of Lamb Weston's Steering Committee overseeing the ERP implementation, which met at least every two weeks and with increasing frequency as the ERP problems mounted during the Class Period. Further, as FE-3 reported, Defendant Madarieta received information about the status of the implementation for the purpose of reporting it up to Defendant Werner, to whom she frequently presented. FE-2 also reported multiple discussions in which problems with the ERP were discussed with Defendant Werner.

262. As FE-3, FE-1, and FE-2 all explained, beginning in September 2023, Lamb Weston's executive leadership, including Defendant Madarieta, attended "Go/No Go" meetings, during which E&Y gave detailed presentations showing that there were widespread errors with the ERP system that made it unsuitable for the planned launch in November 2023. As a result, FE-3 said Lamb Weston executives, including Defendant Madarieta were "absolutely aware" of the implementation issues before the system's Go-Live date, yet disregarded E&Y's recommendations and repeated warnings in deciding to proceed with the November 2023 launch. It was also understood that Defendant Madarieta was reporting the issues raised with the ERP to Defendant Werner.

263. Defendants were also aware of problems with the ERP from internal reporting through the Company's RAID log, which tracked and documented every single risk related to the ERP implementation from the moment the ERP design was "locked" in 2022. As FE-3 explained,

the most severe of those issues were elevated to the Steering Committee, including Defendant Madarieta. Thus, Defendants were aware of the most severe ERP issues through the RAID log.

264. Following the system's launch in November 2023, Defendants continued to receive regular updates regarding the ERP's failures, and consequently, they were aware that their public statements continued to be false and/or misleading. For example, as FE-1 reported, the inventory visibility and order fulfillment issues following the launch were so severe that the Company began holding twice daily "tracker" meetings beginning in December 2023, which Defendant Madarieta personally attended. These meetings revealed that as little as ***50%*** of customer orders were being correctly processed and shipped in December using the new ERP system, and made Defendant Madarieta "100%" aware of the ERP implementation's disastrous results following the system's launch. These meetings continued to be held each week until at least until April 2024.

265. In fact, as Lamb Weston repeatedly stated in its SEC filings, the new ERP system was specifically "designed to . . . provide timely information to [Lamb Weston's] management team related to the operation of the business." Thus, either the new ERP system ***was*** providing timely information to management, in which case Defendants knew about the system's shortcomings, or the system ***failed*** to provide such information, in which case Defendants were reckless in making statements regarding the implementation's success. In all events, Defendants' access to, and awareness of, information contradicting their public statements supports a compelling inference of scienter.

266. ***Second,*** Defendant Madarieta was directly involved in both pricing decisions and supervision of the ERP system implementation as the project's "sponsor." According to FE-1, Defendant Madarieta was among the senior executives making pricing decisions for Lamb Weston's products. FE-1 also explained that Defendant Madarieta's role as an ERP sponsor

required her to approve any additional investments, resources, or changes in schedule to the ERP project. Defendant Madarieta had "overall oversight" of the ERP project. In addition to serving as the ERP project's sponsor, Defendant Madarieta was also on the Steering Committee responsible for overseeing the ERP project. Thus, Defendant Madarieta was uniquely situated to know about the ERP system implementation failures. Her direct involvement with Lamb Weston's pricing decisions and the ERP implementation strengthens the inference of scienter. For example, according to FE-3, Defendant Madarieta received reports from Lamb Weston finance personnel regarding what prices to charge. Defendant Madarieta received information about the status of the implementation for the purpose of reporting it up to Defendant Werner, to whom she frequently presented.

267. ***Third,*** not only was Defendant Madarieta directly involved in supervising the ERP implementation, but she continually misrepresented the status of the ERP project to Lamb Weston's Board of Directors and modified the project's RAID log as discussed above. That Defendant Madarieta misrepresented the status of the ERP project, including to Lamb Weston's own Board of Directors, strengthens the inference of scienter.

