UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| OFI INVEST ASSET MANAGEMENT, on behalf of OFI INVEST ACTIONS AMÉRIQUE; and OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM; individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> LAMB WESTON HOLDINGS, INC.; THOMAS P. WERNER; and BERNADETTE M. MADARIETA, <br><br> Defendants. | Case No. 1:24-cv-00282-DCN <br><br> **MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Before the Court are Defendants' Motions to Dismiss (Dkt. 66) and to Transfer (Dkt. 67), as well as Plaintiffs' Motion for Leave to File Sur-Reply (Dkt. 84).[1] Defendants, Lamb Weston Holdings, Inc. and its former executives Thomas Werner and Bernadette Madarieta, seek to dismiss a class action securities fraud complaint brought by institutional investors.[2] The Court held a hearing on the Motions on March 11, 2026, and took the matters under advisement. Dkt. 91.

---

[1] Due to the complexities of the case, the Court finds Plaintiffs' Sur-Reply justified, GRANTS that Motion, and will give the Sur-Reply the weight it deems appropriate.

[2] Lead Plaintiffs are Ofi Invest Asset Management (on behalf of Ofi Invest Actions Amerique) and the Oklahoma Police Pension and Retirement System. The Cleveland Bakers and Teamsters Pension Fund and West Palm Beach Firefighters' Pension Fund are also named plaintiffs.

Because portions of the Amended Complaint cannot survive the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), and as explained in more detail below, the Court GRANTS in PART and DENIES in PART the Motion to Dismiss, and DENIES AS MOOT the Motion to Transfer.

## II. BACKGROUND

Lamb Weston is the largest U.S. producer and distributor of frozen potato products. As part of an effort to modernize its management practices, Lamb Weston implemented a new Enterprise Resource Planning ("ERP") software system in late 2023. Far from modernizing Lamb Weston's inventory management, however, the ERP's flaws led to inventory visibility problems resulting in millions of dollars in missed orders and lost business. Plaintiffs are a proposed class of investors who allege Defendants fraudulently misrepresented the ERP rollout before and after the ERP became operational. The Amended Complaint alleges the following facts, which the Court must assume are true for the purposes of the Motion to Dismiss.

### A.    Pre-Go Live Statements

Lamb Weston began exploring options for upgrading its ERP as early as 2017. (An ERP is a software system built to integrate business-wide data into one platform, providing users inventory management, fulfillment, customer service, accounting, manufacturing, and human resources information, all in real time.)

After COVID-19 related setbacks, Lamb Weston renewed its efforts to upgrade its ERP as one of several projects within the "Win-As-One" modernization effort. In July 2021, Lamb Weston filed a risk disclosure with the SEC announcing its intention to resume

MEMORANDUM DECISION AND ORDER - 2

ERP implementation. A month later, Lamb Weston elevated Defendant Bernadette Madarieta to the position of CFO. Madarieta oversaw the ERP implementation, and reported to Defendant and Lamb Weston CEO Thomas Werner on the ERP's development. Under Madarieta's direction, the ERP was developed with a target launch date—also known internally as the ERP "Go-Live"—of November 27, 2023.

### 1. July 25, 2023 Statements

Starting on July 25, 2023, Werner and Madarieta made statements to investors which expressed their confidence in Lamb Weston generally and the opportunities posed by the ERP specifically. Werner told investors Lamb Weston "continue[d] to strengthen [its] operational infrastructure" by completing the design phase of the ERP, and Madarieta stated Lamb Weston made "increased investments to upgrade [its] information systems and ERP infrastructure . . . as well as ERP investments we expect to place in service during the year." Dkt. 62, at ¶ 198. The same day, on an SEC Form 10-K risk disclosure signed by Werner and Madarieta, Lamb Weston stated that supply chain disruptions could adversely affect its business and could result in increased warehouse or storage costs. *Id.* at ¶ 200.

### 2. October 5, 2023 Statements

On October 5, 2023, Werner told investors that Lamb Weston's global expansion and modernization efforts remained on track and that it would rely on supply chain productivity improvements to combat inflation. *Id.* at ¶ 202. Werner also predicted Lamb Weston's volume would grow over the next few quarters as it completed a shift in its target market. *Id.* at ¶ 204. Lamb Weston also disclosed (on an SEC Form 10-Q signed by Werner and Madarieta) that problems with the transition, design, or implementation of its ERP

system could interfere with business operations, and that it had experienced (and may continue to experience) difficulties during the transition to upgraded systems. *Id.* at ¶ 206.

*3. October 11, 2023 Statements*

Six days later, Lamb Weston issued a press release (on SEC Form 8-K) to coincide with its investor's day call. Lamb Weston described itself as "well-positioned to drive sustainable, profitable growth," and Werner credited its global supply chain optimization as creating a more profitable, high-growth business." *Id.* at ¶ 208. On the call, Madarieta noted multiple "strategic levers" Lamb Weston could rely on to drive margin improvement, including supply chain productivity initiatives and global manufacturing network optimization, which would be aided by a global ERP system once the system was fully implemented. *Id.* at ¶ 209. Madarieta echoed Werner's expectation of improved volume trends in the short to medium term. *Id.*

**B.     ERP Development**

Yet even before the July 25 public announcement of the ERP's impending launch, Lamb Weston insiders began to worry that the launch might prove disastrous. Some of these insiders have since spoken to the Plaintiffs. Although they are partially anonymized—using all-female pronouns and referring to them as FE-#, meaning "former employee number X"—the Amended Complaint relies heavily on their descriptions of the ERP's development and eventual failures.

FE-1 was Lamb Weston's Vice President of Customer Service Planning & Logistics from October 2020 to June 2023. FE-1 was a "Global Process Owner," meaning she held global responsibilities for certain aspects of Lamb Weston's operations. Starting in March

2023, the Global Process Owners met monthly (accelerating to bi-monthly in September 2023) to discuss the ERP implementation to discuss its status and "gaps." Shortly after they began meeting, the Global Process Owners began to question the degree of training Lamb Weston personnel were receiving. FE-1 estimated customer service specialists required three to four weeks of training, but were allotted a mere three to five hours. *Id.* at ¶ 70. Defendant Madarieta refused to approve a training server, or "practice box," which might have enabled future users to better prepare for the ERP's implementation. At "Go/No Go" meetings, held biweekly in the months before Go-Live to determine whether to delay the ERP's launch, Madarieta personally heard the concerns of FE-1 and others. *Id.* at ¶ 73.

In addition to training deficiencies, the ERP was largely untested, and what tests Lamb Weston did perform indicated the ERP posed significant operational risks. *Id.* at ¶¶ 75–79. According to FE-1, Lamb Weston tested less than 27% of the total export scenarios the ERP would face, when her prior experience indicated Lamb Weston should have tested 60%–70% of the critical scenarios. *Id.* at ¶ 75.

As late as one month prior to Go-Live, Ernst & Young (as consultants on the ERP implementation) advised Lamb Weston that 40% of electronic data interchange transactions ("EDIs") were failing. EDIs are the digital messengers which connect Lamb Weston's various operations by updating company-wide figures and notifying Lamb Weston's offices when their attention is needed. For example, when inventory ships from a particular warehouse and the warehouse logs that shipment in the ERP, the shipment is transmitted via EDI throughout the ERP, notifying finance that it needs to generate an invoice and updating inventory and accounts to reflect the shipment. *See id.*, at ¶ 76.

MEMORANDUM DECISION AND ORDER - 5

Madarieta was aware of the EDI communication failures as early as September 2023, and E&Y briefed Lamb Weston's C-Suite at Go/No-Go meetings. *Id.* at ¶¶ 76–77.

Indeed, according to FE-2 (Lamb Weston's Chief Supply Chain Officer from 2019 to October 2023), Madarieta and Werner were thoroughly aware of the system's faults. *Id.* at ¶¶ 85–91. FE-2 was a member of the "Steering Committee" responsible for overseeing ERP development, as well as the Executive Leadership Team (which included Werner and Madarieta). *Id.* at ¶ 85. According to FE-2, Madarieta and Lamb Weston Chief Operating Officer Mike Smith were "co-owners" with overall responsibility for the ERP implementation. *Id.* at ¶ 86. According to FE-2, on four or five occasions Werner was briefed on ERP problems. *Id.* at ¶ 87. FE-2's report is corroborated by FE-3 (Lamb Weston's Vice President of Supply Chain Strategy from April 2023 through November 2023) who stated that Madarieta had overall oversight of the ERP project and frequently briefed Werner. *Id.* at ¶ 92. According to FE-3, Madarieta frequently rewrote FE-3's presentations to the Steering Committee and modified risk logs to downplay the ERP's problems. *Id.* at ¶ 96–97.

Two months before the scheduled Go-Live, E&Y firmly recommended Lamb Weston delay ERP implementation because the system was not ready. *Id.* at ¶ 88. FE-4, a financial analyst at Lamb Weston who had worked closely with E&Y in the leadup to Go-Live, estimated that, at launch, the ERP was 60–70% functional.

C.    **Go-Live and the Immediate Aftermath**

Lamb Weston launched the ERP on November 27, 2023. *Id.* at ¶ 73. But the EDI failures persisted, and the ERP could not generate the reports Lamb Weston needed to

accurately track and fill orders. *Id.* at ¶¶ 78–80. Because Lamb Weston simultaneously disabled its legacy system, *id.* at ¶ 118, the company had no immediate method to restore inventory visibility or order tracking. Lamb Weston began conducting C-suite level "tracker meetings" to manually inform executives how many orders and pounds of product were being shipped. *Id.* at ¶ 81. Company executives met twice a day in December 2023 and daily thereafter. *Id.* By the end of December 2023, Lamb Weston was shipping 20–30% of its normal volume and barely half of outstanding orders. *Id.* Lamb Weston held tracker meetings into February 2024. *Id.* Madarieta attended every meeting. *Id.*

Thus, beginning immediately after Go-Live, Lamb Weston wrestled with "very low confidence" in the ERP's order tracking function and little to no inventory visibility. *Id.* at 82. The resulting supply chain management failures required Lamb Weston to write down millions of dollars in inventory beginning in December 2023 and continuing through February 2024. *Id.* at ¶¶ 82, 116. The fallout reached Lamb Weston suppliers, whose payments were missed or delayed because of the ERP. *Id.* at ¶ 117.