268. ***Fourth,*** Defendants repeatedly spoke about the status of the ERP system implementation, putting their knowledge directly at issue. For instance, when discussing Lamb Weston's new ERP system during the Company's October 5, 2023 earnings call, Defendant Werner assured investors that the Company's "modernization efforts around the globe remain on track." A few months later, ***after*** the ERP system was launched, Defendant Madarieta minimized any problems with the ERP implementation, stating: "We're experiencing the usual bumps associated with these highly challenging large scale projects but don't expect that the cutover will have a material impact on our full year business or operating results."

269. Then, on April 4, 2024, while Defendants disclosed for the first time the problems they had experienced transitioning to the new ERP system, they simultaneously focused on soothing the market by pointing to the Company's supposed recovery, as well as the supposed lack of customer impact. That day, Defendant Werner falsely told investors that Lamb Weston had "contained the effect of the inventory visibility issues to our third quarter." Similarly, in direct response to a Bank of America analyst question that day about whether Lamb Weston's customers were "leaning on" the Company more during contract negotiations based upon the "recent challenges" created by the ERP implementation, Defendant Werner stated definitively: "there's no fallout from a lot of our bigger customers as we went through this."

270. Additionally, Defendants repeatedly provided false explanations for Lamb Weston's significant price increases throughout the Class Period. Specifically, Defendants assured investors that price increases were simply reflective of macroeconomic conditions, designed to counter or catch up with input cost inflation. For instance, in July 2023, Defendant Werner stated that "our pricing actions last year were intended to catch up to the effect of multiple years of high inflation." Then, in October 2023, Defendant Madarieta stated "[p]rice/mix was up 23% as we benefited from the pricing actions taken in fiscal 2023 in both our North America and International segments to counter input and manufacturing cost inflation." Defendant Madarieta continued to give the same explanation for Lamb Weston's price increases all the way through October 2, 2024, when she stated price increases reflected "pricing actions announced this year to counter input cost inflation." That Defendants repeatedly made statements concerning each of these issues, including in direct response to pointed questions from analysts, strengthens the inference of scienter.

271. ***Fifth,*** Defendants received consistent additional warnings about problems with the ERP from Lamb Weston's outside consultant, E&Y, as well as the Company's third-party

warehousing providers. For instance, during a meeting in September 2023, E&Y expressly warned Lamb Weston and Defendant Madarieta not to proceed with the ERP launch because the "basic elements" needed for the ERP system to properly function were ***still*** "not in place." During this meeting, E&Y also warned Defendants that the accuracy rate for Lamb Weston's new ERP system needed to be corrected before the ERP could be used for business purposes. Furthermore, E&Y expressly warned Defendants at this meeting that they were "not even close" to being prepared for the launch. Similarly, FE-1 recounted that E&Y reported to Defendants that 40% of the EDI transactions were failing just four weeks before the system was supposed to launch, and then again just one week before the launch. And according to FE-3, E&Y had told the Steering Committee, including Defendant Madarieta, that EDI communications through the ERP to and from Lamb Weston's storage facilities were repeatedly failing.

272. Similarly, as FE-3 reported, Lamb Weston's third-party provider, Americold, raised concerns about the ERP implementation during the testing phase in August 2023, warning that the ERP encountered problems interfacing with third-party systems in shifting to an "interactive real time" process, issues that directly impacted inventory visibility and order fulfillment. That Lamb Weston's outside consultants and other third parties identified and repeatedly warned about significant deficiencies in Lamb Weston's ERP system in the immediate lead-up to the system's launch, and that Defendants refused to fix those problems before launching the system, strengthens the inference of scienter.