The biggest problem, according to one Lamb Weston project manager identified as FE-5, was the ERP's inability to interface with third party warehouser's inventory and shipping systems. *Id.* at ¶ 121. Lamb Weston's failure to reliably ship from warehousers to customers caused it to lose significant business to competitors. *Id.* at ¶¶ 123, 130. According to FE-6, a sales manager for specialty markets from 2016–2024, the ERP obliterated her line of sight to inventory through the fall of 2024. *Id.* at ¶ 127. Some orders were never filled, and when Lamb Weston was able to ship, the customer would often

MEMORANDUM DECISION AND ORDER - 7

receive only half the ordered product. *Id.* at ¶ 129. The ERP's failures caused fulfillment to drop from 96–99% to around 70% for a period of months. *Id.* at ¶ 130.

Critically, the EDI and reporting failures persisted as late as April 2024. *Id.* at ¶ 118–19. FE-6 reported visibility and status tracking problems into October 2024. *Id.* at ¶ 127.

**D.    The Post-Go-Live Statements**

*1. TD Cowen Report*

On December 4, 2023—that is, about a week after Go-Live—market analyst TD Cowen released an analyst report discussing Lamb Weston's stock position. *Id.* at ¶ 211. In the report, based on conversations with unidentified "investor relations" personnel, TD Cowen stated the ERP conversion was off to a good start and there were no major issues to report. *Id.*

*2. January 4, 2024 Statements*

On January 4, 2024, Lamb Weston held an earnings call to discuss the second quarter of FY 2024. On the call, Madarieta stated Lamb Weston experienced "the usual bumps associated with these highly challenging large-scale projects but don't expect that the cutover will have a material impact on our full year business or operating results." *Id.* at ¶ 214. She described Lamb Weston's visibility challenges as "short-term" and experienced "in the period immediately following the cutover." *Id.* Madarieta further offered her expectation that "we expect the inventory visibility challenges *that we experienced* at the third-party warehouses to affect shipment . . . . But as I mentioned, earlier, we continue to expect year over year volume growth in our fiscal fourth quarter." (emphasis added). *Id.* In response to a question regarding sales volumes, Madarieta stated

that she was pleased with what she was seeing and predicted Lamb Weston would be positive in the fourth quarter of FY 2024. *Id.* at ¶ 215. Werner, for his part, told analysts that Lamb Weston remained confident its volume trends would continue to improve as it lapped and backfilled exited volumes with higher margin business. *Id.*

The same day, Lamb Weston released an SEC Form 8-K press release which expressed an expectation that its volume performance improved sequentially over its first fiscal quarter. *Id.* at ¶ 213. Lamb Weston also filed a quarterly report with the SEC on Form 10-Q, signed by Werner and Madarieta. *Id.* at ¶ 218. There, Lamb Weston stated there had been no material changes to the risk factors identified in its annual Form 10-K. *Id.* at ¶ 218.

### 3. April 4, 2024 Statements

Lamb Weston held another earnings call on April 4, 2024. *Id.* at ¶ 220. Werner told investors that the ERP transition proved more difficult than expected "despite countless hours we spent planning, testing, and preparing for the transition." *Id.* Werner told investors flatly that the impact of the order fulfillment issues were in the past. *Id.* In response to a question about whether Lamb Weston's volume decline was primarily driven by the ERP transition or market-wide factors, Madarieta stated, "it's more industry is where you're going to be seeing that with the softer traffic trends. And then the other piece will be any hangover that we have from the ERP transition, but definitely more traffic trends softening that's impacting that." *Id.* at ¶ 221. Werner, for his part, offered that there had been "no fallout from a lot of our bigger customers as we went through this." *Id.* at ¶ 224.

During an April 4 call, Werner and Madarieta consistently emphasized that Lamb Weston had contained the ERP transition fallout to the third fiscal quarter of FY 2024. *Id.* at ¶¶ 222–23, 225. Werner summarized their position by saying "we believe the impact of the order fulfillment issues has been contained in the third quarter as service levels have been restored to pre-transition levels," *Id.* at ¶ 222, reiterating that position later in the call, *Id.* at ¶ 223. And Madarieta echoed Werner, thanking Lamb Weston employees "who did work tirelessly to remedy the issues we experienced and bring our customer order fulfillment rates back to pretransition levels within the quarter." *Id.* at ¶ 223.

As usual, Lamb Weston's earnings call coincided with SEC filings. On a Form 8-K press release, Werner was quoted as saying,

> The ERP transition temporarily reduced the visibility of finished goods inventories located at distribution centers, which affected our ability to fill customer orders. In turn, this pressured sales volume and margin performance. While we are disappointed with the magnitude of the ERP transition's effect on the quarter, after implementing systems adjustments and modifying processes, we believe the impact is behind us as our order fulfillment rates have normalized.

*Id.* at ¶ 219. The press release reiterated that theme: "The Company believes the impact of the order fulfillment issues were contained to the fiscal third quarter as customer order fulfillment rates have been restored to pre-transition levels." *Id.*

Finally, Lamb Weston filed an SEC Form 10-Q quarterly report, which stated Lamb Weston had "restored the visibility into our finished goods inventories and customer order fulfillment rates to pre-transition levels" and offered the expectation that the ERP

transition would not have a material impact on the remainder of FY 2024 "as customer order fulfillment rates have been restored to pre-transition levels." *Id.* at ¶ 225.

### E.     Lamb Weston's Competitive Environment

Separate from the ERP rollout, Plaintiffs allege that Defendants misrepresented the competitive nature of the frozen potato market. On July 25, 2023, Lamb Weston filed an SEC Form 10-K signed by Werner and Madarieta which described the frozen potato market as highly competitive. The disclosure warned that if its competitors elected to compete aggressively with Lamb Weston on price, Lamb Weston may need to reduce pricing, increase promotional spending, and it might suffer a loss in market share or price flexibility. *Id.* at ¶ 146. In October 2023, January 2024, and April 2024, Defendants attributed recent price increases to hedges against inflation in input and manufacturing costs and claimed to have absorbed inflationary costs as well. *Id.* at ¶ 148–51.

However, the Amended Complaint alleges Lamb Weston and its competitors were refusing to compete on price in order to sustain supracompetitive prices for frozen potatoes. *Id.* at ¶¶ 152–62. It points to four instances of price hikes taken within a few weeks or months of each other, *id.* at ¶ 153, statements from competitors observing coordinated price increases and a reticence to compete with Lamb Weston on price, *id.* at ¶¶ 154, 158–59, data showing increases in frozen potato prices apparently outstripping costs, *id.* at ¶¶ 155–61, general observations about the weakened competitive structure of the frozen potato market, *id.* at ¶ 162, and the statement of a pre-spinoff employee attributing price hikes to consolidation in the frozen potato industry, *id.* at ¶ 157.

MEMORANDUM DECISION AND ORDER - 11

F.    **Lamb Weston's Share Price Falls**

Plaintiffs allege that shares of Lamb Weston common stock allegedly traded at artificially inflated prices from the ERP system's announcement on July 25, 2023, to Lamb Weston's final disclosure of the ERP systems' troubled implementation in December 2024. Plaintiffs allege Lamb Weston partially disclosed the extent of the ERP system's failed implementation multiple times.

On April 4, 2024, Lamb Weston disclosed it had experienced significant challenges with its transition to the new ERP system during the third quarter of fiscal year 2024, which ended February 25, 2024. The roll-out of the ERP system caused the Company to lose $135 million in net sales during the quarter and required a $330 million reduction to its sales guidance for the full fiscal year of 2024. In reaction to this news, the price of Lamb Weston common stock declined from a closing price of $101.12 per share on April 3, 2024, to a closing price of $81.53 per share on April 4, 2024—a loss of $19.59 per share, or nearly a fifth of the stock's value.

Plaintiffs further allege that, before the markets opened on July 24, 2024, Lamb Weston again announced disappointing financial results, attributing them to "impacts associated with the Company's ERP transition[,]" including the loss of customers and market share stemming from the botched implementation. Dkt. 62, at 10. Following this news, the price of Lamb Weston common stock declined from a closing price of $78.62 per share on July 23, 2024, to a closing price of $56.42 per share on July 24, 2024—an additional loss of $22.20 per share, or more than 28% of the stock's July 23d closing value.

Finally, before markets opened on December 19, 2024, Lamb Weston made a third announcement of disappointing financial performance: income from operations declined 94%, and net income declined from $251 million to a $36 million *loss*. Defendant Thomas Werner, then Lamb Weston's CEO, admitted that ongoing difficulties with ERP implementation were largely to blame. On December 18, Lamb Weston stock had closed at $78.22 per share; on December 19, the stock closed at $62.50. This $15.72 per share loss represented a loss of over 25% of the stock's December 18 value. Lamb Weston announced Werner's departure the same day.

## G.    Procedural History

Plaintiffs assert Defendants' acts and omissions resulted in declines in the market value of Lamb Weston common stock when the truth was disclosed, harming class members. The Amended Complaint alleges violations of Section 10(b) of the Exchange Act and Security and Exchange Commission ("SEC") Rule 10b-5 (against all defendants) and violations of Section 20(a) of the Exchange Act (against the individual defendants) .

This action was filed on June 13, 2024. Dkt. 1. A month and a half later, Case No. 1:24-cv-00350-DCN was filed, stating essentially the same claims. The actions were consolidated on November 12, 2024 (Dkt. 38), and the operative Amended Complaint was filed three months later (Dkt. 62).

On April 25, 2025, Defendants moved to dismiss all of Plaintiffs' claims, arguing the Amended Complaint fails to state a claim because the ERP-related statements are not actionable, the competition allegations lack a theory of loss causation, and the Amended Complaint fails to create a plausible inference of scienter. Dkt. 66. Defendants later moved

to transfer this action to the Northern District of Illinois based on the competition allegations because antitrust actions against the frozen potato industry are currently pending there. Dkt. 67. Plaintiffs have responded to both motions, Dkts. 82; 76 respectively, and Defendants have replied, Dkts. 83; 79. After Defendants replied regarding the Motion to Dismiss, Plaintiffs sought leave to file a sur-reply. Dkt. 84. Defendants responded, Dkt. 85, and Plaintiffs replied, Dkt. 86. The Court heard oral arguments on the pending motions on March 11, 2026. Dkt. 91.