273. ***Sixth,*** Defendants' misrepresentations concerned two of the most pressing issues facing the Company: the ERP system and Lamb Weston's pricing and profit margins. The ERP implementation was a major investment that was necessary to bring Lamb Weston's outdated operations up to modern standards. Indeed, the Company had been planning the ERP

implementation for years. Defendant Werner stated as early as July 23, 2019 that a new ERP system would "drive productivity and reduce costs by streamlining supply chain, commercial and back-office processes, while also improving our demand in operations planning across our global manufacturing footprint." As Defendant Madarieta herself stated during the Company's July 25, 2023 earnings call, Lamb Weston was "replacing, again, decades of under-spending in IT with the ERP." By October 2023, Defendants were frequently touting the new ERP system as one of the "multiple strategic levers" the Company had to "pull to drive margin improvement." Analysts also understood that the new ERP project was critical to the company's performance. As an Equisights analyst wrote on May 5, 2024, "***[t]he ERP upgrade is not only crucial for streamlining current operations*** but also sets the foundation for a global rollout that will standardize processes across regions, thereby ***driving long-term efficiency gains***. This transition, once fully stabilized, is expected to provide a robust platform for Lamb Weston to support scalable growth, enhance customer service levels, and improve operational flexibility, which are ***vital for maintaining competitive advantage*** in the dynamic food processing industry." In addition, the market was keenly focused on Lamb Weston's margins and their importance to the Company's success. Analysts consistently reported on Lamb Weston's "unique pricing power," and frequently asked questions about Lamb Weston's pricing actions. In response, Defendants regularly attributed pricing increases to innocuous factors such as inflation. That Defendants' misrepresentations concerned two of the most pressing issues facing Lamb Weston strengthens the inference of scienter.

274. ***Seventh,*** Defendants knew that securities analysts were intently focused on Lamb Weston's ERP implementation and its consequences. Throughout the Class Period, analysts published detailed reports that repeated and credited Defendants' misrepresentations concerning

the ERP implementation's status and impact on Lamb Weston's business. For instance, analysts at TD Cowen wrote on December 4, 2023 that "[i]n our recent meeting with investor relations, we were encouraged to hear that . . . ***the company's ERP conversion is off to a good start***," and that there "***were no major issues to report***." Similarly, analysts at Barclays wrote on January 5, 2024 that the Company had "***prudently incorporated any potential impact*** stemming from the ERP implementation into its FY24 guidance." Even after the April 4, 2024 partial corrective disclosure, Defendants continued to misrepresent the impact of the ERP implementation, and analysts continued to believe that the ERP launch problems were now fully behind the Company. For instance, analysts at Wells Fargo noted on April 4, 2024 that "***ERP impact appear[ed] contained***" to the previous quarter. Similarly, TD Cowen stated on May 23, 2024 that Lamb Weston had "***expressed a high degree of confidence*** that they will win back the small customers they lost during the ERP conversion when they couldn't ship." That securities analysts were intently focused on this issue, and Defendants continued to mislead them, strengthens the inference of scienter.

275. ***Eighth,*** the temporal proximity between Defendants' false and misleading statements and the revelation of the truth strengthens the scienter inference. On January 4, 2024, Defendant Madarieta stated: "[w]e're experiencing the usual bumps associated with these highly challenging large scale projects but don't expect that the cutover will have a material impact on our full year business or operating results." Similarly, Defendant Madarieta assured investors on that same call that "[t]he estimated financial impact of the system's go live is included in our fiscal 2024 targets, including the impact of pausing production and increasing planned downtime at our processing facilities, followed by a gradual ramp up of production, and reduced shipments[.]" Yet just three months later on April 4, 2024, Defendant Werner disclosed that Lamb Weston had

"reduced [its] fiscal 2024 financial targets to reflect . . . the higher-than-expected financial impact of the ERP transition." The constant, long-term nature of the information Defendants received undermines the notion that their knowledge of the ERP implementation's expected financial impact would have shifted in such a short period of time.