The matters are now ripe for review.

## III. LEGAL STANDARDS

### A. Section 10(b) and Rule 10b-5

Under § 10(b) of the Exchange Act,

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . .

15 U.S.C. § 78j(b). The SEC regulations contemplated by § 10(b) are codified at 17 C.F.R. § 240.10b-5. Known as Rule 10b-5, the regulations prohibit the use of any device, scheme, or artifice to defraud (§ 240.10b-5(a)); the making of untrue statements or omission of a material fact when necessary to prevent a statement from becoming misleading (§ 240.10b-5(b)); and engaging in any act, practice, or course of business which operates or would operate as a fraud (§ 240.10b-5(c)).

Thus, to plead a securities fraud claim, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014) (citation modified).

## B.     Section 20(a)

Section 20(a) of the Exchange Act imposes liability on certain 'controlling' individuals for violations of Section 10(b) and its underlying regulations. 15 U.S.C. § 78t(a); *see also Weston Fam. P'ship LLLP v. Twitter, Inc.,* 29 F.4th 611, 623 (9th Cir. 2022). Section 20(a) claims are derivative. *Twitter*, 29 F.4th at 623. A defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (citation modified).

## C.  Rule 12(b)(6) Motion to Dismiss in a PSLRA Case

A motion to dismiss under Rule 12(b)(6) attacks the sufficiency of the complaint's allegations. To survive a 12(b)(6) challenge, a plaintiffs claim for relief must be "facial plausibility" under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As with all 12(b)(6) motions, the Court must look past the plaintiff's labels, conclusions, and naked assertions to determine whether the factual allegations in the complaint raise a right of relief above the speculative level. *See Twombly*, 550 U.S. at

MEMORANDUM DECISION AND ORDER - 15

555; *Iqbal*, 556 U.S. at 678. However, both the Federal Rules of Civil Procedure and federal law establish heightened pleading standards in securities fraud cases.

Under Fed. R. Civ. P. 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." To meet that standard, allegations of fraud "must specify the times, dates, places, benefits received, and other details of the alleged fraudulent activity" so that the defendants have "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge . . . ." *Glazer*, 63 F.4th at 765. In the Ninth Circuit, Rule 9(b)'s particularity requirement "applies to all elements of a securities fraud action . . . ." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 605 (9th Cir. 2014).

In addition to rules-based hurdles, Congress has enacted exacting pleading standards for securities fraud cases. The PSLRA "imposes 'formidable pleading requirements to properly state a claim and avoid dismissal under Fed.R.Civ.P. 12(b)(6).'" *Id.* (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008)). The PSLRA's requirements are element specific. 15 U.S.C. § 78u-4(b).

Regarding misleading statements and omissions, in private class actions where

the plaintiff alleges that the defendant [violated Rule 10b-5(b) by making a material misstatement or omission]; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).

Although a plaintiff must disclose its sources, confidential sources meet the PSLRA's requirements so long as they describe the confidential witness "with sufficient particularity to establish their reliability and personal knowledge." *Glazer*, 63 F.4th at 767 (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009), as amended (Feb. 10, 2009)). The PSLRA also includes a statutory safe harbor for otherwise actionable forward-looking statements: "a defendant will not be liable for a false or misleading statement if it is forward-looking and *either* is accompanied by cautionary language *or* is made without actual knowledge that it is false or misleading." *Glazer*, 63 F.4th at 767 (quoting *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017)) (emphasis in original).

And regarding the state of mind necessary to commit fraud—called *scienter*—"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

> Assessing whether a plaintiff meets the PSLRA's strong inference requirement is a 'dual inquiry': first, this court determines whether any of the allegations, alone, are sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, this court conducts a 'holistic' review to see if the allegations, when considered together, give rise to a strong inference of scienter.

*Constr. Laborers Pension Tr. of Greater St. Louis v. Funko Inc*, 166 F.4th 805, 830 (9th Cir. 2026) (citing *Glazer*, 63 F.4th at 766). The inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007).

"Review is limited to the complaint, materials incorporated into the complaint by reference, and matters of which the court may take judicial notice." *Metzler Inv. GMBH*, 540 F.3d at 1061.

### D.      Transfer of Venue

A district court may, "for the convenience of parties and witnesses," and "in the interest of justice," transfer "any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "Because the broad federal venue statutes often result in inconvenient forums, Congress intended section 1404(a) to remedy this situation by authorizing the transfer of actions to a more convenient forum." *Our Children's Earth Found. v. U.S. Envtl. Prot. Agency*, 2008 WL 3181583, at *4 (N.D. Cal. Aug. 4, 2008) (citing *Ferrens v. John Deere Co.*, 494 U.S. 516, 522 (1990)).

Transfer under section 1404(a) involves a two-step inquiry. First, the court must determine whether the proposed transferee court is one where the action might have been brought. *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). Second, provided the case could have been brought in the transferee forum, the court must balance "the plaintiff's interest in choosing a forum against the aggregate considerations of convenience and the interest of justice/fairness." *Western Watersheds Project v. Bernhardt*, 2019 WL 3022188, at *4 (D. Idaho July 9, 2019) (citation modified).

In striking this balance, a court may consider the following non-exhaustive list of factors: (1) the plaintiff's choice of forum; (2) the convenience of the parties and the witnesses; (3) ease of access to evidence; (4) familiarity with the applicable law; (5)

MEMORANDUM DECISION AND ORDER - 18

feasibility of consolidation with other claims; (6) any local interest in the controversy; and (7) the relative court congestion and time to trial in each forum. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 842–43 (9th Cir. 1986); *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000).

The moving party bears the burden of showing that transfer is appropriate. *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). Further, courts give "great weight" to a plaintiff's choice of forum. *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987). However, "the degree to which courts defer to a plaintiff's chosen venue is substantially reduced where the plaintiff does not reside in the venue or where the forum lacks a significant connection to the activities alleged in the complaint." *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) (citation modified).

Courts adjudicate motions to transfer under 28 U.S.C. § 1404(a) with an "individualized" and "case-by-case consideration of convenience and fairness." *Jones*, 211 F.3d at 498. Ultimately, motions to transfer venue lie within the broad discretion of the district court. *Decker*, 805 F.2d at 843; *Jones*, 211 F.3d at 498.

## IV. DISCUSSION

Defendants characterize Plaintiffs as pleading "fraud by hindsight": the Plaintiffs are unhappy with Lamb Weston's performance with respect to the ERP rollout and are attempting to transmute that dissatisfaction into a fraud case. Although they raise more specific objections at times, Defendants primarily object to the Amended Complaint's pleadings regarding falsity and scienter.

MEMORANDUM DECISION AND ORDER - 19

## A. False Statements of Fact

The first element of a securities fraud case is falsity. "A statement is false or misleading if it directly contradicts what the defendant knew at that time or omits material information." *Glazer*, 63 F.4th at 764 (citation modified). "A statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023) (citation modified). An omission is fraudulent when the speaker omits a material fact necessary to prevent the statement from being misleading under the circumstances. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1188 (9th Cir. 2021). "A misleading omission is material if there is a substantial likelihood that it would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 699–700 (9th Cir. 2021). "[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Garbaccio v. Starbucks Corp.*, 809 F. Supp. 3d 1261, 1283 (W.D. Wash. 2025) (citing *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995)).

Opinions are actionable in three circumstances: when the speaker does not actually hold that opinion, when the opinion contains an embedded statement of fact,[3] and when the opinion, in context, would give the reasonable investor the impression that the speaker

---

[3] e.g., "I believe our TVs have the highest resolution available because we use patented technology" contains an embedded assertion that the speaker's company uses patented technology.

had a specific basis in fact for forming the opinion.[4] *Tesla*, 985 F.3d at 1188–89 (citing *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 183–85, 188 (2015)).[5] Statements of general optimism, nonspecific boasting, and statements of future expectations (collectively, "puffery") are "not actionable because when valuing corporations, investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers. Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives." *Constr. Laborers Pension Tr.*, 166 F.4th at 822 (citation modified).[6] Apparent puffery is actionable only if it "provide[s] [a] concrete description of the past and present that affirmatively create[s] a plausibly misleading impression of a state of affairs that differed in a material way from the one that actually existed." *Id.* (citation modified).

Finally, federal law establishes a "safe harbor" for certain otherwise actionable statements: forward-looking statements are not actionable if " accompanied by meaningful

---

[4] e.g., opining that the speaker's conduct is lawful may be misleading if, in context, it appears to imply the speaker sought legal counsel when the speaker had not done so.

[5] Plaintiffs cite *In re QuantumScape Sec. Class Action Litig.* for the proposition that opinion-quantifying language is necessary to constitute an opinion. 580 F. Supp. 3d 714, 739 (N.D. Cal. 2022) (citing *Omnicare*, 575 U.S. at 183). But whether a statement is fraudulent depends on the statement's context. *Omnicare*, 575 U.S. at 196. Although opinion-quantifying language may be a strong indicator that a statement is an assertion, if any reasonable jury would conclude the statement, in context, reflects a speaker's beliefs rather than assertions of fact, the Court will assess the statement as an opinion.

[6] The Court notes that Plaintiffs frame puffery as an objection to materiality rather than falsity. The Court will consider it along with falsity for two reasons. First, the Ninth Circuit has addressed objections to falsity and materiality simultaneously under a general discussion of actionability. *See, e.g.*, *Glazer*, 63 F.4th at 7701–71; *Construction Laborers Pension Trust*, 166 F.4th at 822–24. And second, puffery analysis is much closer to typical falsity analysis—which discusses whether the contents or implications of the statement are truth apt—than the "total mix" analysis used to determine typical materiality objections. *Cf. Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38–42 (2011).

MEMORANDUM DECISION AND ORDER - 21

cautionary statements identifying important factors which could cause actual results to differ materially from those in the forward-looking statement," 15 U.S.C. § 78u-5(c)(1)(A)(i), or "the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge by that person that the statement was false or misleading," 15 U.S.C.§ 78u-5(c)(1)(B)(i). A statement is forward-looking if it contains a financial projection, discloses management's plans and objectives, projects future economic performance, states the assumptions underlying or relating to any of the above classes of statements, constitutes a report issued by an outside reviewer, or contains a projection or estimate of any subject designated for safe-harbor protection by the SEC. 15 U.S.C. § 78u-5(i)(1).