276. ***Ninth,*** the Individual Defendants were motivated to both artificially inflate Lamb Weston's adjusted gross margin percentage through supra-competitive pricing and to misrepresent the progress of the ERP implementation in order to reap financial benefits through Lamb Weston's executive compensation program. The Company disclosed, in a Form 8-K filed with the SEC on July 26, 2022, that its Compensation Committee had approved on July 20, 2022 one-time equity awards of leveraged performance units ("LPUs")[25] and stock options to certain executive officers of Lamb Weston, including Defendants Werner and Madarieta. According to that same disclosure, compensation from the LPUs would only be realized to the extent Lamb Weston's stock price increased between its 2023 and 2025 fiscal years. As set forth in the table below, if Lamb Weston's share price had reached its 50% target at the end of fiscal year 2025, 100% of the LPUs would vest. If Lamb Weston's share price appreciated by 75% at the end of fiscal year 2025, a maximum 300% of the LPUs would vest.[26]

| Performance Range | Stock Price Appreciation Goal | % of LPUs Vesting |
|---|---|---|
| Max | 75% | 300% |
| Target | 50% | 100% |
| Minimum | 25% | 50% |

[25] Defined as "Performance share award ['PSA'] tied to stock price appreciation with higher leverage than our normal PSAs in the regular long-term incentive plan."

[26] Lamb Weston Holdings Co., Proxy Statement (Form DEF 14A), at 50 (Aug. 8, 2023).

277. According to a March 11, 2024 analyst report published by BNP Paribas—which also noted that the one-time equity awards "are substantial and are linked directly to the performance of [Lamb Weston's] share price"—Defendant Werner would receive ***$31.5 million*** in compensation if Lamb Weston's shares were trading at $139.41 by the end of fiscal year 2025. At the start of the Class Period on July 25, 2023, Lamb Weston's shares opened at $113.43. Knowing that their compensation would increase substantially if Lamb Weston's share price hit those targets, Defendants were motivated throughout the Class Period to hide from investors information regarding the ERP implementation's difficulties that would negatively impact Lamb Weston's share price, as fiscal year 2025 approached.

278. Additionally, according to Lamb Weston's Proxy Statement filed August 8, 2023, the Compensation Committee approved Annual Cash Incentive Compensation ("Annual Incentive Plan") composed of three annual incentive financial measures for fiscal year 2023: net sales (25%), adjusted EBITDA including unconsolidated joint ventures (50%) and adjusted gross margin percentage (25%). The Proxy Statement explained that "[a]lthough our third financial metric had historically been cash flow from operating activities, the Compensation Committee felt strongly that for fiscal 2023 a gross margin metric, specifically Adjusted Gross Margin Percentage, would be better aligned with stockholders' interests in driving margin expansion back to pre-pandemic levels." By achieving an adjusted gross margin percentage of 27.9% for fiscal 2023, Lamb Weston surpassed the 25.0% threshold, thus entitling Defendants to the maximum 200% payout under the Annual Incentive Plan for that metric. These margins—which a former Vice President at Lamb Weston described as never before seen "in the history of the potato industry"—would have been impossible to achieve and sustain if Lamb Weston was competing on price in a functioning market. Knowing that their compensation would be influenced by Lamb Weston's adjusted gross margin

percentage, Defendants were incentivized to increase the Company's profit margin—including through anticompetitive means.

279. JANA Partners, one of Lamb Weston's largest shareholders, further noted that Lamb Weston "[m]isaligned executive compensation [with] targets that heavily incent[ivize] growth, have no return on capital guardrails and have allowed management to earn the maximum amount (200%) of the target in FY24 on the operational performance component of the Long-Term Incentive Program's Performance Share Awards despite disastrous performance for investors."