### 1. Pre-Go-Live Statements

Prior to ERP launch (called "Go-Live" by Lamb Weston), Werner and Madarieta made several statements which expressed confidence that the ERP system would improve business operations and that Lamb Weston was otherwise well-positioned within its market. Dkt. 62, at ¶¶ 198, 202, 204, 208–209. Plaintiffs allege these statements were false or misleading because the ERP system was flawed, Defendants knew it was flawed, and they offered favorable opinions of the ERP system and Lamb Weston's general financial well-being without disclosing those flaws. *Id*. at ¶¶ 199, 203, 205, 210. According to Plaintiffs, Defendants provided customer service specialists three to five hours of training instead of the three to four weeks required, *Id*. at ¶ 70, and 40% of the ERP's electronic data interchange's ("EDI") were failing, *Id*. at ¶ 76, all of which led to consultant Ernst & Young advising Lamb Weston not to proceed with the ERP launch as early as September

2023, Dkt. 62, at ¶ 88. Without disclosing those facts, Plaintiffs contend, Defendants' statements were misleading.

Both Werner's comments and Madarieta's comments prior to Go-Live were inactionable puffery. *See Construction Laborers Pension Trust*, 166 F.4th at 823. Defendants' statements are similar to those found to be puffery in *Construction Laborers Pension Trust*, where corporate insiders described inventory as "generally high quality" and "in a really good healthy position," even though the insiders knew an ERP system's troubled rollout had caused expensive inventory overflows. *Id.* at 817–18, 822. The Ninth Circuit found the insiders' statements of generalized optimism were too vague to give a reasonable investor any specific impressions of fact, and were therefore inactionable. *See id.* at 823 (citing *Glazer*, 63 F.4th at 756–71).

To explain why apparent puffery was actionable in *Glazer*, but not actionable in *Construction Laborers Pension Trust*, the Ninth Circuit drew a subtle line: apparent puffery is actionable when it implies concrete and false details regarding the corporation's business when considered in context. *Id.* In *Glazer*, executives answered a question regarding declining sales by indicating their number of sales representatives were "tracking very well" and the company had a "very large sales pipeline." 63 F.4th at 756–57, 759, 762. Although "very well" and "very large" appear to be puffery because they are "vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers," *see Construction Laborers Pension Trust*, 166 F.4th at 822, the Ninth Circuit held them actionable because in context they implied concrete facts regarding the company: the number of sales representatives was holding steady and the sales pipeline was not the cause

for the declining sales. *Glazer*, 63 F.4th at 770. In *Construction Laborers Pension Trust*, by contrast, rosy descriptions of inventory health were mere puffery because the statements did not leave investors with any concrete impressions regarding *why* the inventory was healthy. 166 F.4th at 823.

Here, no reasonable investor could find Defendants' statements specific enough to imply any concrete details regarding the ERP or Lamb Weston's operations. Werner's statements—that the ERP was part of a broader project to "strengthen our operational infrastructure;" (July 25, 2023; *see* Dkt. 62, at ¶ 198); that Lamb Weston's modernization efforts remained on track and would aid in offsetting inflation (October 5, 2023, *see* Dkt.;62, at ¶ 202); that Lamb Weston was "well positioned to drive sustainable, profitable growth," management had created "more profitable, high-growth business," and Lamb Weston had correctly chosen to exit certain segments of its business (also October 5, 2023; *see* Dkt. 62, at ¶ 204); and that Lamb Weston's "global supply chain optimization" had "created a more profitable, high-growth business" (October 11, 2023; *see* Dkt. 62, at ¶ 208)—could not give anyone any impressions regarding corporate affairs other than Werner felt optimistic about Lamb Weston generally and perhaps about the ERP specifically.

Plaintiffs appear to suggest Werner gave investors a discrete impression regarding the ERP's progress when he said "[o]ur integration of our EMEA operations is progressing well, our capacity expansion in China is now up and running, **and our other expansion and modernization efforts around the globe remain on track**." Dkt. 62, at ¶ 202 (emphasis added); *see also* Dkt. 82, at 35–36. They cite two out of circuit district court

cases—*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*, 2020 WL 3026536 (D.N.J. June 5, 2020) and *In re Cigna Corp. Sec. Litig.*, 2005 WL 3536212 (E.D. Pa. Dec. 23, 2005)—for the proposition that statements characterizing a project as "on track" are actionable. But the former does not discuss whether the allegedly misleading statements were puffery at all. *See Empire Ret. Sys.*, 2020 WL 3026536 at *5. And in the latter, the misleading statement specifically asserted that the Transformation Project (analogous to the ERP here) was on track. *In re Cigna Corp.*, 2005 WL 3536212 at *11. Here however, Werner was not talking about the ERP specifically, but rather Lamb Weston's modernization efforts generally (of which the ERP was only a part). Dkt. 62, at ¶ 202. Such a comment does not "address a specific aspect of Lamb Weston's operations," *In re Quality Sys., Inc. Sec. Lit.*, 865 F.3d at 1143, and is thus inactionable puffery.

Madarieta's statements—that Lamb Weston was making "increased investments to upgrade our information systems and ERP infrastructure . . . as well as ERP investments we expect to place in service during the year" (July 25, 2023; *see* Dkt. 62, at ¶ 198); that Lamb Weston had "multiple strategic levers to pull to drive margin improvement," including its "supply chain productivity initiatives" and the optimization of its global manufacturing network, "which will be aided by a global ERP system once it's fully implemented," and that Lamb Weston was confident it could backfill segments of the frozen potato market it had recently pivoted from (October 11, 2023; *see* Dkt. 62, at ¶ 209)—were also puffery (if they were exaggerated at all).

The Amended Complaint does not dispute the ERP constituted increased investment in information systems or that it was implemented later in 2023 so Madarieta's July 25

statements are not alleged to be false. And although Madarieta indicated the ERP would aid Lamb Weston's manufacturing network once fully implemented, Madarieta made no assurances that the ERP would be "fully implemented" immediately on rollout. Indeed, the use of "fully" here implies that Madarieta expected the ERP to be partially implemented for a time. Madarieta's other statements regarding "multiple strategic levers" and Lamb Weston's ability to backfill forgone market segments are puffery. Madarieta's language constituted vague statements of corporate optimism, and context does not indicate the statements suggested anything specific about the ERP or Lamb Weston. Madarieta's statements are thus inactionable as well.

Plaintiffs' primary argument regarding the pre-Go-Live statements rests on Defendants' failure to disclose negative information regarding the ERP. The Ninth Circuit stated the test for determining the falsity of an opinion based on omissions in *Glazer*:

> A statement of opinion is not misleading just because external facts show the opinion to be incorrect or the issuer knows, but fails to disclose, some fact cutting the other way. However, a reasonable investor expects that the issuer's opinion fairly aligns with the information in the issuer's possession at the time. To state a claim that an opinion is false or misleading, the investor must identify particular material facts regarding the basis for the issuer's opinion, the omission of which make the statement misleading to a reasonable person reading the statement fairly and in context.

63 F.4th at 764 (citing *Omnicare*, 575 U.S. at 188–89, 194) (citation modified). Plaintiffs identify the insufficiency of ERP training, technical failures in the ERP's communication system, and Ernst & Young's September 2023 recommendation against going live as the material facts which render Defendants' statements misleading by omission. *See* Dkt. 82, at 24–26.

MEMORANDUM DECISION AND ORDER - 26

Plaintiffs' particular facts do not render Defendants' pre-Go-Live statements misleading by omission because the statements were too vague to leave investors with an impression contradicted by the particular facts. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698 (9th Cir. 2016), cited by Plaintiffs for the proposition that Defendants' omissions were actionable, is a useful comparator. In *Schueneman*, the issuer made statements expressing confidence in a drug's approval based on "*all the studies that have been completed*" (emphasis original) when one study (the "Rat Study") indicated the drug caused "mammary tumors, brain cancer, skin cancer, and nerve sheath cancer." 840 F.3d at 701–02. Although the issuer expressed "confidence in approval," which might appear to be an opinion, the issuer based that opinion on the favorable results in *all studies that have been completed*, which created an embedded assertion of fact that all studies indicated the drug was safe. *See id.* at 708 (describing the issuer as making an affirmative representation of fact). But here (as discussed above), Plaintiffs have not identified any concrete assertion or implication of fact that Defendants' pre-Go-Live statements left them with. *See Tesla*, 985 F.3d at 1188–89.[7]

Here, none of Defendants' statements were sufficiently precise to imply that Lamb Weston's employees were well-trained, or that the ERP would be fully operational on rollout, or that there were no risks of disruption at Go-Live. *Cf.* Dkt. 62, at ¶¶ 198, 202, 204, 208–209 *with* Dkt. 62, at ¶¶ 199, 203, 205, 210. Even though reasonable investors

---

[7] *Berson v. Applied Signal Technology, Inc.* is distinguishable for the same reason. 527 F.3d 982, 985–87 (9th Cir. 2008) (the affirmative assertion that a certain degree of backlog liability existed was misleading without disclosing the liability attributable to stop work orders because, in context, a reasonable investor would be entitled to presume that stop work orders were included in backlog liability).

could infer that Defendants felt optimistic about the future,[8] Plaintiffs could not infer any particular reason for *why* Defendants were optimistic. Because Plaintiffs cannot identify an untrue implication of fact which they could fairly draw from Defendants' statements in the absence of after-the-fact insider reports, Plaintiffs' omission theory fails.

Plaintiffs also argue that Lamb Weston's risk disclosures were untrue in the lead-up to Go-Live. *Id*. at ¶ 200–01. The risk disclosures explained that Lamb Weston had experienced, and may continue to experience, difficulties in the transition to the ERP, including in business management. Dkt. 66-1, at 25. Defendants argue the disclosures were accurate. Plaintiffs counter the statements are actionable because they imply the company was not currently experiencing the risk of difficulties, and risk disclosures which suggest a company *may* experience a certain risk are actionable when the company *is currently experiencing* the risk. Dkt. 82, at 27 (citing *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 949–50 (9th Cir. 2023)). But the risk disclosures held actionable in *In re Facebook* disclosed a risk that third parties could misuse Facebook data when executives knew misuse had already occurred. 87 F.4th at 948–49. There, the risk had already blossomed into the threatened harm. Here, however, Plaintiffs plead merely that the risks which would eventually materialize at Go-Live were already in place; they do not plead that Lamb Weston was already suffering harms from going live on bug-ridden software. *In re Facebook* is thus inapposite.