280. JANA also disclosed that Defendant Werner had been engaged in "Questionable Use and Disclosure Practices around Aviation Assets." Lamb Weston maintains a corporate plane, which was intended to "facilitate transport of employees between Boise, ID and key manufacturing locations." Based on JANA's "analysis of flight records," however, since 2019, "Lamb Weston's plane has registered ~300 flights into or out of Omaha, NE – the former headquarters of Conagra and what appears to be the CEO's primary residence – and additional flights to numerous other destinations that raise questions regarding the legitimate business purpose of these flights." As JANA noted, Lamb Weston's "proxy disclosures – which show compensation of only $14,463, $13,737 and $21,349 of value for the CEO's personal use of Company aircraft in the years F2022, F2023 and F2024 and neither disclosure for any value received in earlier periods nor indication of plane usage for business purposes related to productivity and safety – seem to be at odds with our flight analysis, which raises serious questions about the use and disclosure around the Company's aviation assets." In other words, according to one of Lamb Weston's largest stakeholders, Defendant Werner had been using corporate assets for personal purposes, taking advantage of the significant financial benefits associated with doing so. That Defendants were incentivized to

defraud investors further strengthens the inference of scienter.

281. ***Tenth,*** the circumstances surrounding Defendant Werner's departure from his role as CEO and member of the Board of Directors at Lamb Weston, as well as Sukshma Rajagopalan's sudden departure from her role as CIO following implementation of the ERP, further strengthen the scienter inference. Lamb Weston announced on December 19, 2024 that Defendant Werner would be "stepping down" from his CEO position and as a member of the board. This announcement coincided with Lamb Weston's disappointing financial results for the second quarter of fiscal 2025, which disclosed continued pricing pressure and market share loss. Similarly, on October 11, 2024, Lamb Weston announced that Rajagopalan would depart the Company effective October 25, 2024, after having only joined the Company in June 2023, just before the Company's announcement it had resumed the ERP project, and having overseen technical aspects of the ERP implementation in the year before her departure. The suspicious timing of these departures further strengthens the scienter inference.

## VIII. ADDITIONAL LOSS CAUSATION ALLEGATIONS

282. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

283. During the Class Period, as detailed herein, Plaintiffs and the Class purchased Lamb Weston common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information and undisclosed risks alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses. As a result of their purchases of Lamb Weston common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## IX. CLASS ACTION ALLEGATIONS

284. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Lamb Weston common stock between July 25, 2023 and December 19, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

285. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Lamb Weston's shares actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Lamb Weston shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Lamb Weston or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

286. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

287. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

288. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the

questions of law and fact common to the Class are: (a) whether Defendants violated the federal securities laws; (b) whether Defendants omitted and misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading; (d) whether the price of Lamb Weston's common stock was artificially inflated; (e) whether Defendants' conduct caused the members of the Class to sustain damages; and (f) the extent of damages sustained by Class members and the appropriate measure of damages.

289. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

290. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint. The statements alleged to be false herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false, and/or the forward-looking statement was authorized or approved by an executive officer of Lamb Weston who knew

that the statement was false when made.

## XI. PRESUMPTION OF RELIANCE

291. The market for Lamb Weston's common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false statements, Lamb Weston's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Lamb Weston's common stock and market information relating to Lamb Weston, and have been damaged thereby.

292. During the Class Period, the artificial inflation of Lamb Weston's shares was caused by the material misrepresentations in this Amended Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false statements about Lamb Weston's business, prospects, and operations. These material misstatements created an unrealistically positive assessment of Lamb Weston and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

293. At all relevant times, the market for Lamb Weston's common stock was an efficient market for the following reasons, among others:

(a) Lamb Weston shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Lamb Weston filed periodic public reports with the SEC and/or the NYSE;

(c) Lamb Weston regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Lamb Weston was followed by common stock analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

294. As a result of the foregoing, the market for Lamb Weston's common stock promptly digested current information regarding Lamb Weston from all publicly available sources and reflected such information in Lamb Weston's share price. Under these circumstances, all purchasers of Lamb Weston's common stock during the Class Period suffered similar injury through their purchase of Lamb Weston's common stock at artificially inflated prices and a presumption of reliance applies.