---

[8] Defendants statements are not actionable based on the inference they felt optimistic without particularized allegations that Defendants were not subjectively optimistic. Although the allegations raise a reasonable inference that Defendants were aware of reasons why the rollout might negatively impact Lamb Weston, there are not *particularized* allegations indicating Defendants were pessimistic as opposed to naively optimistic.

Because Defendants' statements prior to Go-Live were puffery and inactionable opinions, and because Lamb Weston was not currently experiencing the harms from the ERP rollout when it issued the pre-Go-Live risk disclosures, the Motion to Dismiss is GRANTED as to the pre-Go-Live statements.

*2. Statements Immediately Following Go-Live*

Plaintiffs also include allegations regarding statements Defendants made shortly after Go-Live.

The first statement Plaintiffs identify was made on December 4, 2023, in a report issued by third party analyst TD Cowen, allegedly based on conversations with Lamb Weston "investor relations." The TD Cowen report stated that the ERP conversion was "off to a good start" and that "[t]here were no major issues to report." Dkt. 66-14. By then, the ERP had been operational for about a week, and the Amended Complaint alleges with particularity that foreseeable risks had actualized into significant problems for Lamb Weston's logistics. Dkt. 62, at ¶ 78–82.

Under *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, statements in analysts' reports which clearly originated with the defendants and are not a third party projection, interpretation, or impression are actionable. 380 F.3d 1226, 1235 (9th Cir. 2004); *see also Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("For purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."). But to be actionable under Rule 9(b) and the PSLRA, the statements must be attributable to a particular corporate agent either on their face or through other pleadings.

MEMORANDUM DECISION AND ORDER - 29

*In re Semtech Corp.*, 2025 WL 2884810, at *6–7 (C.D. Cal. Oct. 7, 2025) (finding statements attributable to "management" were not particularized within the meaning of Rule 9(b)). The TD Cowen statements, which are attributable only to "investor relations," cannot be attributed to Defendants on the allegations in the Amended Complaint. *See id.* at *7.

Next, Plaintiffs allege Madarieta made actionable statements on the January 4, 2024. earnings call when she characterized Lamb Weston as experiencing "the usual bumps" associated with large-scale projects and suffered "reduced shipments due to short-term inventory visibility challenges at our third-party finished goods warehouses in the period immediately following the cutover." Dkt. 62, at ¶ 214 (emphasis in original).

Madarieta's January 4, 2024 statements are actionable. Unlike Defendants' statements prior to Go-Live, which were insufficiently specific to give reasonable investors any concrete impressions of fact, statements that Lamb Weston was experiencing the "usual bumps" and describing the issues as "short-term inventory visibility challenges . . . in the period immediately following the cutover" could give the reasonable investor the impression that whatever disruptions the ERP had experienced, those disruptions were discountable and would soon be over. *See Glazer*, 63 F.4th at 764.

Taking the Amended Complaint as true and construing all reasonable inferences in its favor, *see Construction Laborers Pension Trust*, 166 F.4th at 820–21, the inference that Lamb Weston's ERP-related fallout was discountable and in the past was false or misleading. Lamb Weston's executive team met daily or twice daily from December 2023 to February 2024 to discuss inventory, because inventory visibility was crippled after ERP

rollout. Dkt. 62, at ¶ 81. The Amended Complaint cites former Lamb Weston employee 1 ("FE-1") as stating the ERP's problems required daily, manual reconciliation. Dkt. 62, at ¶ 82. Despite these measures, the Amended Complaint alleges Lamb Weston was substantially blind to its inventory figures, and as a result, shipped "barely half of outstanding customer orders by the end of December 2023." Dkt. 62, at ¶ 81. FE-1 reported that discrepancies between the ERP's inventory data and the actual inventory housed at third party warehouses required Lamb Weston to write off millions of dollars in inventory in January and February 2026. Dkt. 62, at ¶ 116. The ERP's EDI transactions continued to fail heading into April 2024. Dkt. 62, at ¶ 118. A nearly fifty percent decrease in order fulfilment is not a usual bump, and limited visibility was an ongoing problem on January 4 and would be for a long time thereafter.

To the extent Madarieta's statements appear to be opinions, they are actionable under the third *Tesla* category because they did not fairly represent reality. It is a reasonable inference that, whatever a reasonable investor considers to be "usual bumps," fulfilling barely half of orders does not qualify. And by characterizing part of the impact as short term visibility challenges *in the period immediately after the cutover*, a reasonable investor would have been justified in inferring—incorrectly—that the ERP had been updated to maintain correct inventory visibility moving forward.[9] Whether framed as an affirmative misstatement or an opinion which did not fairly align with the information Madarieta

---

[9] This statement is not misleading because full year results ultimately differed from those projected by the statement. Rather, the implication that ERP-related visibility problems were limited to *the period immediately after the cutover* (i.e., immediately following Go-Live on November 27, 2023) creates a plausible argument for falsity.

possessed, the January 4 statements are actionable. *See also Garbaccio*, 809 F. Supp. 3d at 1283 (citing *Fecht,* 70 F.3d at 1081) ("whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact.").

Plaintiffs also allege Defendants committed fraud by submitting a January 4, 2024, risk disclosure on Form 10-Q which stated there had been no material changes to the risk factors discussed in Form 10-K. Defendants argue these statements were true when made because they disclosed the negative impacts of the ERP rollout Lamb Weston faced at the time. Plaintiffs adequately allege falsity with respect to Defendants' statement that there had been no material change in the risks from those disclosed in the 2023 Schedule 10-K.

Although the 2023 Schedule 10-K included boilerplate disclosures that Lamb Weston "had experienced and may continue to experience" interruptions due to the ERP system's implementation, between when the Schedule 10-K was filed on July 25, 2023 and the January 4 Schedule 10-Q risk disclosure, the risks of the ERP's shortcomings had matured from possible future problems to present harms. The ERP rollout had allegedly caused Lamb Weston to ship barely half of outstanding orders through December 2023. Dkt. 62, at ¶ 81.[10]  Anticipated risks are materially different than present harms, and by

---

[10] The parties dispute whether Defendants waived challenges to allegations in ¶ 218 because the challenge was made in Defense Ex. B rather than in briefing. *See* Dkt. 82, at 25; Dkt. 83, at 19 n.9. Defense Ex. B is a chart listing their paragraph-by-paragraph objections. When managing a complicated timeline involving dozens of statements, using a chart like Exhibit B can aid courts attempting to keep track of statements and objections. But Defendants should take care to fully argue their position in briefing: Incorporating legal argument into exhibits, and then incorporating those arguments by reference back into the brief itself, could reasonably be perceived as an end-run around page limits. Because the Court ultimately finds that Defendants objections are unavailing, it does not reach the question of whether they were waived.

indicating Lamb Weston's risks had not changed, Defendants could easily have left the reasonable consumer with the impression that ERP-related issues were transient or manageable when they were allegedly not. *Cf. Constr. Laborers Pension Tr.*, 166 F.4th at 825 ("where a statement about the future is in the form of a warning about a risk that might hurt business in the future, the statement implicitly serves as a comment on the *present* state of affairs, because it suggests that the circumstance posing the risk has not yet occurred." (emphasis in original)); *see also Glazer*, 63 F.4th at 780 ("We agree with Plaintiffs that this language is not 'meaningful' because it amounts to only a boilerplate listing of generic risks and does not mention the specific risk to which [the defendant] had been alerted . . . ."). The January 4 Form 10-Q is, therefore, also actionable.

Defendants argue the January 4 statements are all protected by the PSLRA's safe harbor provisions. However, statements describing the nature of ERP-related interruptions (i.e., the "usual bumps") and statements that appear to cabin ERP-related inventory blindness to the past (i.e., "in the period immediately after the cutover") are not forward facing because they implicitly describe Lamb Weston's December experience. The January 4 Schedule 10-Q might be forward facing because it pertains to risks going forward. But as the Ninth Circuit recently stated in *Constr. Laborers Pension Tr.*, "where a statement about the future is in the form of a warning about a risk that might hurt business in the future, the statement implicitly serves as a comment on the *present* state of affairs, because it suggests that the circumstance posing the risk has not yet occurred." *Id.* at 825. To the extent the Schedule 10-Q indicated Lamb Weston's risk profile had not changed over the course of the ERP rollout, that too is an implicit comment on Lamb Weston's then-present

state of affairs. Thus, Madarieta's January 4 statements and the risk disclosure statements do not qualify for safe harbor protection.

Because Madarieta's January 4 statements and the January 4 risk disclosures carry an implicit and misleading description of the nature, extent, and duration of Lamb Weston's ERP-related logistical problems, the Court finds such statements actionable and not subject to the PSLRA safe harbor. The Motion to Dismiss is, therefore, DENIED with respect to Madarieta's January 4 statements.

However, Werner also made an allegedly false statement on January 4 when he gave his expectation that volume trends would continue to improve and Lamb Weston would backfill exited volumes. Dkt. 62, at ¶ 215. Such statements were puffery because they expressed generalized optimism and an opinion without particularized factual allegations. *See Construction Laborers Pension Trust*, 166 F.4th at 823. Werner's January 4 statement is also entitled to safe harbor protection because it was purely forward-facing and accompanied by the earning's call partial disclosure of ERP fallout. *See* 15 U.S.C. § 78u-5(c). Accordingly, the Motion is GRANTED as to Werner's January 4 statement.

### 3. Post-Q3 Statements

The Amended Complaint also alleges Lamb Weston committed fraud related to statements it made after Q3 closed. Dkt. 62, at ¶¶110, 118, 127, 130, 132, 135–38, 219–25, 228. Defendants object that these statements were not false when made, and that certain statements were puffery and protected by the PSLRA safe harbor. Defendants made three classes of allegedly fraudulent assertions after the close of FY 2024 Q3. First , Defendants asserted that service levels had been restored to pre-transition levels. Second, Defendants

asserted that order fulfilment issues were contained in the third quarter. *Id*. at ¶ 219–25. Third, Defendants asserted they expected to recover any business lost due to ERP-related attrition. *Id*. at ¶ 224.