## XII. CAUSES OF ACTION

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

295. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

296. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Lamb Weston's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

297. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Lamb Weston's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

298. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Lamb Weston's financial well-being and prospects, as specified herein.

299. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Lamb Weston's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts about Lamb Weston and its business operations and future prospects, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

300. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were the CEO and CFO of the Company during the Class Period and had complete control over the Company's public statements and filings; (ii) the Individual Defendants were privy to, and in fact personally directed the creation and reporting of the Company's public filings, including its financial metrics; and (iii) each of Individual Defendants was aware of the Company's dissemination of false information to the investing public which they knew and/or recklessly disregarded was materially false.

301. The Individual Defendants had actual knowledge of the misrepresentations of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Individual Defendants knowingly and/or recklessly made material misrepresentations for the purpose and effect of concealing Lamb Weston's financial well-being and prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by the Individual Defendants' misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false.

302. As a result of the dissemination of the materially false information, as set forth above, the market price of Lamb Weston's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false statements made by the Defendants, or upon the integrity of the market in which the common stock trades, and/or in the

absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Lamb Weston's common stock during the Class Period at artificially high prices and were damaged thereby.

303. At the time of said misrepresentations, misleading statements and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true and complete. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Lamb Weston was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Lamb Weston common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

304. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

305. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

306. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

307. The Individual Defendants were controlling persons of Lamb Weston within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as CEO and CFO of the Company, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements

filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be false prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

308. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the common stock violations as alleged herein, and exercised the same.

309. As set forth above, Lamb Weston and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts as alleged in this Amended Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 21, 2025 Respectfully Submitted,

*/s/ Scott McKay*
Scott McKay (ISB#4309)
Nathan Pittman (ISB#9430
**NEVIN, BENJAMIN & MCKAY LLP**
303 W. Bannock
Boise, ID 83702
Telephone: (208) 343-1000
Facsimile: (208) 345-8274
Email: smckay@nbmlaw.com
Email: npittman@nbmlaw.com

*Local Counsel for Plaintiffs and the Class*

Salvatore J. Graziano (*pro hac vice*)
Jeroen van Kwawegen (*pro hac vice*)
James A. Harrod (*pro hac vice*)
Katherine Sinderson (*pro hac vice*)
**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
1251 Avenue of the Americas, 44th Floor
New York, NY 10020
Tel: (212) 554-1903
Fax: (212) 554-1444
salvatore@blbglaw.com
jeroen@blbglaw.com
jim.harrod@blbglaw.com
katiem@blbglaw.com

Karin E. Fisch (*pro hac vice*)
Vincent J. Pontrello (*pro hac vice*)
Cecilia E. Stein (*pro hac vice*)
Alexandra E. Forgione (*pro hac vice*)
**GRANT & EISENHOFER P.A.**
485 Lexington Avenue, 29th Floor

New York, NY 10017
Tel.: (646) 722-8500
Fax: (646) 722-8501
kfisch@gelaw.com
vpontrello@gelaw.com
cstein@gelaw.com
aforgione@gelaw.com

*Counsel for Lead Plaintiffs and Lead Counsel for the Class*

Frank R. Schirripa (*pro hac vice*)
Kathryn A. Hettler (*pro hac vice*)
**HACH ROSE SCHIRRIPA & CHEVERIE LLP**
112 Madison Avenue, 10th Floor
New York, NY 10016
Tel: (212) 213-8311
Fax: (212) 779-0028
fschirripa@hrsclaw.com
kh@hrsclaw.com

*Counsel for Plaintiff Cleveland Bakers and Teamsters Pension Fund*

# APPENDIX A


Comparison of PPI of Frozen Potatoes vs. Other Producer Indexes
Index (2011=100)
250
200
150
100
50
2012
2013
2014
2015
2016
2017
2018
2019
2020
2021
2022
2023
2024
2025
2026
Frozen Potatoes
Frozen Food
Manufacturing
All Foods
Food Manufacturing
General
Potatoes