Defendants argue the Amended Complaint does not plead the service level-related statements were false with particularity. FE-6 stated that service levels fell to 70% for a period of months. *Id*. at ¶ 130. Although FE-6 does not say when the fall in service levels ended, she also stated she continued to receive customer complaints for six full months following Go-Live; i.e., into May 2024. *Id*. at ¶ 130. Drawing all reasonable inferences in favor of the Plaintiffs, the Court finds they have adequately pleaded falsity with respect to service-level-related statements. *See Garbaccio*, 809 F. Supp. 3d at 1283.

Plaintiffs have also adequately plead falsity regarding Defendants' assertion that order fulfillment issues were contained in the third quarter of FY 2023. The Amended Complaint alleges EDI transaction failures, an inability to reliably generate critical reports, and an inability to process orders with multiple shipping containers all plagued the ERP system into April 2024 and perhaps thereafter. Dkt. 62, at ¶ 118. As late as October 2024, the ERP could issue shipping directives *to*, but left Lamb Weston blind to the inventory levels *at*, the warehouses and distribution centers which held approximately 90% of Lamb Weston's inventory. *Id*. at ¶ 127. For six full months following Go-Live in November 2023, "our customers were stressed not being able to count on us fulfilling their orders to their satisfaction" and order fulfillment rates dropped below the expected 96-99% fulfillment

MEMORANDUM DECISION AND ORDER - 35

rate to approximately 70% for a period of months. *Id*. at ¶ 130.[11] Inventory visibility issues prevented Lamb Weston from processing export orders to Japan and South Korea, leading to a complete absence of French fries at the McDonald's locations in those countries. *Id*. at ¶ 137. And contemporary news reports from South Korea blame Lamb Weston for the French fry drought. *Id*. at ¶ 138.

Considering Plaintiffs' allegations, statements that the impact of inventory visibility problems were contained to FY 2023 Q3 would be misleading at least. A reasonable jury could find that a reasonable investor, hearing the ERP caused losses which were "contained to the third quarter," would justifiably infer the ERP system was now functional and inventory visibility fully restored. Defendants suggest their statements regarding the impact of the ERP rollout were inactionable opinions. But opinions are actionable if, in context, the recipient would predictably draw an inference that the speaker knows is false. *Tesla*, 985 F.3d at 1188–89.

Arguably, a reasonable speaker would not be entitled to infer that the ERP fallout was entirely in the past because Defendants gave a specific basis for their opinion: service levels had returned to pre-rollout levels. Yet in the broader context of explaining *how the*

---

[11] Defendants attack this allegation as insufficiently particular pointing to *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422 (C.D. Cal. Sept. 20, 2017). There, the court rejected a conclusory allegation that a pharmaceutical was unsafe because there were no particularized facts showing the basis for the conclusion (including the specific way it was unsafe) and the confidential source there did not even call the drug inherently unsafe. *Id.* at *4. Defendants argue that FE-6's reports of unspecified "customer complaints" are likewise imprecise. Dkt. 66-1, at 32. If FE-6 had simply stated that "the ERP continued to impact customers" or failed to explain how the ERP caused customer complaints, the Court would be inclined to agree. But FE-6 claims to have received complaints in her usual role as a sales manager because the ERP hampered inventory visibility leading to unfulfilled orders. Dkt. 62, at ¶¶ 132–33. Reading allegations ¶ 130–33 as a whole, the Amended Complaint gives sufficient specificity to both the nature and timeframe of FE-6's receipt of complaints.

*ERP system impacted inventory visibility*, a jury could find it misleading to assert that the impact was contained to Q3 based on service levels alone when the information in Defendants' possession unambiguously indicated the ERP system continued to negatively impact inventory visibility. A reasonable recipient would be entitled to draw the inference that the inventory visibility problems had been fixed, and *that correction* is what enabled service to return to pre-rollout levels. These statements are, therefore, actionable under an omission theory.

Defendants also made statements on April 4, 2023, to the effect that they expected to regain any business lost to alternative suppliers in the long term. While those statements may have been ultimately untrue, they were forward facing expectations accompanied by cautionary language—i.e., "some customers affected by either delayed or canceled shipments may have temporarily secured supply from alternative sources until they gain confidence in our service levels" (Dkt. 62, at ¶ 113)—entitling them to safe-harbor protection. *See* 15 U.S.C. § 78u-5. Likewise, although business was eventually impacted by the loss of large customers, there are no allegations indicating that a permanent rupture with any large customer was evident as of April 4. Thus, the April 4 statements regarding expectations of market share losses are not actionable.[12]

---

[12] The parties also dispute whether allegations regarding a product quality issue, pleaded at Dkt. 62, ¶¶ 138–41, is sufficiently particularized. The Amended Complaint alleges that FE-1 knew ERP problems processing orders to Japan and South Korea were not resolved by the time she left, and she believed ERP-related problems caused Lamb Weston to lose business from McDonalds South Korea. *Id.* at ¶ 136, 138. Plaintiffs argue FE-1's belief is corroborated by FE-5, who reports that a coworker told her McDonalds South Korea did not have French fries, but the secondhand statement of a confidential informant is not sufficiently particularized because it fails to identify whether the original source was in a position to know the facts alleged, *see Glazer*, 63 F.4th at 766–67. McDonalds South Korea announced in June 2024 that, due to "unexpected issues in the supply chain," "[s]ome frozen potatoes did not meet our standards, so we

Accordingly, the Court GRANTS IN PART and DENIES IN PART the motion to dismiss as stated above.

### 4. Competition and Pricing Allegations

The Amended Complaint raises two more allegations of fraud which are unrelated to the ERP rollout. Plaintiffs allege Defendants fraudulently described the frozen potato market as competitive when Lamb Weston and other frozen potato firms did not compete on price. Dkt. 62, at ¶ 258. These are referred to as Defendants' "competition statements." Plaintiffs further allege Defendants fraudulently characterized their pricing actions as inflation-driven, when Lamb Weston increased prices in coordination with other frozen potato firms. These are referred to as Defendants' "pricing statements."*Id*. at ¶ 259.

---

proactively decided to halt product distribution." *Id*. at ¶ 137. About a month later, Defendants reported they had identified a product quality issue shortly after the end of Q4 and initiated a "voluntary withdrawal" of product from an unspecified customer. *Id*. at ¶ 139. Plaintiffs allege the facts surrounding the recall "closely mirror" the concerns of former employees and statements made by McDonalds South Korea. These allegations are not pleaded with sufficient particularity. There are no allegations connecting any former employee's opinion to the voluntary withdrawal specifically, and a product quality issue is not, on its face, necessarily related to the ERP's failures. *Cf. Id*. at ¶ 138 (alleging FE-1 believed Lamb Weston lost business from McDonalds due to order fulfillment issues, but not specifying whether she believed the product quality issue was either a euphemism or caused by the ERP issues). Without any allegations that the product quality issue description was euphemistic, how the ERP problems impacted product quality, or any allegations contradicting Madarieta's account that the issue was discovered after FE-1 had left the company, it is difficult to infer that the ERP problems were the cause for the loss of business at McDonalds South Korea. Indeed, the Amended Complaint does not even allege McDonalds South Korea is the corporation referenced in Lamb Weston's post-Q4 press release, limiting its allegation to pointing out that the post-Q4 report "closely mirrors" the McDonalds South Korea press release (which is true) and the concerns of unspecified employees (which is more dubious, as they expressed no concern that there would be a product quality issue). In sum, FE-1's belief regarding events after she left, plus FE-5's secondhand report from an unidentified former employee, plus the fact that Lamb Weston made a statement "closely mirroring" McDonalds South Korea's statement, do not add up to a particularized pleading. The Court, therefore, agrees with Defendants that allegations surrounding Lamb Weston's loss of McDonalds South Korea's business are insufficiently particularized, providing a secondary reason for dismissing allegations surrounding April 4 statements regarding whether Defendants expected to regain lost business.

Defendants argue Plaintiffs have failed to adequately plead falsity or loss causation as to the competition and pricing statements because: a) they merely parrot ongoing antitrust allegations, b) they fail to plead an antitrust conspiracy with particularity, and c) the market value of Lamb Weston stock did not drop once the antitrust allegations against the frozen potato industry were announced.

Defendants' first objection can be dealt with swiftly. Defendants identify multiple cases where courts have rejected pleadings of fact which cite complaints in other cases as sources of fact. *See, e.g.*, *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 811–12 (N.D. Cal. 2019) (allegations of wrongdoing are an insufficient basis for an attorney to allege the wrongdoing as a fact under Rule 11); *accord Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 n.4 (D. Colo. Mar. 14, 2018). But Plaintiffs' Amended Complaint does not, on its face, use allegations as a source for any factual pleading. *See* Dkt. 62, at ¶¶ 145–62. Plaintiffs cite public press releases, transcripts of statements, third party analysts' statements, and statistics compiled by the federal government. *See id.* Plaintiffs do not violate Rule 11 by relying on sources merely because those same sources were used to substantiate similar allegations in other cases, so Defendants' first objection is inapposite.

Defendants' second objection requires deeper investigation. Defendants argue the Amended Complaint fails to adequately allege falsity because the Amended Complaint fails to plead an underlying antitrust violation with particularity and yet relies on antitrust law for their theory of falsity. Plaintiffs argue courts have sustained complaints similar to the instant Amended Complaint, and they deny that securities plaintiffs are required to

plead the elements of underlying collusion with particularity so long as they plead there was collusion and defendants' statements were misleading in light of that collusion.

Plaintiffs cite *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 595 (N.D. Cal. 2019) in support of their argument that they need not plead an antitrust violation. There, the plaintiffs alleged that McKesson executives committed fraud by characterizing their market as competitive while McKesson and its competitors were involved in an anticompetitive conspiracy. 411 F.Supp. 3d at 594. The district court found Plaintiffs implausibly pleaded McKesson's involvement and dismissed falsity allegations premised thereon. *Id.* at 495. But the plaintiffs also pleaded that McKesson's competitors were involved in an anticompetitive conspiracy and that McKesson's executives knew about the conspiracy when they characterized their market as competitive. *Id.* at 598. The court found the *McKesson* plaintiffs' second theory adequately pleaded falsity because the complaint alleged "specific, direct evidence of *unlawful* agreements between those companies' executives." *Id.* (emphasis added).

*McKesson* thus found that pricing and competition statements can plead falsity without pleading the *defendant committed* an antitrust violation. But it did so because the *McKesson* complaint particularly pleaded *the defendant's competitors were involved in* an antitrust violation, and the defendant knew about it. Although the Amended Complaint includes particularly pleaded allegations of statements showing other frozen potato producers were hesitant to compete with Lamb Weston on price, that is a far cry from "specific, direct evidence of unlawful agreements between those companies' executives." *Id.* Critically, there are no allegations of an agreement of any kind between Lamb Weston's

competitors. Rather, the allegations amount to the competitors' independent belief that competing with the largest producer of frozen potatoes on price was not worth the business risk at various points in the last few years. The Court finds that *McKesson* is, therefore, distinguishable.

Of far more use is the Second Circuit's opinion in *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455 (2d Cir. 2019). There, securities fraud plaintiffs alleged that chicken farms colluded on prices, enabling them to immunize their prices from the business cycle. *Id.* at 459. The Southern District of New York dismissed the complaint because the allegations of collusion did not satisfy the PSLRA's particularity requirement. *Id.* at 461–62. Affirming the district court, the Second Circuit found the PSLRA and Rule 9(b) require plaintiffs who rest their falsity theory on anticompetitive conduct must plead the facts of an underlying antitrust violations with particularity. *Id.* at 465. The court reasoned that allowing plaintiffs to establish falsity on an antitrust violation while generally pleading the underlying facts of the violation would allow plaintiffs to circumvent the particularity requirement. *Gamm*, 944 F.3d at 465.

*Gamm*'s reliance on particularized pleading of underlying collusion fits the language of the Rule 9(b) and the PSLRA. Under Rule 9(b), "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." And under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b).

MEMORANDUM DECISION AND ORDER - 41

Both the Rules and PSLRA require the plaintiff to plead with particularity the facts which make the defendant's statements false or misleading. If the fact which makes a statement untrue is itself a conclusion derived from several facts, none of which by themselves render the statement untrue, it follows that the plaintiff must plead the several facts with particularity to plead the conclusion with particularity. Courts in the Eighth and Tenth Circuits accord with *Gamm*'s conclusion. *See Hogan*, 2018 WL 1316979, at *4–5,[13] *In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 985, 990 (W.D. Ark. 2017).

Plaintiffs cite other district court cases which have sustained complaints without pleading the elements of an antitrust violation. *See Pelletier v. Endo Int'l PLC*, 439 F. Supp. 3d 450, 466 (E.D. Pa. 2020); *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134 (D.N.J. Aug. 6, 2019). *Pelletier* is an out-of-circuit case whose relevant analysis is too cursory to be useful to the Court. *See* 439 F. Supp. 3d at 466. And *In re Allergan* involved both direct and indirect evidence of agreement, including market participants' antitrust violations. *See* 2019 WL 3562134 at *6–7. Thus, when securities fraud plaintiffs

---

[13] Plaintiffs point out that *Hogan* was reversed on appeal, and the complaint was eventually sustained on remand. But the order cited by Defendants ("*Hogan I*") has never been reversed, and the complaint that was ultimately sustained was not the same complaint *Hogan I* dismissed. *Hogan I* dismissed a first amended complaint (although it mistakenly referred to the first amended complaint as a second amended complaint throughout the order) on falsity grounds. 2018 WL 1316979, at *9. The *Hogan* plaintiffs then amended their complaint again, and defendants moved to dismiss the second amended complaint. The district court dismissed the second amended complaint as well, but did so based on the statute of repose and declined to take up the adequacy of the second amended complaint's falsity allegations. *Hogan v. Pilgrim's Pride Corp.* (*Hogan II*), 2021 WL 1534602, at *4–8 (D. Colo. Apr. 16, 2021). The plaintiffs appealed from both *Hogan I* and *Hogan II*, as well as their respective orders denying reconsideration. The Tenth Circuit reversed *Hogan II*'s application of the statute of repose, which mooted the appeal of *Hogan I*. *Hogan v. Pilgrim's Pride Corp.*, 73 F.4th 1150, 1153 (10th Cir. 2023). On remand, the district court applied the same pleading standard as it did in *Hogan I* but found the plaintiffs' amendments materially changed the analysis. *Hogan v. Pilgrim's Pride Corp.*, 2023 WL 8896324, *5 (D. Colo. Dec. 26, 2023). So, although it is true that the district court was reversed and the complaint sustained in *Hogan*, none of those developments call into question the standard applied in *Hogan I*.

allege a statement is false or misleading because of undisclosed collusion in the market, they must plead the circumstances of the collusion—at a minimum, the agreement and the acts taken pursuant to that agreement—with particularity to survive a motion to dismiss.

Here, Plaintiffs plead that Defendants' competition and pricing statements were false or misleading because Lamb Weston represented it was making pricing decisions based on competition and inflationary pressures when it was *actually* making pricing decisions based on collusive coordination with its "competitors." Dkt. 62, at ¶¶ 258–59. The PSLRA and Rule 9(b), therefore, require Plaintiffs to plead the circumstances of the collusion with particularity to state a claim. To the extent collusion on prices is a form of antitrust conspiracy (and to the extent that antitrust conspiracy law would be highly persuasive even if it were not necessarily controlling, *see In re Tyson*, 275 F. Supp. 3d at 990 n.9), the Court will look to antitrust conspiracy law to determine whether Plaintiffs have particularly pleaded the underlying facts of collusion.

Plaintiffs' allegations which might support a finding of collusion include: tandem price increases, Dkt. 62, at ¶ 153; the structure of the frozen potato market, *id.* at ¶ 162; statements from competitors, *id.* at ¶ 154, 158–59; a former employee's reflection on the consolidation of the frozen potato industry, *id.* at ¶ 157; publicly available data which show frozen potato prices outstripping component costs, *id.* at ¶¶ 155–56; and large increases in net income from sales between 2022 and 2024, *id.* at ¶ 161.

Plaintiffs fail to allege facts which raise a plausible inference of an agreement to collude. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–64 (2007). An agreement to restrain trade may be established by direct or circumstantial evidence. *Stanislaus Food*

*Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1088 (9th Cir. 2015). Parallel conduct

is circumstantial evidence of collusion, but even conscious parallel conduct is insufficient

to raise a plausible inference of agreement. *In re Musical Instruments & Equip. Antitrust*

*Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015).

Here, the Amended Complaint does not directly allege the facts of an agreement.

*Id.* at 1193 n.5. Statements from competitors and former employees regarding conscious

parallelism, *see* Dkt. 62, at ¶ 154, 157–59, cannot qualify as plus factors because plus

factors must be facts other than conscious parallelism. *In re Musical Instruments*, 798 F.3d

at 1193. The alleged fact that the structure of the frozen potato market rendered it

susceptible to anticompetitive pricing behavior speaks to the opportunity to act collusively

rather than an agreement to collude. Increases in prices alone do not function as a plus

factor, *id.* at 1197, and the simple fact that increases in prices exceeded increases in some

of the component costs of frozen potato production does not raise a reasonable inference

that it exceeded *all* the component costs of production, let alone did so because there was

collusion in the market. Accordingly, the Court finds the Amended Complaint raises no

reasonable inference of collusion in the frozen potato market, and GRANTS the Motion

with respect to allegations founded on collusion.[14] Because the Court dismisses such

allegations based on falsity, the Court has no occasion to address loss causation.

---

[14] To the extent the Amended Complaint can be construed as alleging the Defendants are liable because their statements regarding competition were misleading because their knowledge of parallelism in the market or market consolidation altered the total mix of information in a fashion which would mislead the reasonable investor even in the absence of price fixing, the Court dismisses such allegations under scienter, *infra*.

MEMORANDUM DECISION AND ORDER - 44

## B.    Scienter

Under the PSLRA, the Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). The state of mind required to violate § 10(b) and Rule 10b-5 is an "intent to deceive, manipulate, or defraud on the part of the defendant." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976). Scienter includes the intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors. *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d at 1053. "Deliberate recklessness is a higher standard than mere recklessness and requires more than a motive to commit fraud." *Glazer*, 63 F.4th at 765. "Recklessness therefore only satisfies the scienter requirement insofar as it reflects some degree of intentional or conscious misconduct." *Constr. Laborers Pension Tr.*, 166 F.4th at 830 (citation modified).

On a motion to dismiss, a securities fraud complaint must give rise to a "strong inference" of scienter. "The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs,* 551 U.S. at 310. Thus, "[a]ssessing whether a plaintiff meets the PSLRA's strong inference requirement is a 'dual inquiry': first, this court determines whether any of the allegations, alone, are sufficient to give rise to a strong inference of scienter; second, if no individual allegations are sufficient, this court conducts a "holistic" review to see if the allegations, when considered together, give rise to a strong inference of scienter." *Constr. Laborers Pension Tr.*, 166 F.4th at 830. "Merely reasonable inferences are insufficient . . . courts

must take into account plausible opposing inferences and determine that a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

No individual allegation gives rise to a strong inference of scienter. Individual allegations which establish scienter typically provide the factual basis to conclude the issuer had some motive to deceive. *See, e.g.*, *City of Marysville Gen. Emps. Ret. Sys. v. NightHawk Radiology Holdings, Inc.*, 2011 WL 4584778, at *22 (D. Idaho Sept. 12, 2011), *report and recommendation adopted*, 2011 WL 4574304 (D. Idaho Sept. 30, 2011) ("Scienter may be established by proving insider trading."). As Defendants point out, there is no allegation that Maderieta or Werner were intending to commit insider trading or otherwise directly benefit from the immediate market impact of these statements. Dkt. 66-1, at 41. Thus, the Court must turn to step two: whether a holistic review of the allegations gives rise to a strong inference of scienter as to each class of actionable statements.

### 1. Post-Go-Live Statements

Plaintiffs allege Defendants actually knew—or were deliberately reckless to the possibility that—the ill effects of ERP implementation would continue past January 4, 2023. To support that inference, Plaintiffs plead a long, detailed series of warnings which Defendants allegedly discounted or ignored.

In the lead up to Go-Live, Defendants knew there were severe risks to rolling out the ERP system. Madarieta, as ERP "project sponsor," attended "Global Process Owners" meetings to discuss the ERP rollout with senior Lamb Weston officers. Dkt. 62, at ¶¶ 67–68. FE-1 raised concerns regarding the planned amounts of testing and training every

**MEMORANDUM DECISION AND ORDER - 46**

month from March 2023 to July 2023.*Id*. at ¶¶ 70–71. Madarieta personally refused to approve additional training resources to enable Lamb Weston staff to learn how to use the ERP prior to rollout.  *Id*. at ¶ 72. Lamb Weston failed to test a large majority of critical scenarios, including orders to ship multiple containers, which were allegedly common.  *Id*. at ¶ 75. Beginning in September 2023, and continuing in the weeks prior to Go-Live, ERP consultant Ernst & Young reported that 40% of the EDI transactions were failing. *Id*. at ¶ 76.

When the ERP went live, no one at Lamb Weston "had reports on how much product was being shipped to customers, the value of their inventory, how much inventory they had, or the location of the Company's inventory," Dkt. 62, at ¶ 78, and EDI failures continued to plague the system, *id*. at ¶ 80. The ERP's problems required daily, manual reconciliation to overcome the very limited inventory visibility provided by the ERP, and the resulting data was used with very low confidence in its accuracy. *Id*. at ¶ 82.

Lamb Weston's C-suite began to meet once or twice a day to hold "tracker" meetings, where attendees learned how many orders and how many pounds of product would be shipped each day. Dkt. 62, at ¶ 81. In December 2023, Lamb Weston was only shipping 20%–30% of its normal volume; by the end of December 2023 (i.e., immediately before Werner and Madarieta assured investors the ERP rollout-related "usual bumps" were behind them), Lamb Weston was shipping just over half of outstanding orders. *Id.* The meetings occurred several times a week in January and February 2024, *id.*, and Madarieta was present for every meeting. *Id.*

**MEMORANDUM DECISION AND ORDER - 47**

The Amended Complaint pleads that Madarieta was intimately familiar with the ERP's problems before and after Go-Live. Aside from attending numerous Global Process Owner meetings, Steering Committee Meetings, and eventually tracker meetings, the Amended Complaint alleges Madarieta was personally involved in efforts to downplay the ERP's flaws. FE-3 stated that Madarieta at times rewrote FE-3's presentations to the Board to "downplay internal problems with the ERP, especially when those problems were attributable to people Madarieta managed." Dkt. 62, at ¶ 96. Prior to Go-Live, for instance, when problems with the ERP master data caused the ERP to improperly price products, Madarieta reworked FE-3's presentation to cast blame on third parties and minimize the fallout on one of her direct reports. *Id.*

The Amended Complaint alleges the ERP's deficiencies were reported to Werner as well. Werner was briefed multiple times on the ERP's technical deficiencies and stated he would deal with them himself, per FE-2. Dkt. 62, at ¶ 87. Madarieta, along with COO Mike Smith, reported directly to Werner regarding ERP implementation. *Id.* at ¶ 86. FE-3 stated that Madarieta frequently presented on the status of the ERP to Werner. *Id.* at ¶ 92.

All in all, the Amended Complaint pleads with particularity that Defendants were intimately familiar with the ERP's deficiencies both before and after Go-Live. Taking the Amended Complaint's allegations regarding falsity as true, Plaintiffs' allegations raise a powerful inference that Defendants knew or were deliberately reckless to the possibility that their statements would lead investors to believe the ERP was fully functional as of January 4, 2024 (and then as of April 4, 2024) when they knew it was not fully functional.

MEMORANDUM DECISION AND ORDER - 48

To determine whether Plaintiffs' inference of scienter is *strong*, the Court must consider possible non-fraudulent alternatives. Plaintiffs suggest that, for post-Go-Live statements, the best non-fraudulent inference is that the chaos following Go-Live created a rapidly evolving situation, and Defendants should not be held liable for simply failing to predict the ultimate outcome of the situation correctly. Dkt. 66-1, at 46–47. Defendants argue their inference is stronger than Plaintiffs' because—if Defendants were misrepresenting the scope of ERP-related damage—the truth would soon emerge, and Defendants lacked an economic incentive to lie in the meantime. *Id* at 47. Defendants bolster their argument by pointing out the Amended Complaint does not allege Werner or Madarieta personally benefited from the alleged fraud, and point out that Lamb Weston conducted stock buy-backs during the period in which its stocks were overvalued. Dkt. 66-1, at 41–42, 46–47.

Defendants overstate the importance of pecuniary motive in securities fraud law. The Ninth Circuit's decision in *Construction Laborers Pension Trust*, issued in February 2026, reversed a district court on scienter without finding there was any insider trading or other fiscal motive. 166 F.4th at 829–34. *Construction Laborers Pension Trust* notes Ninth Circuit caselaw which states that deliberate recklessness "is a higher standard than mere recklessness and requires more than a motive to commit fraud." 166 F.4th at 829. That is true: a mere motive to deceive is not enough to show *that a person knew what he or she was saying was false*. But if the Amended Complaint particularly alleges that a speaker had knowledge of material facts which render a statement likely to mislead investors, and the speaker gave the statement anyway, the Amended Complaint alleges scienter with or

without surrounding allegations of motive. Thus, pecuniary motive is a highly persuasive indicator of an intent to deceive or defraud, in the cases where it is present. But pecuniary motive is not an element of securities fraud scienter. Moreover, Plaintiffs' inference of scienter does not need to be irrefutable to be strong. *Tellabs*, 551 U.S. at 310. At the pleadings stage, an inference is strong if it is cogent, compelling, and at least as plausible as the innocent inferences.

The Court finds Plaintiffs' inference of scienter is at least as compelling as Defendants' nonfraudulent inference. Madarieta herself allegedly sought to downplay the ERP's risks prior to Go-Live, including by manipulating reports within Lamb Weston. *See* Dkt. 62, at ¶ 96. The Ninth Circuit has found efforts to disguise or suppress unfriendly information probative of scienter. *See Glazer*, 63 F.4th at 772. There, defendants were accused of miscategorizing transactions as "committed" to make the company look healthier. *Id.* at 756–57. The Ninth Circuit found scienter based on allegations the defendants attempted to coerce employees into miscategorizing transactions. *Id.* at 772–73. Although Plaintiffs do not allege any instances of Madarieta disguising or suppressing information after Go-Live, her pre-Go-Live efforts support inferences that a) she was aware of problems with the ERP at all times relevant, and b) she was willing to play loose with facts to keep blame from falling on her or the ERP. The Amended Complaint also alleges Madarieta was deeply involved in "tracker meetings," which existed solely for the purpose of manually communicating information which the ERP was intended to automatically report. Thus, the inference that Madarieta knew (or disregarded to a degree far beneath any reasonable standard of care) that reasonable investors might incorrectly infer from her

statements that the ERP was fully functional as of the date she spoke is at least as strong as the inference that she spoke in the confusion of a rapidly-evolving situation.

The Amended Complaint alleges that Werner, for his part, was aware of the flaws in the ERP prior to Go-Live as well. Although there are no particularized allegations of his knowledge after Go-Live, there are particularized pleadings that he and Madarieta communicated regarding the ERP rollout. And a decline in order fulfillment from the high 90% range to barely 50% based on flaws in a $100 million highly-touted software overhaul is a fact of such prominence that it would be absurd, in light of the pleadings that are particularized, to conclude Werner was unaware of the status of the ERP system.

It is not fraud to mismanage a company, or to take bold risks. But once the harms from those risks become apparent, officers must speak candidly to investors. Attempts to shield the officer or the company from scrutiny by misstating the extent or duration of harms are made with at least deliberate recklessness to the possibility of continued severe harm. Because the Court finds the Amended Complaint, taken holistically, raises a strong inference of deliberate recklessness as to post-Go-Live statements, the Motion must be DENIED IN PART.

*2. Competition Allegations*

Although there are sufficient allegations to support the conclusion that Madarieta and Werner knew the ERP was not functional and would continue to impact the company for months to come, there are not sufficient allegations to support the conclusion that Werner and Madarieta knew the market for frozen potatoes was not competitive. Although Werner and Madarieta knew details regarding Lamb Weston's pricing strategies, there are

no particularized allegations that they knew other corporations were unwilling to compete with them on price. The competing, nonfraudulent inference—that competition did present significant risks to Lamb Weston if a competitor decided to undercut them, and thus Lamb Weston was required to account for the risks of being undercut in plotting corporate strategy—is far stronger than the inference that Werner and Madarieta divined from general facts regarding market consolidation and roughly contemporaneous price increases that there was no risk of competition-based risk. The same is true for general allegations that Defendants misled investors by omitting information regarding the competitive landscape in the frozen potato market: the inference that they felt the pressure of theoretical competition is far stronger than the inference that they tried to mislead the market, especially as to public or otherwise accessible information. Accordingly, the Motion is GRANTED IN PART on scienter grounds as to the pricing and competition statements.

### C.    Motion to Transfer

The Parties agreed at oral argument that the motion to transfer would be mooted by an order dismissing allegations based on the pricing and competition statements. Because the Court does so today, the Motion to Transfer is DENIED AS MOOT.

### V. CONCLUSION

Motions to dismiss are especially difficult in the securities fraud context, and the Court commends the parties on their able briefing and argument. Because some of Plaintiffs' claims are inactionable as puffery, opinions, or subject to statutory safe harbors, the Court GRANTS in PART the Motion to Dismiss. But because many of Plaintiffs' claims are adequately pleaded, the Motion must be DENIED in PART.

## VI. ORDER

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendants' Motion to Dismiss (Dkt. 66) is GRANTED IN PART and DENIED in PART as outlined above. The Motion is DENIED with respect to Madarieta's January 4 statements, the January 4 risk disclosures, and all of Defendants' April 4 statements except those predicting Lamb Weston would not lose customers. In all other respects, the Motion is GRANTED.

2. Defendants' Motion to Transfer (Dkt. 67) is DENIED AS MOOT.

3. Plaintiffs' Motion for Leave to File Sur-Reply (Dkt. 84) is GRANTED.

4. Plaintiffs are GRANTED leave to amend. Any amended complaint must be filed within 30 days of the entry of this Order.

DATED: May 12, 2026

David C. Nye
U.S. District Court Judge